FILED IN DISTRICT COURT
OKLAHOMA COUNTY

SEP 1 0 2025

RICK WARREN
COURT CLERK
88.

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA *ex rel.* )
OFFICE OF MANAGEMENT AND )
ENTERPRISE SERVICES, )
     )
       *Plaintiff,* )
     )
v. )
     )
KLEO, INC. d/b/a CLASSWALLET, )
     )
       *Defendant.* )

Case No. CJ-2024-619

## PLAINTIFF'S MOTION TO DISQUALIFY ATTORNEY GENERAL AND REQUEST FOR EVIDENTARY HEARING

Plaintiff, State of Oklahoma *ex rel.* Office of Management and Enterprise Services, respectfully moves for an evidentiary hearing and an order disqualifying the Attorney General and his office. Pursuant to Oklahoma Rules of Professional Conduct ("ORPC") 1.9 and 1.10, the Attorney General and the Office of the Attorney General have an incurable conflict of interest, which prohibit their appearance. Absent entry of an order disqualifying the Attorney General and his office, there will not only be real harm to Plaintiff, but there will be real harm to the integrity of the judicial process.

## RELEVANT FACTS AND BACKGROUND

1. On August 5, 2022, the Office of the Attorney General filed a lawsuit in Oklahoma County District Court against KLEO, Inc. d/b/a ClassWallet on behalf of the State of Oklahoma *ex rel.* Office of Management and Enterprise Services (OMES) and State of Oklahoma *ex rel.* Office of

1

Educational Quality and Accountability (OEQA) due to monetary damages suffered by OMES because of ClassWallet's failure to comply with contractual, and legal, requirements. *See State of Oklahoma ex rel. Office of Management and Enterprise Services and State of Oklahoma ex rel. Office of Educational Quality and Accountability v. KLEO, Inc. d/b/a ClassWallet*, Case No. CJ-2022-3757, Oklahoma County District Court, State of Oklahoma.

2. Attorney General Drummond took office on January 9, 2023.

3. Two weeks later, Attorney General Drummond issued a press release describing the ClassWallet lawsuit as "almost wholly without merit."[1]

4. That same day, Attorney General Drummond dismissed the lawsuit filed against KLEO, Inc. d/b/a ClassWallet, without the consent of OMES. **Ex. A.**

5. On January 12, 2024, the Governor formally requested that the Attorney General refile the lawsuit on behalf of OMES in the manner styled *Office of Management and Enterprise Services and Office of Educational Quality and Accountability v. Kleo, Inc., d/b/a ClassWallet. See* **Ex. B**, which explicitly sets forth the need for and validity of the lawsuit.

---

[1] *See* OKLA. ATT'Y GEN., *Drummond dismisses ClassWallet lawsuit, vows accountability for responsible parties* (Jan. 31, 2023), https://oklahoma.gov/oag/news/newsroom/2023/january/drummond-dismisses-classwallet-lawsuit--vows-accountability-for-
.html#:~:text=Drummond%20dismisses%20ClassWallet%20lawsuit%2C%20vows%20accountability%20for%
20responsible%20parties,-
PRINT&text=OKLAHOMA%20CITY%20(Jan.,in%20federal%20COVID%20relief%20dollars.

6. In response, the Attorney General declined to refile the case, stating in part that "[o]ther records suggest questionable motivations for filing the suit." **Ex. C** at 1.

7. In that same letter, the Attorney General stated he would not "initiate a case that is frivolous and an assured drain of taxpayer resources." **Ex. C** at 5.

8. He further stated, "I'll be clear: to the extent you unilaterally pursue legal action on these matters, this office will fully exercise its authority, including taking control of and asserting complete dominion over the case." **Ex. C** at 5.

9. In reply, the Governor expressed concern that the Attorney General would "use information gained through representation to the detriment of its former client" and "enter an appearance in the refiled lawsuit and take action against the client on whose behalf the office would appear." **Ex. D** at 1.

10. Due to the conflict of interest, the Governor informed the Attorney General that the "Governor deems it necessary to employ independent counsel to protect the rights and interest of the State, as authorized by state law." **Ex. D** at 2.

11. On January 29, 2024, the Governor appointed Plaxico Law as special counsel pursuant to his independent right to do so. *See* 74 O.S. § 6. **Ex. E.**

12. Plaxico Law refiled this lawsuit the next day, on behalf of OMES, to protect taxpayer dollars, the interests of OMES and the State of Oklahoma. **Ex. F.**

13. On February 6, 2024, the Attorney General's office made broad claims about the Oklahoma Rules of Professional Conduct. **Ex. G.**

14. On February 9, 2024, the Attorney General sent a letter to Plaxico Law purporting to terminate its representation of OMES, without the consent of OMES or the Governor. **Ex. H.**

15. In the same letter, the Attorney General made threats against Plaxico Law because of their representation of OMES, stating, "my office is evaluating the implications of your impermissible representation. At the appropriate time, you will be notified of the actions my office deems necessary to take." **Ex. H.**

16. Shortly thereafter, consistent with the Governor's concerns in his January 30, 2024 letter, the Attorney General entered an appearance "as counsel in this case for the State of Oklahoma *ex rel.* Office of Management and Enterprise Services" without the consent of OMES. **Ex. I.**

17. Simultaneously, the Attorney General filed a motion to dismiss the refiled lawsuit with prejudice on behalf of OMES, again without consent from OMES, the Governor, or Plaxico Law. **Ex. J.**

18. On August 12, 2024, the trial court stayed the proceedings, citing the pending resolution of a certified question before the Oklahoma Supreme

Court in *Cherokee Nation v. United States Department of the Interior*, No. CQ-122108 (Okla. 2024). **Ex. K.**

19. On January 22, 2025, the Oklahoma Supreme Court held in *Cherokee Nation v. United States Dep't of the Interior*, 2025 OK 4, ¶ 37, that the Governor has independent authority under 74 O.S. § 6 to appoint special counsel. **Ex. L.**

20. The Oklahoma Supreme Court also stated, "our conclusion today does not nullify the Attorney General's authority to appear *ex officio* in the *present case.*" **Ex. L** at ¶ 54 (emphasis added).

21. Following that ruling, the Attorney General entered a modified Entry of Appearance "*ex officio* on behalf of the State of Oklahoma" in this case. **Ex. M.**

22. In that same filing, the Attorney General threatened to depose the Governor and other members of the executive branch if Plaintiff continues protecting its rights. **Ex. M.**

23. On September 3, 2025, the Governor delivered to the Attorney General a letter summarizing the Attorney General's many violations of the Oklahoma Rules of Professional Conduct over a period of more than a year, including in this litigation, and demanding that the Attorney General take remedial actions, beginning with withdrawing from this and other litigation in which the Attorney General has a conflict of interest and yet persists in being involved in the case. **Ex. N.**

5

24. On September 9, 2025, the Attorney General responded by reiterating his stance in other cases, namely that the rules of ethics do not apply to him, that the State of Oklahoma is the real party in interest, and that he would not withdraw from any litigation, including this case. **Ex. O.**

## ARGUMENT AND AUTHORITY

### I.    Standard for Granting Motion to Disqualify

The Oklahoma Supreme Court has recognized that where an attorney has previously represented a client "there is always a possibility, however remote, that confidential information received from the original client may be used to his detriment." *Ne. Okla. Cmty. Dev. Corp. v. Adams*, 1973 OK 58, ¶ 16, 510 P.2d 939, 942. While disqualification is a not a routine measure, "it is used when necessary to preserve the integrity of the judicial process." *Miami Bus. Servs., LLC v. Davis*, 2013 OK 20, ¶ 12, 299 P.3d 477, 484. The operative question in deciding whether to grant a motion to disqualify "is whether real harm to the integrity of the judicial process is likely to result if counsel is not disqualified." *Bd. of Cnty. Comm'rs of Harmon Cnty. v. Ass'n of Cnty. Comm'rs of Okla. Self-Insured Grp.*, 2021 OK 15, ¶ 9, 485 P.3d 234, 237. The burden of proof rests with the movant to "establish the likelihood of harm by a preponderance of the evidence." *Bd. of Cnty. Comm'rs of Harmon Cnty. v. Ass'n of Cnty. Comm'rs of Okla. Self-Insured Grp.*, 2021 OK 15, ¶ 9, 485 P.3d 234, 237.

Courts must hold an evidentiary hearing before ruling on a motion to disqualify. *Id.* at ¶ 13. Although courts must include factual findings of the

6

attorney's knowledge of confidential information, "[a] former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter." *Id.* at ¶¶ 13, 19.

## II.    The Attorney General's Conduct Has and Is Causing Harm to OMES and Has Compromised the Judicial Process

The Attorney General's actions throughout this litigation reveal a clear objective: to sabotage and undermine his former client—OMES. That motive is evidenced by the record. **Exs. C, H, I, J**. The continued involvement of the Attorney General poses an ongoing threat of harm—harm that has already occurred and is likely to continue—unless the Attorney General and his Office are disqualified.

Upon taking office, Attorney General Drummond publicly discredited his client's legal position in this lawsuit by labeling the lawsuit "almost wholly without merit."[2] Simultaneously, Attorney General Drummond dismissed the original case without the consent of OMES.[3] *See* **Ex. A**. As the statute of limitations for the underlying claims approached, the Governor invoked his

---

[2] *See* OKLA. ATT'Y GEN., *Drummond dismisses ClassWallet lawsuit, vows accountability for responsible parties* (Jan. 31, 2023), https://oklahoma.gov/oag/news/newsroom/2023/january/drummond-dismisses-classwallet-lawsuit--vows-accountability-for-.html#:~:text=Drummond%20dismisses%20ClassWallet%20lawsuit%2C%20vows%20accountability%20for%20responsible%20parties,-PRINT&text=OKLAHOMA%20CITY%20(Jan.,in%20federal%20COVID%20relief%20dollars.

[3] At the time of the initial filing, former Attorney General O'Conner and the office of the Attorney General represented OMES. After Attorney General Drummond assumed office, the Office of the Attorney General continued to represent OMES.

authority under 74 O.S. § 18b(A)(3)[4] to direct the Attorney General to appear in this case to protect OMES' interest. Attorney General Drummond refused, stating, "*[o]ther records suggest* questionable motivations for filing the suit" and asserting that he would not pursue a lawsuit he deemed "frivolous and an assured drain of taxpayer resources." **Ex. C**. (emphasis added). Attorney General Drummond went further and clarified his intent in this case, "I'll be clear: to the extent you unilaterally pursue legal action on these matters, *this office* will fully exercise its authority, including taking control of and asserting complete dominion over the case." **Ex. C** (emphasis added).

The Governor then relayed his concerns to Attorney General Drummond that Drummond would "use information gained through representation to the detriment of its former client" and "enter an appearance in the refiled lawsuit and take action against the client on whose behalf the office would appear." **Ex. D** at 1. Because of the clear conflict of interest between the Office of the Attorney General and OMES, the Governor—acting on OMES' request—appointed Plaxico Law as special counsel to safeguard OMES' legal interests. **Ex. E**. After Plaxico Law refiled this case with consent, Attorney General Drummond, displeased that OMES moved forward, purported to fire Plaxico Law—again without OMES' knowledge or consent. *See* **Exs. H, I**.

Subsequently, Attorney General Drummond entered his appearance on behalf of OMES without its consent. **Ex. I**. In his entry of appearance, Attorney

---

[4] 74 O.S. § 18b(A)(3) outlines that one of the duties of the Attorney General shall be "to appear [in an action] at the request of the Governor."

General Drummond publicly attacked OMES' legal position, calling the lawsuit "wholly without merit," "meritless," and "frivolous." **Ex. I**. He simultaneously attempted to dismiss the re-filed case *with prejudice*. **Ex. J**. Again, this action was taken without the consent or approval of OMES, his supposed client. In that filing, the Attorney General, who at that time purportedly represented OMES, again stated that OMES' "claims are wholly without merit." **Ex. J**.

The record is clear: at every stage, Attorney General Drumond has taken affirmative steps to undermine the legal interests of OMES—his client and then former client. His conduct has not only resulted in material harm to OMES in this litigation, but also threatens the integrity of the judicial process itself. *N.E. Okla. Cnty. Dev. Corp. v. Adams*, 1973 OK 58, ¶ 20, 510 P.2d 939, 942 ("The court has the duty over and above that of counsel to see that the integrity and good name of the bar and administration of justice are upheld.") After all, "the proper test for granting a motion to disqualify counsel is whether real harm to the integrity of the judicial process is likely to result if counsel is not disqualified." *Bd. of County Comm'rs v. Ass'n of Cty. Comm'rs of Okla. Self-Insured Grp. (ACCO-SIG)*, 2021 OK 15, ¶ 13, 485 P.3d 234, 238. Here, "real harm to the integrity of the judicial process" is not only likely, but has already occurred, evidenced by OMES' inability to serve the Defendant in this matter for nineteen (19) months due to the Attorney General's interference with the litigation.

Further, if the Attorney General continues to participate in this case, there is a possibility—indeed a likelihood—that he reveals information relating to the

representation of his former client in violation of Rule 1.6. 5 O.S. Ch. 1, App. 3-A. R. 1.6. Disqualification is not merely warranted; it is necessary to preserve the rule of law and prevent further abuse of the attorney-client relationship.

### III.    Violation of the Oklahoma Rules of Professional Conduct

#### A. The Attorney General's Conflict of Interest Violates Rule 1.9 of the Oklahoma Rules of Professional Conduct

The Oklahoma Rules of Professional Conduct and case law are clear, when a lawyer has formerly represented a client in a case, that lawyer cannot represent other clients with materially adverse interests to the former client, unless the former client gives informed consent in writing. *See* 5 O.S. Ch. 1, App. 3-A. R. 1.11[5]; *Bd. of Cnty. Comm'rs of Harmon Cnty. v. Ass'n of Cnty. Comm'rs of Okla. Self-Insured Grp.*, 2021 OK 15, ¶ 17, 485 P.3d 234, 239-40. If the former client does not give informed consent to the subsequent representation, then the lawyer should be disqualified from representing subsequent clients in the same matter. *N.E. Okla. Cnty. Dev. Corp. v. Adams*, 1973 OK 58, ¶ 16, 510 P.2d 939, 942. As OMES has never given, or even been asked for, informed consent, Drummond must be disqualified.

Here, there is no dispute the Office of the Attorney General—including Attorney General Drummond—has represented OMES in this matter. There is also no dispute that by virtue of that representation, the Office of the Attorney

---

[5] Rule 1.9 Conflict of Interest: Duties to Former Clients
(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

General, if not Attorney General Drummond himself, gained confidential information that could be weaponized against OMES. The Office of the Attorney General appeared and filed the original petition on OMES' behalf in 2022.[6] This representation, at a minimum, must have included a discussion with OMES personnel as to the substance of OMES' claims. Prior to that filing, the Office of the Attorney General undoubtedly obtained access to confidential and proprietary information and participated in privileged strategic meetings with OMES.[7] "[K]nowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." *Bd. of Cnty. Comm'rs of Harmon Cnty.,* 2021 OK 15 at ¶ 18. Accordingly, both the current Attorney General and his office possess confidential information related to the case, prohibiting representation of opposing parties.

If that were not enough, Attorney General Drummond personally entered the case and filed a dismissal of the original petition. **Ex. A.** After Plaxico Law refiled the lawsuit with OMES' consent, Attorney General Drummond entered an appearance "as counsel in this case for the State of Oklahoma *ex rel.* Office of Management and Enterprise Services" again without obtaining OMES' consent. **Ex. I**. At the same time, the Attorney General attempted to dismiss the refiled

---

[6] *See* State of Oklahoma ex rel. Office of Management and Enterprise Services and State of Oklahoma ex rel. Office of Educational Quality and Accountability v. KLEO, Inc. d/b/a ClassWallet, Case No. CJ-2022-3757, Oklahoma County District Court, State of Oklahoma.

[7] "A conclusion about the possession of such [confidential] information may be based on the nature of the services the lawyer provided the former client and information that would, in ordinary practice, be learned by a lawyer providing such services." Bd. of Cnty. *Comm'rs* of Harmon Cnty. v. Ass'n of Cnty. *Comm'rs* of Okla. Self-Insured Grp., 2021 OK 15, ¶ 19, 485 P.3d 234, 240–41.

lawsuit with prejudice—purporting to act on behalf of OMES, and again without the approval of OMES, the Governor, or Plaxico Law. **Ex. J**. It is beyond dispute that, throughout this litigation, the Attorney General and his office have repeatedly acted as counsel for OMES, who now stands as their former client. Neither the Attorney General, nor anyone in his office, has obtained OMES' informed consent to represent any other client in this matter.

The fact the Attorney General has represented OMES in **this** case and now seeks to take action adverse to OMES **in the same case** is sufficient for disqualification. "A lawyer who has formerly represented a client in a matter **shall** not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client[.]" 5 O.S. Ch. 1, App. 3-A. R. 1.11. As such, attorneys cannot represent adverse parties in the same litigation after obtaining confidential or material information because it results in "real harm to the integrity of the judicial process[.]" *Bd. of Cnty. Comm'rs v. Ass'n of Cty. Comm'rs of Okla. Self-Insured Grp. (ACCO-SIG)*, 2021 OK 15 at ¶ 13.

The Attorney General may advance two arguments to combat this clear conflict—neither hold water. First, the Attorney General may argue that his office is not bound by Rule 1.9. That assertion is wrong. Rule 1.11(d) explicitly states, "[e]xcept as law may otherwise expressly permit, a lawyer currently serving as a

public officer or employee: (1) is subject to Rules 1.7 and 1.9 . . . ."[8] There is no doubt that Attorney General Drummond is a lawyer who is currently serving as a public officer. Likewise, his office is composed of lawyers who are public employees. Therefore, both the Attorney General and his office are bound by Rule 1.9.

Second, the Attorney General may attempt to argue—as he did in the *Cherokee Nation* case—that the State of Oklahoma was the real party in interest, and therefore the State was his client, not OMES. However, as discussed, the Office of the Attorney General entered an appearance on behalf of **OMES**. The Office of the Attorney General filed the first lawsuit on behalf of **OMES**. Now, the Attorney General enters an appearance *ex officio* flaunting his excitement to depose the Governor and those in his administration if OMES serves the summons and petition upon ClassWallet. This Court cannot permit the Attorney General to take actions which not only harm prior clients but also diminish the judiciary's integrity. *See Ark. Valley State Bank v. Phillips*, 2007 OK 58, ¶ 13, 171 P.3d 899, 905 ("It is this Court's nondelegable, constitutional responsibility to regulate both

---

[8] Rule 1.11. Special Conflicts of Interest for Former and Current Government Officers and Employees
(d) Except as law may otherwise expressly permit, a lawyer currently serving as a public officer or employee:
(1) is subject to Rules 1.7 and 1.9; and
(2) shall not:
(i) participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment, unless the appropriate government agency gives its informed consent, confirmed in writing; or
(ii) negotiate for private employment with any person who is involved as a party or as lawyer for a party in a matter in which the lawyer is participating personally and substantially, except that a lawyer serving as a law clerk to a judge, other adjudicative officer or arbitrator may negotiate for private employment as permitted by Rule 1.12 (b) and subject to the conditions stated in Rule 1.12 (b).

the practice and the ethics, licensure, and discipline of the practitioners of the law, and in doing so, to preserve public confidence in the bar and the judicial process.").

Moreover, "[a]lthough the State of Oklahoma is ultimately the real party in interest," it is the government official named "in his official capacity" that "is answerable on behalf of the State in the underlying matter," and therefore "possesses statutory and constitutional authority to represent the interests of the State of Oklahoma in that proceeding." *Cherokee Nation v. U.S. Dep't of Interior*, 2025 OK 4, ¶ 48, 564 P.3d 58; *see also State of Okla. ex rel. Phillips v. Am. Book Co.*, 144 F.2d 585, 587–88 (10th Cir. 1944) ("A state can only act through an agent duly authorized and, of necessity, there must be **some person before the court** throughout the proceeding to represent the state and to control and direct the proceeding on behalf of the state.") (emphasis added). Here, the "person" before the Court was and is the plaintiff, OMES, which was represented by the Attorney General, and that former representation requires the Attorney General's disqualification.

### B. The Attorney General's Failure to Communicate with His Client Violated Rule 1.2 of Oklahoma Rules of Professional Conduct

Under Rule 1.2 of the Oklahoma Rules of Professional Conduct, "a lawyer shall abide by a **client's** decisions concerning the objectives of representation and as required by Rule 1.4, shall consult with the **client** as to the means by which they are to be pursued." Indeed, "[t]he ORPC imposes a mandatory duty upon

14

attorneys to act promptly and diligently on matters and to communicate with clients." *State ex rel. Okla. Bar Ass'n v. Vincent*, 2002 OK 40, ¶ 8, 48 P.3d 797, 800 (citing *State ex rel. Okla. Bar Ass'n v. Johnston*, 1993 OK 91, 863 P.2d 1136, 1145).

The Rules do not permit a lawyer to follow his own objectives. "[A] lawyer shall abide by a **client's** decisions concerning the objectives of representation and as required by Rule 1.4, shall consult with the **client** as to the means by which they are to be pursued." 5 O.S. Ch. 1, App. 3-A. R. 1.2 (emphasis added). However, the Attorney General has and continues to actively undermine OMES' claims, oftentimes without communicating with OMES. The Attorney General did not consult OMES when dismissing the first lawsuit—that was the Attorney General's decision. The Attorney General did not consult OMES when attempting to terminate Plaxico Law—that was the Attorney General's decision. And, most alarming, the Attorney General did not consult OMES when attempting to dismiss this case **with prejudice**—that, again, was the Attorney General's decision. Attorneys must be "loyal and committed to [their] **client's** lawful objectives" and must "act promptly and diligently on matters and . . . communicate with [their] client[]." *See*, Section 2.1 of the Oklahoma Bar Association's Standards of Professionalism; 5 O.S. Ch. 1, App. 3-A. R. 1.2. At every turn, the Attorney General acted against his client's wishes, and, in fact, sought to thwart OMES' opportunity to recover damages.

IV.    **The Ability to Appear "Ex Officio" Does Not Exempt the Attorney General and His Office from the Rules of Professional Conduct.**

The Oklahoma Supreme Court resoundingly and unanimously rejected the Attorney General's contention that he may "take and assume control" of all litigation involving the State or state officials. Indeed, the Court's language is unambiguous: "the Attorney General's statutory authority to take and assume control of the State's defense is **subordinate** to the Governor's constitutionally-granted Supreme Executive power, and statutorily-granted authority[.]" *Cherokee Nation v. United States Dep't of the Interior*, 2025 OK 4, ¶ 37, 564 P.3d 58, 71 (emphasis added).

Although the Court briefly acknowledged that the Attorney General may appear in the *Cherokee Nation* litigation "ex officio," no fair reading of that statement, in context of the broader holding, would license the Attorney General to appear in other cases where he has a clear conflict of interest. To hold otherwise would mean that the Attorney General and his office are not subject to the rules of professional conduct. As stated *supra*, the Attorney General and his office are undoubtedly bound by those rules. Even if *Cherokee Nation* recognized a general *ex officio* appearance power, it must still operate within the bounds of the rules of professional conduct and Oklahoma law governing attorney disqualification.

## CONCLUSION

For the foregoing reasons, the State of Oklahoma ex rel. Office of Management and Enterprise Services—the Attorney General's former client respectfully requests that this Court grant Plaintiff's Motion to Disqualify the Attorney General and the Office of the Attorney General and take any further action necessary to ensure a fair proceeding.

Respectfully Submitted,

Cheryl Plaxico, OBA No. 4499
Austin Moseley, OBA No. 35690
PLAXICO LAW FIRM PLLC
923 N. Robinson Ave., 5th Floor
Oklahoma City, Oklahoma 73102
Telephone: (405) 400-9609
cplaxico@plaxico.law
amoseley@plaxico.law

and

Benjamin Lepak, OBA No. 30886
*General Counsel*
OFFICE OF GOVERNOR J. KEVIN STITT
2300 N. Lincoln Blvd., Ste. 212
Oklahoma City, OK 73105
(405) 521-2345
Benjamin.Lepak@gov.ok.gov

Remington D. Dean, OBA No. 35581
*Deputy General Counsel*
OFFICE OF GOVERNOR J. KEVIN STITT
2300 N. Lincoln Blvd., Ste. 212
Oklahoma City, OK 73105
(405) 522-8853
Remington.Dean@gov.ok.gov

*Attorneys for Plaintiff*

17

## CERTIFICATE OF MAILING

I hereby certify that on this ___10th___ day of September 2025, a true and correct copy of the foregoing was mailed by regular U.S. mail to the following:

Gentner F. Drummond, Attorney General
Garry M. Gaskins, Solicitor General
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Cheryl Plaxico





**EXHIBIT**

**A**

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA *ex rel.* OFFICE OF )
MANAGEMENT AND ENTERPRISE SERVICES )
And STATE OF OKLAHOMA *ex rel.* OFFICE )
OF EDUCATIONAL QUALITY AND )
ACCOUNTABILITY, )
                                           )
                        Plaintiffs,        )
                                           )
v.                                         )
                                           )
KLEO, INC. d/b/a CLASSWALLET,              )
                                           )
                        Defendant.         )

**FILED IN DISTRICT COURT**
**OKLAHOMA COUNTY**

JAN **3 1** 2023

RICK WARREN
COURT CLERK

112

Case No. CJ-2022-3757

## DISMISSAL WITHOUT PREJUDICE

Pursuant to 12 O.S. § 684(A), Plaintiffs State of Oklahoma *ex rel.* Office of Management

and Enterprise Services and State of Oklahoma *ex rel.* Office of Educational Quality and

Accountability hereby dismiss without prejudice their causes of action against Defendant Kleo,

Inc. d/b/a ClassWallet.

Respectfully submitted,

GENTNER DRUMMOND
 *Attorney General*
 gentner.drummond@oag.ok.gov

ERIN M. MOORE, OBA #20787
 *Assistant Attorney General*
 erin.moore@oag.ok.gov

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct: (405) 521-3921
*Counsels for Plaintiffs*

J. Kevin Stitt
Office of the Governor
State of Oklahoma

January 12, 2024

**Via email**
Gentner Drummond, Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

     Re: Request to prosecute pursuant to 74 O.S. § 18b(A)(3)

General Drummond:

     The Office of the Attorney General, on behalf of the State of Oklahoma *ex rel.* Office of Management and Enterprise Services and State of Oklahoma *ex rel.* Office of Educational Quality and Accountability, filed a detailed lawsuit against KLEO, Inc. d/b/a ClassWallet, on August 5, 2022. Claims against ClassWallet included breach of contract, fraud and/or negligent misrepresentation, and a request for declaratory and injunctive relief. Those claims were viable at the time of filing and remain viable today.

     While I recognize that you have expressed a belief that some facts are disputed and that the State may have some level of culpability, I also know we agree that our obligations are to the State, and in this case, that must manifest as advocacy. Of course, litigation such as the lawsuit against ClassWallet does not exist without an opposing party presenting to a judge and potentially a jury competing facts and legal theories. In other words, the existence of disputed facts or legal positions does not render a lawsuit fruitless or anything nearing frivolous; it simply highlights the need for litigation and zealous advocacy. And, this, like other contested litigation, is a legitimate case, necessitating action by the State.

     The following statements are supported by indisputable evidence and support the refiling of the lawsuit: 1) The State entered the contract only after ClassWallet had guaranteed in writing that federal funds would not be fraudulently expended; 2) ClassWallet then breached several terms of the Contract; and 3) As a direct result of ClassWallet's acts and omissions, the State has suffered and/or will suffer monetary damages.

     As for the contract, ClassWallet was obligated to create an online platform that had the "[a]bility for [parents and legal guardians] to purchase educational resources other than tuition such as technology, supplies, books, etc. with approved ecommerce vendors integrated into the Fiscal Management and Payment Systems."[1] Put differently, and consistent with ClassWallet's representations (i.e. that its services would virtually eliminate the risk of fraud or misuse of funds),

---

[1] *See* Section V of Attachment C to the Contract.

*Privileged and Confidential Attorney-Client Communication*

the system was not supposed to allow purchases other than for educational resources.[2] The terms of the Contract also explicitly required ClassWallet to retain records the State has since desperately needed to address issues raised by the United States Department of Education.[3] ClassWallet did not fulfill those and other contractual obligations, and its purported justifications lack legal merit.[4] Unfortunately, the State has suffered and will likely continue to suffer damages as a direct result of ClassWallet's behavior.

Although the breach of contract and fraud claims alone necessitate action against ClassWallet, there is more. As a subrecipient, ClassWallet had unique obligations tied to federal law and regulations.[5] Disappointingly, and to the State's detriment, ClassWallet failed to comply with certain of those obligations. When confronted about its noncompliance, ClassWallet simultaneously denied its subrecipient status and conceded that it did not comply with the reporting obligations of a subrecipient. The denial has since been contradicted by even the State Auditor[6] who found that ClassWallet "met all of the characteristics that support the classification of [ClassWallet] as a subrecipient and not as a contractor."[7] ClassWallet's failure to satisfy its subrecipient obligations has cost the State real monetary loss, just as the contractual breaches and fraud have. Fortunately, the federal code entitles the State to relief against ClassWallet.[8]

Given the legitimacy of claims and entitlement to recourse, the State urges you to reconsider your prior position that the State's claims were "wholly without merit."[9] I suspect that statement may have been a byproduct of full information not having been provided to or available to you. As you may know, ClassWallet, through counsel, initiated settlement discussions prior to the lawsuit even having been served. In other words, ClassWallet, the defendant, recognized the exposure caused by its wrong acts. There is simply no doubt that ClassWallet is culpable.

As Governor, and for the benefit of the State, I am requesting that the Attorney General's Office, pursuant to 74 O.S. § 18b(A)(3), refile the lawsuit styled *Office of Management and Enterprise Services and Office of Educational Quality and Accountability v. Kleo, Inc., d/b/a ClassWallet*, which was dismissed without prejudice, on January 31, 2023. If your office declines

---

[2] ClassWallet contends it was advised to turn off controls, thereby allowing expenditures for purposes unrelated to education. Of course, for ClassWallet to have followed through on any such instruction, the contracting parties would have had to amend the contract according to its terms. That did not occur, and ClassWallet was never relieved of its contractual duties.

[3] *See* Section 10.2 of the Contract.

[4] To be clear, ClassWallet has not even attempted to justify its failure to have maintained records in accordance with clear contractual terms.

[5] *See* Section 9.1 to the Contract.

[6] This Office is not suggesting that the Auditor is positioned to make conclusions of law or that any such conclusions are binding.

[7] Cindy Byrd, *State of Oklahoma Single Audit Report for the Fiscal Year Ended June 30, 2021*, OKLA. ST. AUDITOR & INSPECTOR, (June 27, 2023), https://www.sai.ok.gov/Search%20Reports/database/2021SingleAudit.pdf.

[8] When a subrecipient has not complied with federal regulations, a pass-through entity can pursue any remedy legally available. 2 C.F.R. § 200.339 (f).

[9] *Drummond Dismisses ClassWallet Lawsuit, Vows Accountability for Responsible Parties*, OFF. OF THE OKLA. ATT'Y GEN. (Jan. 31, 2023), https://www.oag.ok.gov/articles/drummond-dismisses-classwallet-lawsuit-vows-accountability-responsible-parties.

to do so, please advise. Given that the lawsuit must be refiled by January 31, 2024, alternative options will be pursued, if necessary to protect the State of Oklahoma's interests.

If you would like to discuss, please do not hesitate to contact me.

Sincerely,

Kevin Stitt
Governor

*Privileged and Confidential Attorney-Client Communication*

**EXHIBIT**

**C**



# GENTNER DRUMMOND
## ATTORNEY GENERAL

January 23, 2024

*__Delivery Via Email__*

The Honorable Kevin Stitt
Governor of the State of Oklahoma
2300 North Lincoln Boulevard, Suite 212
Oklahoma City, Oklahoma 73105
Kevin.Stitt@gov.ok.gov

Dear Governor Stitt:

I am in receipt of your January 12, 2024, request that the Office of the Attorney General, on behalf of the State of Oklahoma, file another ill-advised lawsuit against Kleo, Inc., d/b/a ClassWallet ("ClassWallet"). As Chief Law Officer of the State of Oklahoma, I decline your request.[1]

Your letter correctly notes that we agree our obligation in this matter is to the State. That obligation does not require filing a meritless lawsuit. In fact, my obligation to the State forecloses any frivolous legal action. I will not pursue such a futile exercise in poor judgement.[2] As you are aware, I thoroughly reviewed this matter before dismissing the August 5, 2022, lawsuit filed by my predecessor. It was clear to me then and remains clear now that the lawsuit was filed only in response to pressure applied by your office. Email records indicate your staff began seeking involvement from this office shortly after becoming aware that public disclosure of misspent funds was imminent. Other records suggest questionable motivations for filing the suit.

While factual reasons are detailed below to further evidence why your notion is poorly conceived, I can summarize it by quoting two words from your former Secretary of Education, whose faulty judgment resulted in millions of misspent funds: "blanket approval." The United States Department of Education's Office of Inspector General ("Inspector General") thoroughly

---

[1] 74 O.S. §§ 18, 18b.

[2] *Id.*; *see also State ex rel. Derryberry v. Kerr-McGee Corp.*, 1973 OK 132, ¶ 20, 516 P.2d 813, 818; 12 O.S. § 2011 Just as these authorities vest the power with the Attorney General to initiate and appear in any action on behalf of the State, they also grant, arguably require, that this office dismiss a frivolous case or one that is otherwise not in the interest of justice. Because you have not provided any new facts that warrant filing a new action, I can only assume there are none.

♻ recycled paper

documented the improper acts in a sixty-nine-page audit.[3]  That audit recommends Oklahoma repay at least $652,720 due to questionable expenditures and a lack of controls to oversee those funds. Moreover, the audit report consists of the following findings:

- Although Oklahoma attributed the identified deficiencies to ClassWallet, Oklahoma *chose not* to use all of ClassWallet's available controls.
- Oklahoma rejected internal controls and measures of oversight.[4]
- Oklahoma *did not* review expenditures.
- Oklahoma *did not* develop any written monitoring policies and procedures and conducted only limited monitoring activities.
- Oklahoma *did not* have any monitoring controls in place to prevent the Bridge the Gap purchases we identified in our testing as items that *did not* appear to be education related.

Regarding this final point, having provided "blanket approval" for item purchases and neglecting to oversee these funds, more than ten percent ($652,720 out of $6,126,614) of the initiative's expenditures were improper, including purchases at Home Depot and for items such as video game consoles, home appliances, and Christmas trees. The overwhelming evidence shows no oversight and no control measures and suggests that no one in your administration tried to shut off the spigot of these improper expenditures.

Following the Inspector General's audit report, the State of Oklahoma, through your appointed Attorney General, filed a lawsuit against ClassWallet. However, Attorney General O'Connor neither served nor attempted to serve ClassWallet with the lawsuit. Instead, the case sat idle for one hundred and seventy-nine days, one shy of the maximum permitted before a case is deemed dismissed for lack of service, which suggests he also thought the suit lacked merit. 12 O.S. § 2004(I). Accordingly, I dismissed the lawsuit. As I said then, this office will continue working with various state and federal agencies to investigate the misuse of taxpayer dollars. On April 26, 2023, I requested State Auditor and Inspector Cindy Byrd conduct an investigative audit of Oklahoma's administration and expenditure of GEER funds. While that audit continues, a separate and unrelated audit from Auditor Byrd only deepens the concerns regarding your administration's evident lack of oversight and responsibility for these funds.

On June 27, 2023, Auditor Byrd issued the Single Audit Report of the State of Oklahoma for the fiscal year ending June 30, 2021 ("Single Audit").[5]  Regarding the State's contract with ClassWallet, the Single Audit states:

---

[3] The Inspector General issued the final audit report, *Oklahoma's Administration of the Governor's Emergency Education Relief Fund* ("GEER") on July 18, 2022.  https://oig.ed.gov/sites/default/files/reports 2023-12 Oklahoma%25E2%2580%2599s-Administration-Governor%25E2%2580%2599s-Emergency-Education-Relief-Fund-Grant.pdf

[4] On August 31, 2020, a ClassWallet representative asked Ryan Walters, the Chief Executive Officer of Every Kid Counts Oklahoma ("EKCO"), who was overseeing the ClassWallet project—also your appointee to the Commission on Education Quality and Accountability, and whom you later appointed to be the Secretary of Education—if ClassWallet should direct questions regarding allowable items for purchase or whether there was blanket approval for items for any vendor on the ClassWallet platform. Mr. Walters responded, "[b]lanket approval with vendors on your platform."

- The State of Oklahoma directed the Office of Educational Quality and Accountability (OEQA) to sign the contract with Class Wallet. Emails show that the Office of Management and Enterprise Services ("OMES") Executive Director advised the State of Oklahoma that the State Department of Education would be more appropriate to "take ownership of both the financial and day-to-day functions of the solution." In addition, a Secretary of State staff member with significant experience related to federal grants also advised the State of the significant monitoring and reporting requirements required for federal grants and suggested that the State use an agency that was already administering federal grants and had the infrastructure in place to administer the grants appropriately.

- According to staff at OEQA, the State conveyed to them that their agency only had to sign the agreement with Class Wallet, and *no other oversight* duties would be necessary.

- The State *did not* inform OEQA of the federal compliance requirements related to administering the federal grant.

- FACTS Management is the entity that Class Wallet subcontracted with to house the applications system, perform eligibility determinations, and award SIS and BTG program funds to applicants. Through a review of email communications, SAI determined that Class Wallet did not originally intend to be the one signing a contract with a subcontractor for the application system and eligibility reviews. At the request of the Executive Director of Every Kid Counts Oklahoma ("EKCO") [now Superintendent Ryan Walters], Class Wallet agreed to subcontract with FACTS Management instead of the State of Oklahoma directly contracting with FACTS Management. In addition, the Executive Director of EKCO [Superintendent Walters] and other individuals employed by outside entities/special interest groups *directly participated* in reviewing the contract wording and determining the scope of work for the FACTS Management contract. These individuals *failed* to ensure that the contract with FACTS Management contained the required record retention clause.[6]

- The State of Oklahoma *allowed* individuals employed by *outside* entities and *special interest groups* to administer the programs, largely *without any oversight* from the State. These individuals *did not* have the appropriate experience to administer these federal funds.

---

[5] https://www.sai.ok.gov/Search%20Reports/database/2021SingleAudit.pdf

[6] In your request, you state that ClassWallet did not fulfill contractual obligations, and its purported justification for not maintaining records lacks legal merit. In support of this claim, you specifically state that ClassWallet "has not even attempted to justify its failure to have maintained records in accordance with the clear contractual terms." The Single Audit revealed that the State initiated and participated in the actions leading to the recordkeeping failure. Specifically, the Single Audit reports that the Executive Director of EKCO [Superintendent Walters] requested that ClassWallet, and not the State of Oklahoma, subcontract with FACTS Management. If the State of Oklahoma subcontracted with FACTS Management, the contract would have included a record retention requirement. Second, the Executive Director of EKCO [Superintendent Walters] and others purportedly acting on behalf of the State of Oklahoma reviewed the FACTS Management contract and "failed to ensure the contract with FACTS Management contained the required record retention clause." *See* Single Audit, p. 44.

The Single Audit also claims that shortly after the Inspector General began its audit, your office appointed the OMES as fiscal agent for the GEER fund and contracted with a consulting firm to perform subrecipient monitoring. However, despite the apparent opportunity, neither OMES nor the consulting firm secured all books and records of ClassWallet and FACTS Management. *Id.* at p. 45. Additional findings in the Single Audit include the following:

- The State of Oklahoma *did not establish and maintain* effective internal controls that provide reasonable assurance that the funds were managed in compliance with applicable laws.
- The State of Oklahoma *failed* to limit the types of items families could purchase online. Rather, the State of Oklahoma gave "blanket approval" of all vendors and all items to these vendors on ClassWallet's system.
- The State of Oklahoma *did not evaluate* ClassWallet's risk of noncompliance with applicable laws.
- The State *did not utilize* available ClassWallet system controls, through which it could have limited certain vendors and preapproved purchase.
- The State *failed* to review any purchasing reports available from ClassWallet's system, which would have alerted the State to the unallowable and questionable expenditures.[7]
- The State of Oklahoma *allowed* significant amounts of Stay in School funds schools to be *paid directly* to private schools for tuition costs that *did not* meet the programs published objectives (i.e., more than the families actual out of pocket tuition costs, no COVID-19 related economic hardship). However, 657 students of families who appeared eligible were denied an award.

In total, the Single Audit finds more than $1,830,000 in questioned costs related to unallowable expenditures, and the Stay in School program had over $6,500,000 in questioned costs associated with unallowable expenditures.

Somehow, after hundreds of pages of audits detailing your administration's mishandling of federal funds, and approximately one year after I appropriately dismissed this matter, you now assert that it is a "legitimate case" and should be refiled. In addition to claiming it "legitimate," you summarily assert that ClassWallet is culpable because it guaranteed the funds would not be fraudulently expended, and it breached several terms of the Contract. Crucially, you entirely omit any of the litany of errors committed by your administration.

Finally, you identify in the footer of your January 12 correspondence that it is a **"Privileged and Confidential Attorney-Client Communication."** *See* Letter dated January 12, 2024 (emphasis in original). For at least three reasons, this office disagrees with your characterization of the current state of our office's relationship here. First, your request asks that I file the case on behalf of the State of Oklahoma, not the Governor of the State of Oklahoma. Also, as you recently stated in a pleading in federal court, my office's representation of your

---

[7] The contract with ClassWallet provides that ClassWallet will provide Oklahoma with reports, to include "detail summaries of purchases and amounts."

office results in you having "**counsel he [the Governor] affirmatively does not want**...." *See The Cherokee Nation, et al. v. United States Department of the Interior, et al.*, United States District Court of Columbia, Case: 1:20-cv-2167-TJK, ECF No. 180 at 4 (emphasis added). I take you at your word as the Governor of the State of Oklahoma: you affirmatively do not want this office as your legal counsel. Without a client and legal counsel, our offices do not have an existing attorney-client relationship here. Third, the lawsuit previously filed against ClassWallet named the State of Oklahoma and two state agencies as the plaintiffs. The Office of the Governor of the State of Oklahoma was not a named plaintiff. And to be certain, your unsolicited letter does not rise to the "consultation" required in Rule 1.18 of the Oklahoma Rules of Professional Conduct. Accordingly, there is no existing attorney-client relationship between this office and yours concerning these matters.

To the extent you have newly discovered evidence, such as emails and text messages, to show that the State of Oklahoma acted contrary to the audit findings, I request that you immediately provide this information. Until then, I will not exercise my power as the Chief Law Officer for the State of Oklahoma to initiate a case that is frivolous and an assured drain of taxpayer resources. In your letter, you vaguely assert that "alternative options will be pursued" if a case against ClassWallet is not initiated. I'll be clear: to the extent you unilaterally pursue legal action on these matters, this office will fully exercise its authority, including taking control of and asserting complete dominion over the case. 74 O.S. § 18b(A)(3) (authorizing the Attorney General, as Chief Law Officer, "to initiate or appear in any action in which the interests of the state or the people of the state are at issue...."); *see also State ex rel. Derryberry v. Kerr-McGee Corp.*, 1973 OK 132, ¶ 20, 516 P.2d 813, 818 ("The Attorney General, by statute, 74 O.S.1971 § 18 is the Chief Law Office of the State. In the absence of explicit legislative or constitutional expression to the contrary, he possesses complete dominion over every litigation in which he appears in the interest of the State, whether or not there is a relator or some other nominal party.").

Respectfully,

GENTNER DRUMMOND
*Oklahoma Attorney General*

5

EXHIBIT
D



J. Kevin Stitt
Office of the Governor
State of Oklahoma

January 30, 2024

**Via email**
Gentner Drummond, Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

General Drummond:

This serves as a response to your January 23, 2024, letter by which you highlight a conflict of interest that precludes not only your representation of the State of Oklahoma in a lawsuit against ClassWallet but also any public statements or other actions adverse to your office's former client(s) in this matter. As implicitly conceded in your letter, ClassWallet breached its contract with the State,[1] and for the taxpayers' sake, a lawsuit must be refiled to vindicate the State's interests.

It is essential to address threats, if only implicit, in your letter. As I understand certain statements, the Attorney General's Office—the office that previously represented the State in the litigation at issue—plans to (1) use information gained through representation to the detriment of its former client and (2) enter an appearance in the refiled lawsuit and take action against the client on whose behalf the office would appear. As acknowledged in your letter, the Oklahoma Rules of Professional Conduct (Rules) apply to the Attorney General's Office, and those Rules prohibit the actions at issue.

Lawyers simply cannot take actions adverse to clients' and former clients' interests. *See, e.g.*, Rules 1.8(b), 1.9(c). And lawyers cannot utilize information relating to representation to the disadvantage of a current or former client. *Id.* Applied, the referenced rules forbid the Attorney General's Office from making public statements in any way adverse to former clients' interests and from at all engaging in litigation in a manner inconsistent with the plaintiffs' objectives.

The Rules outlining conflicts of interests reinforce the latter notion. *See, e.g.*, 1.7, 1.8. A lawyer is precluded from representing a client if the representation would be materially limited by the lawyer's personal (or political) interests or positions. Lawyers do not have the luxury of dictating clients' objectives (here, to recover damages from a vendor liable for breach of contract); instead, "a lawyer shall abide by a client's decisions concerning the objectives of representation[.]" Rule 1.2(a). Said differently, if a lawyer is unwilling to carry out a client's expressed objectives, the Rules conflict the lawyer from representation. Taken together, the Rules allow no room for the Attorney General's Office—former counsel to the plaintiffs and the office having publicly and privately made clear that it stands in opposition to the plaintiffs—to inject itself in imminent

---

[1] For instance, although you contend the State is somehow responsible for ClassWallet's undisputed failure to maintain records as required by the contract, you (and ClassWallet) at least concede that ClassWallet did not retain records, thereby breaching the contract.

*Privileged and Confidential Attorney-Client Communication*

litigation for any purpose, including, but not limited to, taking the most adverse action (i.e. dismissing the case a second time, thereby leaving the State without the remedy it is due from ClassWallet).

In short, and with respect, the hostile acts directed at a former client of the Attorney General's Office are prohibited by the Rules. Given the dynamic, the Governor deems it necessary to employ independent counsel to protect the rights and interests of the State, as authorized by state law. *See*, 74 O.S. §§ 6, 18c(A)(4)(a).

Sincerely,

Trevor S. Pemberton
General Counsel

*Privileged and Confidential Attorney-Client Communication*



EXHIBIT
E

**Cheryl Plaxico**
Managing Member
(405) 400-9609 | Ext. 101
cplaxico@plaxico.law

Mailing Address:
**Plaxico Law Firm PLLC**
**P.O. Box 298**
**Oklahoma City, Oklahoma 73101**

Midtown OKC location:
923 N. Robinson Ave., 5th Floor
Oklahoma City, Oklahoma 73102

**www.plaxico.law**



## Contract of Representation

1.  Plaxico Law Firm PLLC ("PLF") is a Professional Limited Liability Company ("PLC") that provides legal representation.

2.  I, as the Governor of Oklahoma, having full authority to enter into this Contract pursuant to 74 O.S. §§ 6 and 18c(A)(4)(a), do hereby retain PLF and employ PLF to protect the rights and interests of the State of Oklahoma ("Client")[1] in the matter described below (the "Matter"), effective January 26, 2024, including PLF staff attorneys and such other attorneys as PLF may ally with to assist in this matter to provide legal representation ("Representation") in connection with the Matter. The Representation is necessary due to the fact that the Oklahoma Attorney General's office has a conflict of interest and has declined representation.

3.  The Matter includes all litigation, including, but not limited to, litigation in trial and appellate courts, associated in any way with the State's (or any of its boards or agencies') contracts and dealings with Kleo, Inc. d/b/a ClassWallet, as generally articulated in Case Number CJ-2022-3757, District Court of Oklahoma County.

4.  The terms of this Contract will apply in the event Client wishes PLF to pursue proceedings beyond the scope of the initial Matter, such as a separate legal proceeding, and if PLF agrees to do so.

5.  PLF will provide Representation concerning the Matter at a reduced rate of $325 per hour for attorney Cheryl Plaxico and a reduced rate of $150 per hour for attorney Austin Moseley.

6.  All out-of-pocket expenses, such as photocopies, telephone charges, on-line computer assisted legal research, courier delivery services, facsimiles, mileage,

---

[1] Client shall include, but not necessarily be limited to, the Office of Management and Enterprise Services and the Office of the Governor.

transportation costs, court filing fees, service of process fees, and other appropriate items will be identified and may be charged to the State as they are incurred. No mark-up will be allowed on reimbursable charges. PLF may be reimbursed for travel expenses pursuant to the State Travel Reimbursement Act, 74 O.S. 2021, §§ 500.1-500.37, and Title 260, Subchapter 7, Part 7 of the Oklahoma Administrative Code. Only expenses deemed actual and necessary shall be compensated. Any travel expenses incurred under this contract will be in accordance with the State Travel Reimbursement Act, 74 O.S. §§ 500 et seq. This shall include automobile mileage at the IRS approved rate. PLF shall obtain prior approval from the Client before incurring fees for investigative services and expert witnesses fees or before incurring any unusual or extraordinary expense, including but not limited to electronic deposition transcript costs, expedited deposition transcript costs, videotape deposition costs, real time deposition and court proceeding transcript costs, court reporter out-of-town travel expenses, court room technology costs, and travel costs related to sending more than one PLF representative to any witness interview, deposition, hearing, conference, or trial appearance.

7.  Client understands that PLF will retain or destroy files related to this Representation in accordance with Paragraph 12 below.

8.  Client will be truthful at all times and reveal all information necessary and relevant to the Representation and shall fully cooperate in all legal proceedings, including preserving evidence. If PLF believes, in its sole judgment, that Client is not cooperating fully in the legal representation, the Client agrees that PLF and the participating attorneys allied with PLF may withdraw from the Matter in accordance with applicable rules of professional conduct.

9.  PLF does not currently anticipate any conflict between Client's objectives in this Matter and its own strategic objectives. In the event a conflict arises, and Client is unwilling to waive the conflict in writing, PLF will seek to withdraw from this Matter in accordance with the applicable rules of professional conduct.

10. PLF represents only Client in this Matter, and its representation does not extend and shall not be deemed to extend to the State of Oklahoma or any affiliate, division, agency, or official thereof, or any person or entity other than Client absent PLF's written agreement.

11. Client understands that PLF may seek attorneys' fees and costs from the opposing party or parties via agreement or court or administrative body order to compensate PLF, and any other participating attorneys, for all attorney time, staff time, and costs expended with respect to the Representation. Client agrees to cooperate fully in the event PLF seeks such fees, and PLF agrees that any such fees and costs recovered from the opposing party or parties will be paid to Client.

12. PLF shall keep and maintain appropriate books and records reflecting the services performed and costs and expenses incurred in connection with its performance of the services for a period of seven years from the ending date of this Representation. Upon reasonable notice, Client, the State Auditor & Inspector's Office, the State Purchasing Directors, or their representatives, shall be entitled to access any books, records, and other documents and items directly pertaining to charges to the State hereunder for purpose of audit and examination, at PLF's premises during normal business hours. PLF further agrees to provide appropriate access by the parties to any sub-contractor's associated records. In the event any audit, litigation, or other action involving these pertinent records is started before the end of the seven-year period, PLF agrees to retain these records until all issues arising out of the action are resolved or until the end of the seven-year period, whichever is later.

13. Communications between PLF and Client are generally confidential and subject to attorney-client privilege, regardless of the method used. Neither Client nor PLF may be required to disclose attorney-client communication in discovery or at trial absent a waiver of the privilege. The privilege may be waived if the communications are disclosed to a third party. Accordingly, Client agrees not to disclose our communications to third parties, whether orally or by forwarding to or copying third parties on communications, without first obtaining approval from PLF and to use care about transmission of electronic communication. Client will notify PLF in advance of responding to any public records request for communications relating to the Matter, and Client will do so sufficiently in advance of the response deadline to enable PLF to oppose or otherwise respond to such request.

14. This agreement shall be construed and enforced in accordance with the laws of the State of Oklahoma, without regard to conflict of law principles. Notwithstanding the application of Oklahoma law, the professional conduct of PLF shall be governed by the Rules of Professional Conduct of the attorneys' jurisdictions. Should any party initiate a lawsuit or other dispute resolution proceeding over any matter relating to or arising out of this agreement, such lawsuit or other proceeding shall be filed and conducted in Oklahoma County, State of Oklahoma.

15. This agreement is invalid and of no effect unless a non-collusion certification is provided by PLF, pursuant to 74 O.S.2021, § 85.22.

16. Client has had the opportunity to seek independent legal counsel and seek clarification of any terms set forth in this Contract. The foregoing Contract is understood, accepted, and agreed to as of the dates indicated below.

Plaxico Law Firm PLLC                          Client

Cheryl Plaxico
Managing Member
923 N. Robinson Ave., Suite 500
Oklahoma City, OK 73102
405-400-9609
cplaxico@plaxico.law
Date: **1.29.24**

Brandon Tatum
Chief of Staff to Governor Kevin Stitt

Date: 2-7-24

**EXHIBIT**

**F**

$CJ24$ $619$



**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JAN 3 0 2024

RICK WARREN
COURT CLERK
43

| | |
|---|---|
| STATE OF OKLAHOMA *ex rel.* OFFICE OF ) | |
| MANAGEMENT AND ENTERPRISE SERVICES,) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Case No. |
| ) | |
| KLEO, INC. d/b/a CLASSWALLET, ) | **CJ - 2024 - 619** |
| ) | |
| Defendant. ) | |

## PETITION[1]

COMES NOW Plaintiff State of Oklahoma *ex rel.* Office of Management and Enterprise

Services (the "State") and for its cause of action against Defendant Kleo, Inc. d/b/a ClassWallet

("Defendant") alleges:

### PARTIES, JURISDICTION AND VENUE

1. On August 6, 2020, the State entered into a contract ("Contract") with Defendant. *See,*

   **Exhibit "A."**

2. Defendant is a foreign corporation organized under the laws of the State of Delaware and

   registered to do business in the State of Oklahoma.

3. The Oklahoma County District Court has general jurisdiction to decide matters involving

   disputes between the State of Oklahoma and Defendant.

4. Venue is proper in Oklahoma County, State of Oklahoma pursuant to Section 26.1 of

   Attachment A to the Contract.

---

[1] The State timely filed a lawsuit against Kleo, Inc., d/b/a ClassWallet, on August 5, 2022, in case number CJ-2022-3757, District Court of Oklahoma County. That case was assigned to Judge Sheila Stinson. The Office of the Attorney General, the State's prior counsel in this matter, dismissed the lawsuit without prejudice to refiling, on January 31, 2023.

1

BACKGROUND AND GENERAL ALLEGATIONS

5.  In 2020, the COVID-19 pandemic caused unprecedent disruption to nearly every aspect of life and uniquely impacted families and children of modest and lesser means, leaving educational needs potentially unmet without the benefit of creative, imminent solutions.

6.  As part of its effort to provide families and students of predominantly low and moderate means the emergency educational support necessitated by the COVID-19 pandemic, the federal government, through the United States Department of Education ("USDOE"), implemented the Governor's Emergency Education Relief Fund (the "Fund"), designed, in part, to ensure funds could be quickly dispersed to those in imminent need.

7.  To ensure its portion of the Fund was administered in compliance with federal guidelines and used to meet the needs of students, schools, and education-related organizations, the State sought out a vendor well-versed in management of education-related grant programs.

8.  Toward that end, the State engaged in discussions with Defendant, which, in order to induce the State to utilize its service, made representations to the State about its product and services, such as that:

    (a) its service virtually eliminates the risk of fraud or misuse of funds;

    (b) the platform implementation is quick and easy;

    (c) there is minimum administrative overhead required;

    (d) for use of funds for educational materials, literacy, supplies, books that there is no risk of fraud and no overhead required; and

    (e) it "ha[d] the requisite knowledge and capability to provide immediate and necessary services for Oklahoma schools to be able to manage their funding, transactions, reconciliation of paperwork and receipts, etc."

2

9. The State ultimately contracted with Defendant—a national company that serves 20% of all United States state agencies and specializes in "maintain[ing] compliance and control" for hyper-technical federal grant programs like the Fund. *See*, classwallet.com/about-us.

10. Under the Contract, Defendant committed to implement and provide certain oversight for the Fund, namely two educational grant programs—Stay in School and Bridge the Gap (collectively, the "Programs")—designed to assist qualified families purchase education-related supplies, materials and technology in the midst of the worldwide COVID-19 pandemic.

11. In August 2020, Defendant received $17,350,000.00 to fund the Programs.

12. Under the Contract, Defendant agreed that it:

    (a) "[had] an ongoing obligation to comply, with all applicable federal, State, and local laws, rules, regulations, ordinances ..."

    (b) "[had] a continuing obligation to comply with Customer-specific mandatory contract provisions required in connection with the receipt of federal funds ..."

    (c) "[was] responsible to review and inform its employees, agents, and subcontractors who provide a product or perform a service under the Contract of [Defendant's] obligations under the Contract and [Defendant] certifie[d] that its employees and each such subcontractor [would] comply with minimum requirements and applicable provisions of the Contract."

    (d) "[was] required to retain records relative to the Contract for the duration of the Contract and for a period of seven (7) years .... If a claim, audit, litigation or other action involving such records is started before the end of the seven-year period, the records are required to be maintained for two (2) years from the date that all issues arising out

3

of the action are resolved, or until the end of the seven (7) year retention period, whichever is later."

(e) "shall remain solely responsible for its obligations under the terms of the Contract, for its actions and omissions and those of its agents, employees and subcontractors ..."

(f) "shall indemnify the [State, OMES and OEQA], as applicable for any and all liability, claims, damages, losses, costs, expenses, demands, suits and actions of third parties ... arising from or in connection with [ClassWallet's] breach of its representations and warranties in the Contract ...."

(g) "Pursuant to 74 O.S. § 85.14, where federal granted funds are involved, applicable federal laws, rules and regulations shall govern to the extent necessary to insure benefit of such federal funds to the State."

13. Defendant further agreed in its Scope of Work that it:

> shall create and supply a parent and student friendly online platform ... The Platform shall ... include (1) an Applicant application portal for the Grants and a Provider application portal (collectively, the 'Application System'); (2) a Fiscal Management and Payment System [which is an 'online platform for Account Holders to receive grants and use grants to make payments as determine by Grants guidelines']; support and training; and reporting services.

14. Defendant also agreed in its Scope of Work that its Application System would provide for "electronic verification and acknowledgment by the Applicant of required assurances and rules of the program."

15. Defendant also agreed in its Scope of Work to "create and deliver training" to parents approved for participation in the Grants.

16. Additionally, implied into the Contract is a covenant of good faith and fair dealing that required Defendant not to injure the reasonable expectations of the State.

4

17. On or about August 10, 2020, Defendant either directly or through a subcontractor caused the Application System and the Fiscal Management and Payment System to go live.

18. On or about August 10, 2020, Defendant either directly or through a subcontractor began verifying statuses in submitted Applications and approving or disapproving Applications for the Programs.

19. However, Defendant either directly or through a subcontractor failed to maintain all the records necessary to verify that Applications met the Programs' applicable guidelines.

20. Defendant either directly or through a subcontractor began approving and releasing funds purportedly pursuant to the Bridge the Gap grant program.

21. Defendant issued payment for items outside the scope of the Bridge the Gap grant program.

22. For purposes of federal law associated with the GEER funds, Defendant was a subrecipient and subject to all applicable guidelines and obligations.

23. Defendant failed to comply with federal guidelines and obligations associated with its subrecipient status.

<u>COUNT I: BREACH OF CONTRACT</u>

The above numbered paragraphs are restated and incorporated by reference in Count I.

24. The State and Defendant entered into the Contract.

25. Defendant breached its Contract by, among other things:

    a.  authorizing payments for items not within the scope of the Bridge the Gap grant program;

    b.  failing to properly educate and advise the applicants of the Programs of related terms and conditions;

    c.  failing to maintain information and records in accordance with the Contract; and

d.  failing to submit reports to the USDOE.

26. As a result of Defendant having failed to meet its contractual obligations, the State has been damaged in an amount in excess of $75,000.00 and will likely continue to suffer damages.

<u>COUNT II: DECLARATORY AND INJUNCTIVE RELIEF</u>

The above numbered paragraphs are restated and incorporated by reference in Count II.

27. Defendant should be declared a subrecipient for purposes of the Programs and required to comply with related subrecipient guidelines and obligations, including, but not limited to, submitting to USDOE requisite reports.

WHEREFORE Plaintiff State of Oklahoma *ex rel.* Office of Management and Enterprise Services prays for judgment against Defendant Kleo, Inc. d/b/a ClassWallet as follows:

a)  damages in an amount in excess of $75,000.00;

b)  declaratory and injunctive relief,

c)  indemnity for any and all liability, claims, damages, losses, costs, expenses, demands, suits and actions of third parties, including, but not limited to, those sought by the United States Department of Education;

d)  any and all attorney's fees and costs incurred as a result of Defendant's actions;

e)  any and all such further relief as deemed equitable and appropriate.

Respectfully Submitted,

Cheryl Plaxico, OBA No. 4499
Austin Moseley, OBA No. 35690
PLAXICO LAW FIRM PLLC
923 N. Robinson Ave., 5th Floor
Oklahoma City, Oklahoma 73102

6

Telephone: (405) 400-9609
cplaxico@plaxico.law
amosclcy@plaxico.law

*Attorneys for Plaintiff*

7

**OKLAHOMA**
**Office of Management**
**& Enterprise Services**

## STATE OF OKLAHOMA CONTRACT WITH CLASSWALLET

This State of Oklahoma Contract is entered into between the State of Oklahoma by and through the Office of Management and Enterprise Services for the benefit of the Office of Educational Quality and Accountability and Kleo, Inc., d/b/a ClassWallet ("Supplier") pursuant to 62 O.S. 34.11.1. The Contract is effective as of August 6, 2020 and extends through December 30, 2020, unless extended by written mutual agreement.

**Purpose**

Due to the unprecedented national and state health threat as well as revenue issues within the state, it is in the state's best interest to promptly engage suppliers well steeped in expertise in assisting state schools and personnel with the development and administration of student directed grant programs to enable students to succeed educationally during this health emergency.

This contract involves the use of the Governors Emergency Education Relief (GEER) Funds. It will establish two grant programs (each award under such programs, a "Grant"):

1. Create a $9,716,000.00 Stay in School program with grants not to exceed $6,500 per awarded applicant to pay for private school tuition;
2. Create a $7,634,000 Bridge the Gap program with grant increments of $1,500.00 to qualified families to purchase educational supplies, materials and technology.

Due to the unprecedented national and State health threat as well as the aggressive timeline to distribute allowable funds and invest in unbudgeted goods and services, it is crucial and in the State's best interest to promptly engage a supplier to manage and get necessary funding to teachers and schools. Supplier has the requisite knowledge and capability to provide immediate and necessary services for Oklahoma schools to be able to manage their funding, transactions, reconciliation of paperwork and receipts, etc.

This Contract Document memorializes the agreement of the parties with respect to terms of the Contract.

Now, therefore, in consideration of the foregoing and the mutual promises set forth herein, the receipt and Sufficiency of which are hereby acknowledged the parties agree as follows:

1. The parties agree that Supplier has not yet begun performance of work under the Contract. Upon full execution of the Contract, Supplier may begin work. Issuance of a purchase order is required prior to payment to a Supplier.

2. The following Contract Documents are attached hereto and incorporated herein:

   2.1    Attachment A: State of Oklahoma General Terms;

602293634.6
602293634.7
602293634.8

1



2.2    Attachment B: State of Oklahoma IT Terms; and

2.3    Attachment C: Statement of Work

3.    Except for information deemed confidential by the State pursuant to applicable law, rule, regulation or policy, the parties additionally agree Contract terms and information are not confidential and are disclosable without further approval or notice to Supplier.

4.    The parties recognize that while the State of Oklahoma is executing this contract, payment obligations rest solely with the Office of Educational Quality and Accountability ("OEQA") and the Office of Management and Enterprise Services ("OMES") shall not be responsible for such. Please send invoices and billing inquiries to:

Office of Educational Quality and Accountability
840 Research Parkway, Suite 455
Oklahoma City, OK 73104

If by 5:00 p.m. Central Standard Time December 30, 2020, the entire amount of Grants has been awarded, no refund shall be due from Supplier to OEQA.

If by 5:00 p.m. Central Standard Time December 30, 2020 the entire amount of Grants has not been awarded, the total amount of Grants not awarded shall be refunded to OEQA no later than January 30, 2021.

5.    The parties recognize that while the State of Oklahoma is executing this contract, OEQA is the business owner of the State of Oklahoma's use ClassWallet's solution and ClassWallet shall look solely to OEQA, not OMES, for any issue or need that does not pertain to the application, Interpretation or enforcement of the terms of this Contract.

6.    Any reference to a Contract Document refers to such Contract Document as it may have been amended. If and to the extent any provision is in multiple documents and addresses the same or substantially the same subject matter but does not create an actual conflict, the more recent provision is deemed to supersede earlier versions.

**STATE OF OKLAHOMA**
**by and through the**
**OFFICE OF MANAGEMENT AND**
**ENTERPRISE SERVICES**

Kleo, Inc. d/b/a/ ClassWallet

By: _____DJerryMoore_____         By: _____

Name: _D Jerry Moore_____         Name: _____

Title: _____CIO_____         Title: _____

Date: _8/7/20202_____         Date: _____

602293634.6
602293634.7
602293634.8

2

The Office of Educational Quality and Accountability is additionally executing this Contract to memorialize its involvement in negotiation of and its agreement with the terms of this Contract.

**Office of Educational Quality and Accountability**

By: _____

Name: _____

Title: _____

Date: _____

## ATTACHMENT A

## STATE OF OKLAHOMA GENERAL TERMS

This State of Oklahoma General Terms ("General Terms") is a Contract Document in connection with a Contract awarded by the Office of Management and Enterprise Services on behalf of the State of Oklahoma.

In addition to other terms contained in an applicable Contract Document, Supplier and State agree to the following General Terms:

**1      Scope and Contract Renewal**

    **1.1**    Supplier may not add products or services to its offerings under the Contract without the State's prior written approval. Such request may require a competitive bid of the additional products or services. If the need arises for goods or services outside the scope of the Contract, Supplier shall contact the State.

    **1.2**    At no time during the performance of the Contract shall the Supplier have the authority to obligate any Customer for payment for any products or services (a) when a corresponding encumbering document is not signed or (b) over and above an awarded Contract amount. Likewise, Supplier is not entitled to compensation for a product or service provided by or on behalf of Supplier that is neither requested nor accepted as satisfactory.

    **1.3**    If applicable, prior to any Contract renewal, the State shall subjectively consider the value of the Contract to the State, the Supplier's performance under the Contract, and shall review certain other factors, including but not limited to the: a) terms and conditions of Contract Documents to determine validity with current State and other applicable statutes and rules; b) current pricing and discounts offered by Supplier; and c) current products, services and support offered by Supplier. If the State determines changes to the Contract are required as a condition precedent to renewal, the State and Supplier will cooperate in good faith to evidence such required changes in an Addendum. Further, any request for a price increase in connection with a renewal or otherwise will be conditioned on the Supplier providing appropriate documentation supporting the request.

    **1.4**    The State may extend the Contract for ninety (90) days beyond a final renewal term at the Contract compensation rate for the extended period. If the State exercises such option to extend ninety (90) days, the State shall notify the Supplier in writing prior to Contract end date. The State, at its sole option and to the extent allowable by law, may choose to exercise subsequent ninety (90) day extensions at the Contract pricing rate, to facilitate the finalization of related terms and conditions of a new award or as needed for transition to a new Supplier.

1.5     Supplier understands that supplier registration expires annually and, pursuant to OAC 260:115-3-3, Supplier shall maintain its supplier registration with the State as a precondition to a renewal of the Contract.

**2       Contract Effectiveness and Order of Priority**

2.1     Unless specifically agreed in writing otherwise, the Contract is effective upon the date last signed by the parties.  Supplier shall not commence work, commit funds, incur costs, or in any way act to obligate the State until the Contract is effective.

2.2     Contract Documents shall be read to be consistent and complementary. Any conflict among the Contract Documents shall be resolved by giving priority to Contract Documents in the following order of precedence:

A.      any Addendum;

B.      any applicable Solicitation;

C.      any Contract-specific State terms contained in a Contract Document including, without limitation, information technology terms and terms specific to a statewide Contract or a State agency Contract;

D.      the terms contained in this Contract Document;

E.      any successful Bid as may be amended through negotiation and to the extent the Bid does not otherwise conflict with the Solicitation or applicable law;

F.      any statement of work, work order, or other similar ordering document as applicable; and

G.      other mutually agreed Contract Documents.

2.3     If there is a conflict between the terms contained in this Contract Document or in Contract-specific terms and an agreement provided by or on behalf of Supplier including but not limited to linked or supplemental documents which alter or diminish the rights of Customer or the State, the conflicting terms provided by Supplier shall not take priority over this Contract Document or Acquisition-specific terms.  In no event will any linked document alter or override such referenced terms except as specifically agreed in an Addendum.

2.4     Any Contract Document shall be legibly written in ink or typed.  All Contract transactions, and any Contract Document related thereto, may be conducted by electronic means pursuant to the Oklahoma Uniform Electronic Transactions Act.

**3       Modification of Contract Terms and Contract Documents**

**3.1** The Contract may only be modified, amended, or expanded by an Addendum. Any change to the Contract, including the addition of work or materials, the revision of payment terms, or the substitution of work or materials made unilaterally by the Supplier, is a material breach of the Contract. Unless otherwise specified by applicable law or rules, such changes, including without limitation, any unauthorized written Contract modification, shall be void and without effect and the Supplier shall not be entitled to any claim under the Contract based on those changes. No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in the Contract.

**3.2** Any additional terms on an ordering document provided by Supplier are of no effect and are void unless mutually executed. OMES bears no liability for performance, payment or failure thereof by the Supplier or by a Customer other than OMES in connection with an Acquisition.

**4** Definitions

In addition to any defined terms set forth elsewhere in the Contract, the Oklahoma Central Purchasing Act and the Oklahoma Administrative Code, Title 260, the parties agree that, when used in the Contract, the following terms are defined as set forth below and may be used in the singular or plural form:

**4.1** Acquisition means items, products, materials, supplies, services and equipment acquired by purchase, lease purchase, lease with option to purchase, value provided or rental under the Contract.

**4.2** Addendum means a mutually executed, written modification to a Contract Document.

**4.3** Amendment means a written change, addition, correction or revision to the Solicitation.

**4.4** Bid means an offer a Bidder submits in response to the Solicitation.

**4.5** Bidder means an individual or business entity that submits a Bid in response to the Solicitation.

**4.6** Contract means the written, mutually agreed and binding legal relationship resulting from the Contract Documents and an appropriate encumbering document as may be amended from time to time, which evidences the final agreement between the parties with respect to the subject matter of the Contract.

**4.7** Contract Document means this document; any master or enterprise agreement terms entered into between the parties that are mutually agreed to be applicable to the

Contract; any Solicitation; any Contract-specific terms; any Supplier's Bid as may be negotiated; any statement of work, work order, or other similar mutually executed ordering document; other mutually executed documents and any Addendum.

4.8     Customer means the State of Oklahoma by and through the Office of Management and Enterprise Services for the benefit of the Secretary of State.

4.9     Debarment means action taken by a debarring official under federal or state law or regulations to exclude any business entity from inclusion on the Supplier list; bidding; offering to bid; providing a quote; receiving an award of contract with the State and may also result in cancellation of existing contracts with the State.

4.10    Destination means delivered to the receiving dock or other point specified in the applicable Contract Document.

4.11    Indemnified Parties means the State and Customer and/or its officers, directors, agents, employees, representatives, contractors, assignees and designees thereof.

4.12    Inspection means examining and testing an Acquisition (including, when appropriate, raw materials, components, and intermediate assemblies) to determine whether the Acquisition meets Contract requirements.

4.13    [RESERVED]

4.14    OAC means the Oklahoma Administrative Code.

4.15    OMES means the Office of Management and Enterprise Services.

4.16    Solicitation means the document inviting Bids for the Acquisition referenced in the Contract and any amendments thereto.

4.17    State means the government of the state of Oklahoma, its employees and authorized representatives, including without limitation any department, agency, or other unit of the government of the state of Oklahoma.

4.18    Supplier means the Bidder with whom the State enters into the Contract awarded pursuant to the Solicitation or the business entity or individual that is a party to the Contract with the State.

4.19    Suspension means action taken by a suspending official under federal or state law or regulations to suspend a Supplier from inclusion on the Supplier list; be eligible to submit Bids to State agencies and be awarded a contract by a State agency subject to the Central Purchasing Act.

**4.20**   Supplier Confidential Information means certain confidential and proprietary information of Supplier that is clearly marked as confidential and agreed by the State Purchasing Director or Customer, as applicable, but does not include information excluded from confidentiality in provisions of the Contract or the Oklahoma Open Records Act.

**4.21**   Work Product means any and all deliverables produced by Supplier under a statement of work or similar Contract Document issued pursuant to this Contract.

**5**   Pricing

**5.1**   Pursuant to 68 O.S. §§ 1352, 1356, and 1404, State agencies are exempt from the assessment of State sales, use, and excise taxes.  Further, State agencies and political subdivisions of the State are exempt from Federal Excise Taxes pursuant to Title 26 of the United States Code. Any taxes of any nature whatsoever payable by the Supplier shall not be reimbursed.

**5.2**   Pursuant to 74 O.S. §85.40, all travel expenses of Supplier must be included in the total Acquisition price.

**5.3**   The price of a product offered under the Contract shall include and Supplier shall prepay all shipping, packaging, delivery and handling fees. All product deliveries will be free on board Customer's Destination. No additional fees shall be charged by Supplier for standard shipping and handling. If Customer requests expedited or special delivery, Customer may be responsible for any charges for expedited or special delivery.

**6**   Ordering, Inspection, and Acceptance

**6.1**   Any product or service furnished under the Contract shall be ordered by issuance of a valid purchase order or other appropriate payment mechanism, including a pre-encumbrance, or by use of a valid Purchase Card. All orders and transactions are governed by the terms and conditions of the Contract. Any purchase order or other applicable payment mechanism dated prior to termination or expiration of the Contract shall be performed unless mutually agreed in writing otherwise.

**6.2**   Services will be performed in accordance with industry best practices and are subject to acceptance by the Customer. Notwithstanding any other provision in the Contract, deemed acceptance of a service or associated deliverable shall not apply automatically upon receipt of a deliverable or upon provision of a service.

Supplier warrants and represents that a product or deliverable furnished by or through the Supplier shall individually, and where specified by Supplier to perform as a system, be substantially uninterrupted and error-free in operation and guaranteed

against faulty material and workmanship for a warranty period of the greater of ninety (90) days from the date of acceptance or the maximum allowed by the manufacturer. A defect in a product or deliverable furnished by or through the Supplier shall be repaired or replaced by Supplier at no additional cost or expense to the Customer if such defect occurs during the warranty period.

Any product to be delivered pursuant to the Contract shall be subject to final inspection and acceptance by the Customer at Destination. The Customer assumes no responsibility for a product until accepted by the Customer. Title and risk of loss or damage to a product shall be the responsibility of the Supplier until accepted. The Supplier shall be responsible for filing, processing, and collecting any and all damage claims accruing prior to acceptance.

Pursuant to OAC 260:115-9-5, payment for an Acquisition does not constitute final acceptance of the Acquisition. If subsequent inspection affirms that the Acquisition does not meet or exceed the specifications of the order or that the Acquisition has a latent defect, the Supplier shall be notified as soon as is reasonably practicable. The Supplier shall retrieve and replace the Acquisition at Supplier's expense or, if unable to replace, shall issue a refund to Customer. Refund under this section shall not be an exclusive remedy.

6.3    Supplier shall deliver products and services on or before the required date specified in a Contract Document. Failure to deliver timely may result in liquidated damages as set forth in the applicable Contract Document. Deviations, substitutions, or changes in a product or service, including changes of personnel directly providing services, shall not be made unless expressly authorized in writing by the Customer. Any substitution of personnel directly providing services shall be a person of comparable or greater skills, education and experience for performing the services as the person being replaced. Additionally, Supplier shall provide staff sufficiently experienced and able to perform with respect to any transitional services provided by Supplier in connection with termination or expiration of the Contract.

6.4    Product warranty and return policies and terms provided under any Contract Document will not be more restrictive or more costly than warranty and return policies and terms for other similarly situated customers for a like product.

7    Invoices and Payment

7.1    Supplier shall be paid upon submission of a proper invoice(s) at the prices stipulated in the Contract in accordance with 74 O.S. §85.44B which requires that payment be made only after products have been provided and accepted or services rendered and accepted.

The following terms additionally apply:

**A.**     An invoice shall contain the purchase order number, description of products or services provided and the dates of such provision.

**B.**     Failure to provide a timely and proper invoice may result in delay of processing the invoice for payment.  Proper invoice is defined at OAC 260:10-1-2.

**C.**     Payment of all fees under the Contract shall be due NET 45 days. Payment and interest on late payments are governed by 62 O.S. §34.72. Such interest is the sole and exclusive remedy for late payments by a State agency and no other late fees are authorized to be assessed pursuant to Oklahoma law.

**D.**     The date from which an applicable early payment discount time is calculated shall be from the receipt date of a proper invoice.  There is no obligation, however, to utilize an early payment discount.

**E.**     If an overpayment or underpayment has been made to Supplier any subsequent payments to Supplier under the Contract may be adjusted to correct the account. A written explanation of the adjustment will be issued to Supplier.

**F.**     Supplier shall have no right of setoff.

**G.**     Because funds are typically dedicated to a particular fiscal year, an invoice will be paid only when timely submitted, which shall in no instance be later than six (6) months after the end of the fiscal year in which the goods are provided or services performed.

**H.**     The Supplier shall accept payment by Purchase Card as allowed by Oklahoma law.

**8**     Maintenance of Insurance, Payment of Taxes, and Workers' Compensation

**8.1**     As a condition of this Contract, Supplier shall procure at its own expense, and, upon written request, shall provide proof of, insurance coverage with the applicable liability limits set forth below and any approved subcontractor of Supplier shall procure and, upon written request, provide proof of the same coverage.  The required insurance shall be underwritten by an insurance carrier with an A.M. Best rating of A- or better.

Such proof of coverage shall additionally, upon written request, be provided to the Customer if services will be provided by any of Supplier's employees, agents or subcontractors at any Customer premises and/or employer vehicles will be used in

connection with performance of Supplier's obligations under the Contract. Additionally, Supplier shall ensure each insurance policy includes a thirty (30) day notice of cancellation and name the State and its agencies as certificate holder and shall promptly provide proof to the State of any renewals, additions, or changes to such insurance coverage. Supplier's obligation to maintain insurance coverage under the Contract is a continuing obligation until Supplier has no further obligation under the Contract. Any combination of primary and excess or umbrella insurance may be used to satisfy the limits of coverage for Commercial General Liability, Auto Liability and Employers' Liability. Unless agreed between the parties and approved by the State Purchasing Director, the minimum acceptable insurance limits of liability are as follows:

A.   Workers' Compensation and Employer's Liability Insurance in accordance with and to the extent required by applicable law:

B.   Commercial General Liability Insurance covering the risks of personal injury, bodily injury (including death) and property damage, including coverage for contractual liability, with a limit of liability of not less than $5,000,000 per occurrence;

C.   Automobile Liability Insurance with limits of liability of not less than $5,000,000 combined single limit each accident, provided, however, that no such coverage shall be required if the Supplier performs all services hereunder on a remote basis without personnel on or traveling to or from Customer's premises;

D.   Directors and Officers Insurance which shall include Employment Practices Liability as well as Consultant's Computer Errors and Omissions Coverage, if information technology services are provided under the Contract, with limits not less than $5,000,000 per occurrence;

E.   Security and Privacy Liability insurance, including coverage for failure to protect confidential information and failure of the security of Supplier's computer systems that results in unauthorized access to Customer data with limits $5,000,000 per occurrence; and

F.   Additional coverage required in writing in connection with a particular Acquisition.

8.2   Supplier shall be entirely responsible during the existence of the Contract for the liability and payment of taxes payable by or assessed to Supplier or its employees, agents and subcontractors of whatever kind, in connection with the Contract. Supplier further agrees to comply with all state and federal laws applicable to any such persons, including laws regarding wages, taxes, insurance, and Workers'

Compensation. Neither Customer nor the State shall be liable to the Supplier, its employees, agents, or others for the payment of taxes or the provision of unemployment insurance and/or Workers' Compensation or any benefit available to a State or Customer employee.

8.3    Supplier agrees to indemnify Customer, the State, and its employees, agents, representatives, contractors, and assignees for any and all liability, actions, claims, demands, or suits, and all related costs and expenses (including without limitation reasonable attorneys' fees and costs required to establish the right to indemnification) relating to tax liability, unemployment insurance and/or Workers' Compensation in connection with its performance under the Contract.

9    Compliance with Applicable Laws

9.1    As long as Supplier has an obligation under the terms of the Contract and in connection with performance of its obligations, the Supplier represents its present compliance, and shall have an ongoing obligation to comply, with all applicable federal, State, and local laws, rules, regulations, ordinances, and orders, as amended, including but not limited to the following:

A.    Drug-Free Workplace Act of 1988 set forth at 41 U.S.C. §81.

B.    Section 306 of the Clean Air Act, Section 508 of the Clean Water Act, Executive Order 11738, and Environmental Protection Agency Regulations which prohibit the use of facilities included on the EPA List of Violating Facilities under nonexempt federal contracts, grants or loans;

C.    Prospective participant requirements set at 45 C.F.R. part 76 in connection with Debarment, Suspension and other responsibility matters;

D.    1964 Civil Rights Act, Title IX of the Education Amendment of 1972, Section 504 of the Rehabilitation Act of 1973, Americans with Disabilities Act of 1990, and Executive Orders 11246 and 11375;

E.    Anti-Lobbying Law set forth at 31 U.S.C. §1325 and as implemented at 45 C.F.R. part 93;

F.    Requirements of Internal Revenue Service Publication 1075 regarding use, access and disclosure of Federal Tax Information (as defined therein);

G.    Obtaining certified independent audits conducted in accordance with Government Auditing Standards and Office of Management and Budget Uniform Guidance, 2 CFR 200 Subpart F §200.500 et seq. with approval and work paper examination rights of the applicable procuring entity;

H.  Requirements of the Oklahoma Taxpayer and Citizen Protection Act of 2007, 25 O.S. §1312 and applicable federal immigration laws and regulations and be registered and participate in the Status Verification System. The Status Verification System is defined at 25 O.S. §1312, includes but is not limited to the free Employment Verification Program (E-Verify) through the Department of Homeland Security, and is available at www.dhs.gov/E-Verify;

I.  Requirements of the Health Insurance Portability and Accountability Act of 1996; Health Information Technology for Economic and Clinical Health Act; Payment Card Industry Security Standards; Criminal Justice Information System Security Policy and Security Addendum; and Family Educational Rights and Privacy Act; and

J.  Be registered as a business entity licensed to do business in the State, have obtained a sales tax permit, and be current on franchise tax payments to the State, as applicable.

9.2   The Supplier's employees, agents and subcontractors shall adhere to applicable Customer policies including, but not limited to acceptable use of Internet and electronic mail, facility and data security, press releases, and public relations. As applicable, the Supplier shall adhere to the State Information Security Policy, Procedures, Guidelines set forth at https://omes.ok.gov/sites/g/files/gmc316/f/InfoSecPPG_0.pdf. Supplier is responsible for reviewing and relaying such policies covering the above to the Supplier's employees, agents and subcontractors.

9.3   At no additional cost to Customer, the Supplier shall maintain all applicable licenses and permits required in association with its obligations under the Contract.

9.4   In addition to compliance under subsection 9.1 above, Supplier shall have a continuing obligation to comply with applicable Customer-specific mandatory contract provisions required in connection with the receipt of federal funds or other funding source.

9.5   The Supplier is responsible to review and inform its employees, agents, and subcontractors who provide a product or perform a service under the Contract of the Supplier's obligations under the Contract and Supplier certifies that its employees and each such subcontractor shall comply with minimum requirements and applicable provisions of the Contract. At the request of the State, Supplier shall promptly provide adequate evidence that such persons are its employees, agents or

approved subcontractors and have been informed of their obligations under the Contract.

9.6    As applicable, Supplier agrees to comply with the Governor's Executive Orders related to the use of any tobacco product, electronic cigarette or vaping device on any and all properties owned, leased, or contracted for use by the State, including but not limited to all buildings, land and vehicles owned, leased, or contracted for use by agencies or instrumentalities of the State.

9.7    The execution, delivery and performance of the Contract and any ancillary documents by Supplier will not, to the best of Supplier's knowledge, violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, any written contract or other instrument between Supplier and any third party.

9.8    Supplier represents that it has the ability to pay its debts when due and it does not anticipate the filing of a voluntary or involuntary bankruptcy petition or appointment of a receiver, liquidator or trustee.

9.9    Supplier represents that, to the best of its knowledge, any litigation or claim or any threat thereof involving Supplier has been disclosed in writing to the State and Supplier is not aware of any other litigation, claim or threat thereof.

9.10    If services provided by Supplier include delivery of an electronic communication, Supplier shall ensure such communication and any associated support documents are compliant with Section 508 of the Federal Rehabilitation Act and with State standards regarding accessibility. Should any communication or associated support documents be non-compliant, Supplier shall correct and re-deliver such communication immediately upon discovery or notice, at no additional cost to the State. Additionally, as part of compliance with accessibility requirements where documents are only provided in non-electronic format, Supplier shall promptly provide such communication and any associated support documents in an alternate format usable by individuals with disabilities upon request and at no additional cost, which may originate from an intended recipient or from the State.

10    Audits and Records Clause

10.1    As used in this clause and pursuant to 67 O.S. §203, "record" includes a document, book, paper, photograph, microfilm, computer tape, disk, record, sound recording, film recording, video record, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form. Supplier agrees any pertinent federal or State agency or governing entity of a Customer shall have the right to examine and

602293634.6
602293634.7
602293634.8

audit, at no additional cost to a Customer, all records relevant to the execution and performance of the Contract except, unless otherwise agreed, costs of Supplier that comprise pricing under the Contract.

10.2    The Supplier is required to retain records relative to the Contract for the duration of the Contract and for a period of seven (7) years following completion or termination of an Acquisition unless otherwise indicated in the Contract terms. If a claim, audit, litigation or other action involving such records is started before the end of the seven-year period, the records are required to be maintained for two (2) years from the date that all issues arising out of the action are resolved, or until the end of the seven (7) year retention period, whichever is later.

10.3    Pursuant to 74 O.S. §85.41, if professional services are provided hereunder, all items of the Supplier that relate to the professional services are subject to examination by the State agency, State Auditor and Inspector and the State Purchasing Director.

11    Confidentiality

11.1    The Supplier shall maintain strict security of all State and citizen data and records entrusted to it or to which the Supplier gains access, in accordance with and subject to applicable federal and State laws, rules, regulations, and policies and shall use any such data and records only as necessary for Supplier to perform its obligations under the Contract. The Supplier further agrees to evidence such confidentiality obligation in a separate writing if required under such applicable federal or State laws, rules and regulations. The Supplier warrants and represents that such information shall not be sold, assigned, conveyed, provided, released, disseminated or otherwise disclosed by Supplier, its employees, officers, directors, subsidiaries, affiliates, agents, representatives, assigns, subcontractors, independent contractors, successor or any other persons or entities without Customer's prior express written permission. Supplier shall instruct all such persons and entities that the confidential information shall not be disclosed or used without the Customer's prior express written approval except as necessary for Supplier to render services under the Contract. The Supplier further warrants that it has a tested and proven system in effect designed to protect all confidential information.

11.2    Supplier shall establish, maintain and enforce agreements with all such persons and entities that have access to State and citizen data and records to fulfill Supplier's duties and obligations under the Contract and to specifically prohibit any sale, assignment, conveyance, provision, release, dissemination or other disclosure of any State or citizen data or records except as required by law or allowed by written prior approval of the Customer.

**11.3**    Supplier shall immediately report to the Customer any and all unauthorized use, appropriation, sale, assignment, conveyance, provision, release, access, acquisition, disclosure or other dissemination of any State or citizen data or records of which it or its parent company, subsidiaries, affiliates, employees, officers, directors, assignees, agents, representatives, independent contractors, and subcontractors is aware or have knowledge or reasonable should have knowledge. The Supplier shall also promptly furnish to Customer full details of the unauthorized use, appropriation, sale, assignment, conveyance, provision, release, access, acquisition, disclosure or other dissemination, or attempt thereof, and use its best efforts to assist the Customer in investigating or preventing the reoccurrence of such event in the future. The Supplier shall cooperate with the Customer in connection with any litigation and investigation deemed necessary by the Customer to protect any State or citizen data and records and shall bear all costs associated with the investigation, response and recovery in connection with any breach of State or citizen data or records including but not limited to credit monitoring services with a term of at least three (3) years, all notice-related costs and toll free telephone call center services.

**11.4**    Supplier further agrees to take such commercially reasonable action within its control to promptly prevent a reoccurrence of any unauthorized use, appropriation, sale, assignment, conveyance, provision, release, access, acquisition, disclosure or other dissemination of State or citizen data and records.

**11.5**    Supplier acknowledges that any improper use, appropriation, sale, assignment, conveyance, provision, release, access, acquisition, disclosure or other dissemination of any State data or records to others may cause immediate and irreparable harm to the Customer and certain beneficiaries and may violate state or federal laws and regulations. If the Supplier or its affiliates, parent company, subsidiaries, employees, officers, directors, assignees, agents, representatives, independent contractors, and subcontractors improperly use, appropriate, sell, assign, convey, provide, release, access, acquire, disclose or otherwise disseminate such confidential information to any person or entity in violation of the Contract, the Customer will immediately be entitled to injunctive relief and/or any other rights or remedies available under this Contract, at equity or pursuant to applicable statutory, regulatory, and common law without a cure period.

**11.6**    The Supplier shall immediately forward to the State Purchasing Director, and any other applicable person listed in the Notices section(s) of the Contract, any request by a third party for data or records in the possession of the Supplier or any subcontractor or to which the Supplier or subcontractor has access and Supplier shall fully cooperate with all efforts to protect the security and confidentiality of such data or records in response to a third party request.

11.7   Customer may be provided access to Supplier Confidential Information. State agencies are subject to the Oklahoma Open Records Act and Supplier acknowledges information marked confidential information will be disclosed to the extent permitted under the Open Records Act and in accordance with this section. Nothing herein is intended to waive the State Purchasing Director's authority under OAC 260:115-3-9 in connection with Bid information requested to be held confidential by a Bidder. Notwithstanding the foregoing, Supplier Confidential Information shall not include information that: (i) is or becomes generally known or available by public disclosure, commercial use or otherwise and is not in contravention of this Contract; (ii) is known and has been reduced to tangible form by the receiving party before the time of disclosure for the first time under this Contract and without other obligations of confidentiality; (iii) is independently developed without the use of any of Supplier Confidential Information; (iv) is lawfully obtained from a third party (without any confidentiality obligation) who has the right to make such disclosure or (v) résumé, pricing or marketing materials provided to the State. In addition, the obligations in this section shall not apply to the extent that the applicable law or regulation requires disclosure of Supplier Confidential Information, provided that the Customer provides reasonable written notice, pursuant to Contract notice provisions, to the Supplier so that the Supplier may promptly seek a protective order or other appropriate remedy.

12   Conflict of Interest

In addition to any requirement of law or of a professional code of ethics or conduct, the Supplier, its employees, agents and subcontractors are required to disclose any outside activity or interest that conflicts or may conflict with the best interest of the State. Prompt disclosure is required under this section if the activity or interest is related, directly or indirectly, to any person or entity currently under contract with or seeking to do business with the State, its employees or any other third-party individual or entity awarded a contract with the State. Further, as long as the Supplier has an obligation under the Contract, any plan, preparation or engagement in any such activity or interest shall not occur without prior written approval of the State. Any conflict of interest shall, at the sole discretion of the State, be grounds for partial or whole termination of the Contract.

13   Assignment and Permitted Subcontractors

13.1   Supplier's obligations under the Contract may not be assigned or transferred to any other person or entity without the prior written consent of the State which may be withheld at the State's sole discretion. Should Supplier assign its rights to payment, in whole or in part, under the Contract, Supplier shall provide the State and all affected Customers with written notice of the assignment. Such written notice shall be delivered timely and contain details sufficient for affected Customers to perform payment obligations without any delay caused by the assignment.

13.2    Notwithstanding the foregoing, the Contract may be assigned by Supplier to any corporation or other entity in connection with a merger, consolidation, sale of all equity interests of the Supplier, or a sale of all or substantially all of the assets of the Supplier to which the Contract relates. In any such case, said corporation or other entity shall by operation of law or expressly in writing assume all obligations of the Supplier as fully as if it had been originally made a party to the Contract. Supplier shall give the State and all affected Customers prior written notice of said assignment. Any assignment or delegation in violation of this subsection shall be void.

13.3    Supplier may utilize subcontractors in in support of the Contract upon prior written approval of the State of such subcontractor. Such approval is within the sole discretion of the State. If the Supplier is permitted to utilize subcontractors in support of the Contract, the Supplier shall remain solely responsible for its obligations under the terms of the Contract, for its actions and omissions and those of its agents, employees and subcontractors and for payments to such persons or entities. Any proposed subcontractor shall be identified by entity name and shall include the nature of the services to be performed. The Supplier shall, upon written request, provide to the State a copy of a written agreement executed by the Supplier and subcontractor setting forth that such subcontractor is bound by and agrees, as applicable, to perform the same covenants and be subject to the same conditions and make identical certifications to the same facts and criteria, as the Supplier under the terms of all applicable Contract Documents (provided, that the other terms and conditions of such subcontract, including without limitation the commercial terms as between Supplier and subcontractor, may be redacted). Supplier agrees that maintaining such agreement with any subcontractor and obtaining prior written approval by the State of any subcontractor shall be a continuing obligation. The State further reserves the right to revoke approval of a subcontractor or an employee thereof in instances of poor performance, misconduct or for other similar reasons.

13.4    All payments under the Contract shall be made directly to the Supplier, except as provided in subsection A above regarding the Supplier's assignment of payment. No payment shall be made to the Supplier for performance by unapproved or disapproved subcontractor.

13.5    Rights and obligations of the State or a Customer under the terms of this Contract may be assigned or transferred, at no additional cost, to other Customer entities.

14    Background Checks and Criminal History Investigations

Prior to the commencement of any services, background checks and criminal history investigations of the Supplier's employees and subcontractors who will be providing services may be required and, if and to the extent so required, the required information shall

be provided to the State in a timely manner. Supplier's access to facilities, data and information may be withheld prior to completion of background verification acceptable to the State. The costs of additional background checks beyond Supplier's normal hiring practices shall be the responsibility of the Customer unless such additional background checks are required solely because Supplier will not provide results of its otherwise acceptable normal background checks; in such an instance, Supplier shall pay for the additional background checks. Supplier will coordinate with the State and its employees to complete the necessary background checks and criminal history investigations. Should any employee or subcontractor of the Supplier who will be providing services under the Contract not be acceptable as a result of the background check or criminal history investigation, the Customer may require replacement of the employee or subcontractor in question and, if no suitable replacement is made within a reasonable time, terminate the purchase order or other payment mechanism associated with the project or services.

## 15    Patents and Copyrights

Without exception, a product or deliverable price shall include all royalties or costs owed by the Supplier to any third party arising from the use of a patent, intellectual property, copyright or other property right held by such third party. Should any third party threaten or make a claim that any portion of a product or service provided by Supplier under the Contract infringes that party's patent, intellectual property, copyright or other property right, Supplier shall enable each affected Customer to legally continue to use, or modify for use, the portion of the product or service at issue or replace such potentially infringing product, or re-perform or redeliver in the case of a service, with at least a functional non-infringing equivalent. Supplier's duty under this section shall extend to include any other product or service rendered materially unusable as intended due to replacement or modification of the product or service at issue. If the Supplier determines that none of these alternatives are reasonably available, the State shall return such portion of the product or deliverable at issue to the Supplier, upon written request, in exchange for a refund of the price paid for such returned goods as well as a refund or reimbursement, if applicable, of the cost of any other product or deliverable rendered materially unusable as intended due to removal of the portion of product or deliverable at issue. Any remedy provided under this section is not an exclusive remedy and is not intended to operate as a waiver of legal or equitable remedies because of acceptance of relief provided by Supplier.

## 16    Indemnification

### 16.1    Acts or Omissions

A.    Supplier shall defend and indemnify the Indemnified Parties, as applicable, for any and all liability, claims, damages, losses, costs, expenses, demands, suits and actions of third parties (including without limitation reasonable attorneys' fees and costs required to establish the right to indemnification)

arising out of, or resulting from any action or claim for bodily injury, death, or property damage brought against any of the Indemnified parties to the extent arising from any negligent act or omission or willful misconduct of the Supplier or its agents, employees, or subcontractors in the execution or performance of the Contract.

**B.**  To the extent Supplier is found liable for loss, damage, or destruction of any property of Customer due to negligence, misconduct, wrongful act, or omission on the part of the Supplier, its employees, agents, representatives, or subcontractors, the Supplier and Customer shall use best efforts to mutually negotiate an equitable settlement amount to repair or replace the property unless such loss, damage or destruction is of such a magnitude that repair or replacement is not a reasonable option. Such amount shall be invoiced to, and is payable by, Supplier sixty (60) calendar days after the date of Supplier's receipt of an invoice for the negotiated settlement amount.

## 16.2    Infringement

Supplier shall indemnify the Indemnified Parties, as applicable, for all liability, claims, damages, losses, costs, expenses, demands, suits and actions of third parties (including without limitation reasonable attorneys' fees and costs required to establish the right to indemnification) arising from or in connection with Supplier's breach of its representations and warranties in the Contract or alleged infringement of any patent, intellectual property, copyright or other property right in connection with a product or service provided under the Contract. Supplier's duty under this section is reduced to the extent a claimed infringement results from: (a) a Customer's or user's content; (b) modifications by Customer or third party to a product delivered under the Contract or combinations of the product with any non-Supplier-provided services or products unless Supplier recommended or participated in such modification or combination; (c) use of a product or service by Customer in violation of the Contract unless done so at the direction of Supplier, or (d) a non-Supplier product that has not been provided to the State by, through or on behalf of Supplier as opposed to its combination with products Supplier provides to or develops for the State or a Customer as a system.

## 16.3    Notice and Cooperation

In connection with indemnification obligations under the Contract, the parties agree to furnish prompt written notice to each other of any third-party claim. Any Customer affected by the claim will reasonably cooperate with Supplier and defense of the claim to the extent its interests are aligned with Supplier. Supplier shall use counsel reasonably experienced in the subject matter at issue and will not settle a claim without the written consent of the party being defended, which consent will not

be unreasonably withheld or delayed, except that no consent will be required to settle a claim against Indemnified Parties that are not a State agency, where relief against the Indemnified Parties is limited to monetary damages that are paid by the defending party under indemnification provisions of the Contract.

**16.4    Coordination of Defense**

In connection with indemnification obligations under the Contract, when a State agency is a named defendant in any filed or threatened lawsuit, the defense of the State agency shall be coordinated by the Attorney General of Oklahoma, or the Attorney General may authorize the Supplier to control the defense and any related settlement negotiations; provided, however, Supplier shall not agree to any settlement of claims against the State without obtaining advance written concurrence from the Attorney General. If the Attorney General does not authorize sole control of the defense and settlement negotiations to Supplier, Supplier shall have authorization to equally participate in any proceeding related to the indemnity obligation under the Contract and shall remain responsible to indemnify the applicable Indemnified Parties.

**16.5    Limitation of Liability**

A.    With respect to any claim or cause of action arising under or related to the Contract, neither the State nor any Customer shall be liable to Supplier for lost profits, lost sales or business expenditures, investments, or commitments in connection with any business, loss of any goodwill, or for any other indirect, incidental, punitive, special or consequential damages, even if advised of the possibility of such damages.

B.    With respect to any claim or cause of action arising under or related to the Contract, Supplier shall not be liable, to either the State, any Customer or the State and any Customer collectively in an amount exceeding $650,000.00 provided, notwithstanding anything to the contrary in the Contract, this limitation shall not apply to limit damages, expenses, costs, actions, claims, and liabilities arising from or related to property damage, bodily injury or death caused by Supplier or its employees, agents or subcontractors; indemnity obligations of Supplier pursuant to Sections 16.1 and 16.2 of this Contract, security or confidentiality obligations under the Contract; the bad faith, negligence, intentional misconduct or other acts for which applicable law does not allow exemption from liability of Supplier or its employees, agents or subcontractors.

C.    The limitation of liability and disclaimers set forth in the Contract will apply regardless of whether Customer has accepted a product or service. The parties

agree that Supplier has set its fees and entered into the Contract in reliance on the disclaimers and limitations set forth herein, that the same reflect an allocation of risk between the parties and form an essential basis of the bargain between the parties. These limitations shall apply notwithstanding any failure of essential purpose of any limited remedy.

17      Termination for Funding Insufficiency

17.1    Notwithstanding anything to the contrary in any Contract Document, the State may terminate the Contract in whole or in part if funds sufficient to pay obligations under the Contract are not appropriated or received from an intended third-party funding source. In the event of such insufficiency, Supplier will be provided at least fifteen (15) calendar days' written notice of termination. Any partial termination of the Contract under this section shall not be construed as a waiver of, and shall not affect, the rights and obligations of any party regarding portions of the Contract that are not terminated. The determination by the State of insufficient funding shall be accepted by, and shall be final and binding on, the Supplier.

17.2    Upon receipt of notice of a termination, Supplier shall immediately comply with the notice terms and take all necessary steps to minimize the incurrence of costs allocable to the work affected by the notice. If a purchase order or other payment mechanism has been issued and a product or service has been accepted as satisfactory prior to the effective date of termination, the termination does not relieve an obligation to pay for the product or service but there shall not be any liability for further payments ordinarily due under the Contract or for any damages or other amounts caused by or associated with such termination. Any amount paid to Supplier in the form of prepaid fees that are unused when the Contractor certain obligations are terminated shall be refunded.

17.3    The State's exercise of its right to terminate the Contract under this section shall not be considered a default or breach under the Contract or relieve the Supplier of any liability for claims arising under the Contract.

18      Termination for Cause

18.1    Supplier may terminate the Contract if (i) it has provided the State with written notice of material breach and (ii) the State fails to cure such material breach within thirty (30) days of receipt of written notice. If there is more than one Customer, material breach by a Customer does not give rise to a claim of material breach as grounds for termination by Supplier of the Contract as a whole. The State may terminate the Contract in whole or in part if (i) it has provided Supplier with written notice of material breach, and (ii) Supplier fails to cure such material breach within thirty (30) days of receipt of written notice. Any partial termination of the Contract

under this section shall not be construed as a waiver of, and shall not affect, the rights and obligations of any party regarding portions of the Contract that are not terminated.

18.2    The State may terminate the Contract in whole or in part immediately without a thirty (30) day written notice to Supplier if (i) Supplier fails to comply with confidentiality, privacy, security, environmental or safety requirements applicable to Supplier's performance or obligations under the Contract; (ii) Supplier's material breach is reasonably determined to be an impediment to the function of the State and detrimental to the State or to cause a condition precluding the thirty (30) day notice or (iii) when the State determines that an administrative error in connection with award of the Contract occurred prior to Contract performance.

18.3    Upon receipt of notice of a termination, Supplier shall immediately comply with the notice terms and take all necessary steps to minimize the incurrence of costs allocable to the work affected by the notice. If a purchase order or other payment mechanism has been issued and a product or service has been accepted as satisfactory prior to the effective date of termination, the termination does not relieve an obligation to pay for the product or service but there shall not be any liability for further payments ordinarily due under the Contract or for any damages or other amounts caused by or associated with such termination. Such termination is not an exclusive remedy but is in addition to any other rights and remedies provided for by law. Any amount paid to Supplier in the form of prepaid fees that are unused when the Contract or certain obligations are terminated shall be refunded. Termination of the Contract under this section, in whole or in part, shall not relieve the Supplier of liability for claims arising under the Contract.

18.4    The Supplier's repeated failure to provide an acceptable product or service; Supplier's unilateral revision of linked or supplemental terms that have a materially adverse impact on a Customer's rights or obligations under the Contract (except as required by a governmental authority); actual or anticipated failure of Supplier to perform its obligations under the Contract; Supplier's inability to pay its debts when due; assignment for the benefit of Supplier's creditors; or voluntary or involuntary appointment of a receiver or filing of bankruptcy of Supplier shall constitute a material breach of the Supplier's obligations, which may result in partial or whole termination of the Contract. This subsection is not intended as an exhaustive list of material breach conditions. Termination may also result from other instances of failure to adhere to the Contract provisions and for other reasons provided for by applicable law, rules or regulations; without limitation, OAC 260:115-9-9 is an example.

19    Termination for Convenience

19.1 The State may terminate the Contract, in whole or in part, for convenience if it is determined that termination is in the State's best interest. In the event of a termination for convenience, Supplier will be provided at least thirty (30) days' written notice of termination. Any partial termination of the Contract shall not be construed as a waiver of, and shall not affect, the rights and obligations of any party regarding portions of the Contract that remain in effect.

19.2 Upon receipt of notice of such termination, Supplier shall immediately comply with the notice terms and take all necessary steps to minimize the incurrence of costs allocable to the work affected by the notice. If a purchase order or other payment mechanism has been issued and a product or service has been accepted as satisfactory prior to the effective date of termination, the termination does not relieve an obligation to pay for the product or service but there shall not be any liability for further payments ordinarily due under the Contract or for any damages or other amounts caused by or associated with such termination. Such termination shall not be an exclusive remedy but shall be in addition to any other rights and remedies provided for by law. Any amount paid to Supplier in the form of prepaid fees that are unused when the Contract or certain obligations are terminated shall be refunded. Termination of the Contract under this section, in whole or in part, shall not relieve the Supplier of liability for claims arising under the Contract.

20    Suspension of Supplier

20.1 Supplier may be subject to Suspension without advance notice and may additionally be suspended from activities under the Contract if Supplier fails to comply with confidentiality, privacy, security, environmental or safety requirements applicable to Supplier's performance or obligations under the Contract.

20.2 Upon receipt of a notice pursuant to this section, Supplier shall immediately comply with the notice terms and take all necessary steps to minimize the incurrence of costs allocable to the work affected by the notice. If a purchase order or other payment mechanism has been issued and a product or service has been accepted as satisfactory prior to receipt of notice by Supplier, the Suspension does not relieve an obligation to pay for the product or service but there shall not be any liability for further payments ordinarily due under the Contract during a period of Suspension or suspended activity or for any damages or other amounts caused by or associated with such Suspension or suspended activity. A right exercised under this section shall not be an exclusive remedy but shall be in addition to any other rights and remedies provided for by law. Any amount paid to Supplier in the form of prepaid fees attributable to a period of Suspension or suspended activity shall be refunded.

20.3 Such Suspension may be removed, or suspended activity may resume, at the earlier of such time as a formal notice is issued that authorizes the resumption of

performance under the Contract or at such time as a purchase order or other appropriate encumbrance document is issued. This subsection is not intended to operate as an affirmative statement that such resumption will occur.

21    Certification Regarding Debarment, Suspension, and Other Responsibility Matters

The certification made by Supplier with respect to Debarment, Suspension, certain indictments, convictions, civil judgments and terminated public contracts is a material representation of fact upon which reliance was placed when entering into the Contract. A determination that Supplier knowingly rendered an erroneous certification, in addition to other available remedies, may result in whole or partial termination of the Contract for Supplier's default. Additionally, Supplier shall promptly provide written notice to the State Purchasing Director if the certification becomes erroneous due to changed circumstances.

22    Certification Regarding State Employees Prohibition From Fulfilling Services

Pursuant to 74 O.S. § 85.42, the Supplier certifies that no person involved in any manner in development of the Contract employed by the State shall be employed to fulfill any services provided under the Contract.

23    Force Majeure

23.1    Either party shall be temporarily excused from performance to the extent delayed as a result of unforeseen causes beyond its reasonable control including fire or other similar casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority provided the party experiencing the force majeure event has prudently and promptly acted to take any and all steps within the party's control to ensure continued performance and to shorten duration of the event. If a party's performance of its obligations is materially hindered as a result of a force majeure event, such party shall promptly notify the other party of its best reasonable assessment of the nature and duration of the force majeure event and steps it is taking, and plans to take, to mitigate the effects of the force majeure event. The party shall use commercially reasonable best efforts to continue performance to the extent possible during such event and resume full performance as soon as reasonably practicable.

23.2    Subject to the conditions set forth above, non-performance as a result of a force majeure event shall not be deemed a default. However, a purchase order or other payment mechanism may be terminated if Supplier cannot cause delivery of a product or service in a timely manner to meet the business needs of Customer. Supplier is not entitled to payment for products or services not received and, therefore, amounts payable to Supplier during the force majeure event shall be equitably adjusted downward.

23.3 Notwithstanding the foregoing or any other provision in the Contract, (i) the following are not a force majeure event under the Contract: (a) shutdowns, disruptions or malfunctions in Supplier's system or any of Supplier's telecommunication or internet services other than as a result of general and widespread internet or telecommunications failures that are not limited to Supplier's systems or (b) the delay or failure of Supplier or subcontractor personnel to perform any obligation of Supplier hereunder unless such delay or failure to perform is itself by reason of a force majeure event and (ii) no force majeure event modifies or excuses Supplier's obligations related to confidentiality, indemnification, data security or breach notification obligations set forth herein.

24    Security of Property and Personnel

In connection with Supplier's performance under the Contract, Supplier may have access to Customer personnel, premises, data, records, equipment and other property. Supplier shall use commercially reasonable best efforts to preserve the safety and security of such personnel, premises, data, records, equipment, and other property of Customer. Supplier shall be responsible for damage to such property to the extent such damage is caused by its employees or subcontractors and shall be responsible for loss of Customer property in its possession, regardless of cause. If Supplier fails to comply with Customer's security requirements, Supplier is subject to immediate suspension of work as well as termination of the associated purchase order or other payment mechanism.

25    Notices

All notices, approvals or requests allowed or required by the terms of any Contract Document shall be in writing, reference the Contract with specificity and deemed delivered upon receipt or upon refusal of the intended party to accept receipt of the notice. In addition to other notice requirements in the Contract and the designated Supplier contact provided in a successful Bid, notices shall be sent to the State at the physical address set forth below. Notice information may be updated in writing to the other party as necessary. Notwithstanding any other provision of the Contract, confidentiality, breach and termination-related notices shall not be delivered solely via e-mail.

If sent to the State:
State Purchasing Director
2401 North Lincoln Boulevard, Suite 116
Oklahoma City, Oklahoma 73105

With a copy, which shall not constitute notice, to:
Purchasing Division Deputy General Counsel
2401 North Lincoln Boulevard, Suite 116
Oklahoma City, Oklahoma 73105

602293634.6
602293634.7
602293634.8

## 26    Miscellaneous

### 26.1    Choice of Law and Venue

Any claim, dispute, or litigation relating to the Contract Documents, in the singular or in the aggregate, shall be governed by the laws of the State without regard to application of choice of law principles. Pursuant to 74 O.S. §85.14, where federal granted funds are involved, applicable federal laws, rules and regulations shall govern to the extent necessary to insure benefit of such federal funds to the State. Venue for any action, claim, dispute, or litigation relating in any way to the Contract Documents, shall be in Oklahoma County, Oklahoma.

### 26.2    No Guarantee of Products or Services Required

The State shall not guarantee any minimum or maximum amount of Supplier products or services required under the Contract.

### 26.3    Employment Relationship

The Contract does not create an employment relationship. Individuals providing products or performing services pursuant to the Contract are not employees of the State or Customer and, accordingly are not eligible for any rights or benefits whatsoever accruing to such employees.

### 26.4    Transition Services

If transition services are needed at the time of Contract expiration or termination, Supplier shall provide such services on a month-to-month basis, at the contract rate or other mutually agreed rate. Supplier shall provide a proposed transition plan, upon request, and cooperate with any successor supplier and with establishing a mutually agreeable transition plan. Failure to cooperate may be documented as poor performance of Supplier.

### 26.5    Publicity

The existence of the Contract or any Acquisition is in no way an endorsement of Supplier, the products or services and shall not be so construed by Supplier in any advertising or publicity materials. Supplier agrees to submit to the State all advertising, sales, promotion, and other publicity matters relating to the Contract wherein the name of the State or any Customer is mentioned or language used from which, in the State's judgment, an endorsement may be inferred or implied. Supplier further agrees not to publish or use such advertising, sales promotion, or publicity matter or release any informational pamphlets, notices, press releases, research

602293634.6
602293634.7
602293634.8

reports, or similar public notices concerning the Contract or any Acquisition hereunder without obtaining the prior written approval of the State.

**26.6    Open Records Act**

Supplier acknowledges that all State agencies and certain other Customers are subject to the Oklahoma Open Records Act set forth at 51 O.S. §24A-1 *et seq.* Supplier also acknowledges that compliance with the Oklahoma Open Records Act and all opinions of the Oklahoma Attorney General concerning the Act is required.

**26.7    Failure to Enforce**

Failure by the State or a Customer at any time to enforce a provision of, or exercise a right under, the Contract shall not be construed as a waiver of any such provision. Such failure to enforce or exercise shall not affect the validity of any Contract Document, or any part thereof, or the right of the State or a Customer to enforce any provision of, or exercise any right under, the Contract at any time in accordance with its terms. Likewise, a waiver of a breach of any provision of a Contract Document shall not affect or waive a subsequent breach of the same provision or a breach of any other provision in the Contract.

**26.8    Mutual Responsibilities**

    **A.**    No party to the Contract grants the other the right to use any trademarks, trade names, other designations in any promotion or publication without the express written consent by the other party.

    **B.**    The Contract is a non-exclusive contract and each party is free to enter into similar agreements with others.

    **C.**    The Customer and Supplier each grant the other only the licenses and rights specified in the Contract and all other rights and interests are expressly reserved.

    **D.**    The Customer and Supplier shall reasonably cooperate with each other and any Supplier to which the provision of a product and/or service under the Contract may be transitioned after termination or expiration of the Contract.

    **E.**    Except as otherwise set forth herein, where approval, acceptance, consent, or similar action by a party is required under the Contract, such action shall not be unreasonably delayed or withheld.

**26.9    Invalid Term or Condition**

To the extent any term or condition in the Contract conflicts with a compulsory applicable State or United States law or regulation, such Contract term or condition is void and unenforceable. By executing any Contract Document which contains a conflicting term or condition, no representation or warranty is made regarding the enforceability of such term or condition. Likewise, any applicable State or federal law or regulation which conflicts with the Contract or any non-conflicting applicable State or federal law or regulation is not waived.

**26.10  Severability**

If any provision of a Contract Document, or the application of any term or condition to any party or circumstances, is held invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable and the application of such provision to other parties or circumstances shall remain valid and in full force and effect. If a court finds that any provision of this contract is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**26.11  Section Headings**

The headings used in any Contract Document are for convenience only and do not constitute terms of the Contract.

**26.12  Sovereign Immunity**

Notwithstanding any provision in the Contract, the Contract is entered into subject to the State's Constitution, statutes, common law, regulations, and the doctrine of sovereign immunity, none of which are waived by the State nor any other right or defense available to the State.

**26.13  Survival**

As applicable, performance under all license, subscription, service agreements, statements of work, transition plans and other similar Contract Documents entered into between the parties under the terms of the Contract shall survive Contract expiration. Additionally, rights and obligations under the Contract which by their nature should survive including, without limitation, certain payment obligations invoiced prior to expiration or termination; confidentiality obligations; security incident and data breach obligations and indemnification obligations, remain in effect after expiration or termination of the Contract.

**26.14  Entire Agreement**

The Contract Documents taken together as a whole constitute the entire agreement between the parties. No statement, promise, condition, understanding, inducement or representation, oral or written, expressed or implied, which is not contained in a Contract Document shall be binding or valid. The Supplier's representations and certifications, including any completed electronically, are incorporated by reference into the Contract.

**26.15  Gratuities**

The Contract may be immediately terminated, in whole or in part, by written notice if it is determined that the Supplier, its employee, agent, or another representative violated any federal, State or local law, rule or ordinance by offering or giving a gratuity to any State employee directly involved in the Contract. In addition, Suspension or Debarment of the Supplier may result from such a violation.

**26.16  Import/Export Controls**

Neither party will use, distribute, transfer or transmit any equipment, services, software or technical information provided under the Contract (even if incorporated into other products) except in compliance with all applicable import and export laws, conventions and regulations.

## ATTACHMENT B
## STATE OF OKLAHOMA TECHNOLOGY TERMS

Pursuant to the Oklahoma Information Technology Consolidation and Coordination Act, OMES-Information Services ("OMES-IS") is designated to purchase information technology and telecommunication products and services on behalf of the State. The Act directs OMES-IS to acquire necessary hardware, software and services and to authorize the use by other State agencies. OMES, as the owner of information technology and telecommunication assets and contracts on behalf of the State, allows other State agencies to use the assets while retaining license or ownership rights, as applicable, and the right to reassign the assets, at no additional cost, upon written notification to Supplier. OMES-IS is the data custodian for State agency data; however, such data is owned by the respective State agency.

**1    Definitions**

    **1.1**    **COTS** means software that is commercial off the shelf.

    **1.2**    **Customer Data** means all data supplied by or on behalf of a Customer in connection with the Contract, excluding any confidential information of Supplier.

    **1.3**    **Data Breach** means the unauthorized access by an unauthorized person that results in the use, disclosure or theft of Customer Data.

    **1.4**    **Host** includes the terms **Hosted** or **Hosting** and means the accessing, processing or storing of Customer Data.

    **1.5**    **Intellectual Property Rights** means the worldwide legal rights or interests evidenced by or embodied in any idea, design, concept, personality right, method, process, technique, apparatus, invention, discovery or improvement including any patents, trade secrets and know-how; any work of authorship including any copyrights, moral rights or neighboring rights; any trademark, service mark, trade dress, trade name or other indicia of source or origin; domain name registrations; and any other proprietary or similar rights. Intellectual Property Rights of a party also includes all worldwide legal rights or interests that the party may have acquired by assignment or license with the right to grant sublicenses.

    **1.6**    **[RESERVED]**

    **1.7**    **Non-Public Data** means Customer Data, other than Personal Data, that is not subject to distribution to the public as public information. It is deemed to be sensitive and confidential

by Customer because it contains information that is exempt by statute, ordinance or administrative rule from access by the general public as public information. Non-Public Data includes any data deemed confidential pursuant to the Contract, otherwise identified by Customer as Non-Public Data, or that a reasonable person would deem confidential.

**1.8**   **Personal Data** means Customer Data that contains 1) any combination of an individual's name, social security numbers, driver's license, state/federal identification number, account number, credit or debit card number and/or 2) data subject to protection under a federal, state or local law, rule, regulation or ordinance.

**1.9**   **Security Incident** means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with the Hosted environment used to perform the services.

**1.10**   **State CIO** means the State Chief Information Officer or authorized designee.

**1.11**   **Supplier Intellectual Property** means all tangible or intangible items or things, including the Intellectual Property Rights therein, created or developed by Supplier, whether prior to providing any services or Work Product to Customer and prior to receiving any documents, materials, information or funding from or on behalf of a Customer relating to the services or Work Product, or after the effective date of the Contract.

**1.12**   **Third Party Intellectual Property** means the Intellectual Property Rights of any third party that is not a party to the Contract, and that is not directly or indirectly providing any goods or services to a Customer under the Contract.

**1.13**   **Work Product** means any and all deliverables produced by Supplier for Customer under a statement of work issued pursuant to the Contract.

**2**   **Termination of Maintenance and Support Services**

Customer may terminate maintenance or support services without an adjustment charge, provided any of the following circumstances occur:

**2.1**   Customer removes the product for which the services are provided, from productive use or;

**2.2**   The location at which the services are provided is no longer controlled by Customer (for example, because of statutory or regulatory changes or the sale or closing of a facility).

If Customer chooses to renew maintenance or support after maintenance has lapsed, Customer may choose to pay the additional fee, if any, associated with renewing a license after such maintenance or support has lapsed, or to purchase a new license. Any amount paid to Supplier in the form of prepaid fees that are unused when services under the Contract or purchase order are terminated shall be refunded to Customer.

**3**   **Compliance and Electronic and Information Technology Accessibility**

State procurement of information technology is subject to certain federal and State laws, rules and regulations related to information technology accessibility, including but not limited to Oklahoma Information Technology Accessibility Standards ("Standards") set forth at _____ . Supplier shall provide a Voluntary Product Accessibility Template ("VPAT") describing accessibility compliance via a URL linking to the VPAT and shall update the VPAT as necessary in order to allow a Customer to obtain current VPAT information as required by State law. If products require development or customization, additional requirements and documentation may be required and compliance shall be necessary by Supplier. Such requirements may be stated in appropriate documents including but not limited to a statement of work, riders, agreement, purchase order or Addendum. All representations contained in the VPAT provided will be relied upon by the State or a Customer, as applicable, for accessibility compliance purposes.

**4    Media Ownership (Disk Drive and/or Memory Chip Ownership)**

**4.1**    Any disk drives and memory cards purchased with or included for use in leased or purchased products under the Contract remain the property of the Customer.

**4.2**    Personal information may be retained within electronic media devices and components; therefore, electronic media shall not be released either between Customers or for the resale, of refurbished equipment that has been in use by a Customer, by the Supplier to the general public or other entities. This provision applies to replacement devices and components, whether purchased or leased, supplied by Supplier, its agents or subcontractors during the downtime (repair) of products purchased or leased through the Contract. If a device is removed from a location for repairs, the Customer shall have sole discretion, prior to removal, to determine and implement sufficient safeguards (such as a record of hard drive serial numbers) to protect personal information that may be stored within the hard drive or memory of the device.

**5    Offshore Services**

No offshore services are provided for under the Contract. State data shall not be used or accessed internationally for troubleshooting or any other use not specifically provided for herein without the prior written permission, which may be withheld in the State's sole discretion, from the appropriate authorized representative of the State. Notwithstanding the above, back office administrative functions, including customer service, of the Supplier may be located offshore and the follow-the-sun support model may be used by the Supplier to the extent allowed by law applicable to any Customer Data being accessed or used.

**6    Compliance with Technology Policies**

**6.1**    The Supplier agrees to adhere to the State of Oklahoma "Information Security Policy, Procedures,          and          Guidelines"          available          at

Supplier's employees and subcontractors shall adhere to the applicable State IT Standard Methodologies and Templates including but not limited to Project Management, Business

Analysis, System Analysis, Enterprise and IT Architecture, Quality, Application and Security Methodologies and Templates as set forth at                    .

**6.2**    Supplier shall comply with applicable Federal Information Processing Standards including, without limitation, FIPS 200, FIPS 140-2 or successor standards and all recommendations from the National Institute of Standards and Technology. The confidentiality of Customer Data shall be protected and maintained in accordance with these standards as well as other applicable Customer standards.

**6.3**    Supplier shall comply with the CJIS Security Policy as more particularly described at Appendix 2 attached hereto and incorporated herein.

**7    Emerging Technologies**

The State of Oklahoma reserves the right to enter into an Addendum to the Contract at any time to allow for emerging technologies not identified elsewhere in the Contract Documents if there are repeated requests for such emerging technology or the State determines it is warranted to add such technology.

**8    Extension Right**

In addition to extension rights of the State set forth in the Contract, the State CIO reserves the right to extend any Contract if the State CIO determines such extension to be in the best interest of the State.

**9    [RESERVED]**

**10    Commercial Off The Shelf Software**

If Supplier specifies terms and conditions or clauses in an electronic license, subscription, maintenance, support or similar agreement that conflict with the terms of this Contract, the additional terms and conditions or conflicting clauses shall not be binding on the State and the provisions of this Contract shall prevail.

**11    [RESERVED]**

**12    Intellectual Property Ownership**

**12.1**    All Supplier Intellectual Property and all Intellectual Property Rights in all Work Product or other intellectual property owned or licensed by Supplier or any subcontractor, or developed by or on behalf of the Supplier or any subcontractor pursuant to this Contract, shall be owned by and reserved in the party developing (or otherwise owning) such intellectual property during the term of this Contract and following termination. All Supplier Intellectual Property and all Intellectual Property Rights in all Work Product or other intellectual property owned or licensed by Supplier or any subcontractor, or developed by or on behalf of the Supplier or any subcontractor pursuant to this Contract, shall not be considered a work made for hire in favor of the State/Customer, and State/ Customer shall have no claim and shall make no claim of ownership or other interest therein (other than the limited license

602293634.6
602293634.7
602293634.8                                     34

rights as explicitly set forth below). Provided, notwithstanding the foregoing, that under no circumstances shall any (i) Customer Data or (ii) customized forms or similar mechanisms of user interface developed exclusively for the Customer in connection with the implementation of the programs contemplated by this Contract constitute Supplier Intellectual Property, which elements of Work Product shall constitute and remain the property of Customer.

12.2    With respect to Supplier Intellectual Property, the Supplier grants the Customer, for no additional consideration, non-transferable, non-exclusive, royalty-free, fully paid license, solely for the internal business use of the Customer, to use, copy, modify, display, perform, transmit and prepare derivative works of Supplier Intellectual Property embodied in or delivered to the Customer in conjunction with this Contract. To the extent that any Third Party Intellectual Property is embodied or reflected in the Work Product or is necessary to provide services, Supplier shall obtain from the applicable third party for the Customer's benefit, a non-transferable, non-exclusive, royalty-free, fully paid license to use such Third Party Intellectual Property, solely for Customer's internal business purposes. The foregoing licenses include the right to sublicense third parties, solely for the purpose of engaging such third parties to assist or carry out Customer's internal business use of the Work Product. Except for the preceding licenses, all rights in Supplier Intellectual Property remain in Supplier and all rights in Third Party Intellectual Property remain in the third-party. On written request, Supplier shall provide Customer with documentation indicating a third party's written approval for Supplier to use any Third Party Intellectual Property that may be embodied or reflected in the Work Product.

12.3    For the avoidance of doubt, nothing in this Contract shall preclude Supplier from developing for itself, or for others, materials which are competitive with those produced as a result of the services provided under the Contract

## 13    Hosting Services

13.1    If Supplier or its subcontractor, affiliate or any other person or entity providing products or services under the Contract Hosts Customer Data in connection with an Acquisition, the provisions of Appendix 1, attached hereto and incorporated herein, apply to such Acquisition.

**13.2** If the Hosting of Customer Data by Supplier or its subcontractor, affiliate or any other person or entity providing products or services under the Contract contributes to or directly causes a Data Breach, Supplier shall be responsible for the obligations set forth in Appendix I related to breach reporting requirements and associated costs. Likewise if such Hosting contributes to or directly causes a Security Incident, Supplier shall be responsible for the obligations set forth in Appendix I, as applicable.

## 14 Change Management

When a scheduled change is made to products or services provided to a Customer that impacts the Customer's system related to such product or service, Supplier shall provide two (2) weeks' prior written notice of such change. When the change is an emergency change, Supplier shall provide twenty-four (24) hours' prior written notice of the change. Repeated failure to provide such notice may be an evaluation factor (as indicative of Supplier's past performance) upon renewal or if future bids submitted by Supplier are evaluated by the State.

## 15 Service Level Deficiency

In addition to other terms of the Contract, in instances of the Supplier's repeated failure to provide an acceptable level of service or meet service level agreement metrics, service credits shall be provided by Supplier and may be used as an offset to payment due.

## 16 Notices

In addition to notice requirements under the terms of the Contract otherwise, the following individuals shall also be provided the request, approval or notice, as applicable:

Chief Information Officer
3115 N. Lincoln Blvd
Oklahoma City, OK 73105

**With a copy, which shall not constitute notice, to:**
Information Services Deputy Counsel
3115 North Lincoln Boulevard
Oklahoma City, Oklahoma 73105

602293634.6
602293634.7
602293634.8

37

602293634.6
602293634.7
602293634.8

39

**Appendix 1 to State of Oklahoma Information Technology Terms**

The parties agree to the following provisions in connection with any Customer Data accessed, processed or stored by or on behalf of the Supplier and the obligations, representations and warranties set forth below shall continue as long as the Supplier has an obligation under the Contract

**A.    Customer Data**

1.    Customer will be responsible for the accuracy and completeness of all Customer Data provided to Supplier by Customer. Customer shall retain exclusive ownership of all Customer Data. Non-Public Data and Personal Data shall be deemed to be Customer's confidential information. Supplier shall restrict access to Customer Data to their employees with a need to know (and advise such employees of the confidentiality and non-disclosure obligations assumed herein).

2.    Supplier shall promptly notify the Customer upon receipt of any requests from unauthorized third parties which in any way might reasonably require access to Customer Data or Customer's use of the Hosted environment. Supplier shall notify the Customer by the fastest means available and also in writing pursuant to Contract notice provisions and the notice provision herein. Except to the extent required by law, Supplier shall not respond to subpoenas, service or process, Freedom of Information Act or other open records requests, and other legal request related to Customer without first notifying the Customer and obtaining the Customer's prior approval, which shall not be unreasonably withheld, of Supplier's proposed responses. Supplier agrees to provide its completed responses to the Customer with adequate time for Customer review, revision and approval.

3.    Supplier will use commercially reasonable efforts to prevent the loss of or damage to Customer Data in its possession and will maintain commercially reasonable back-up procedures and copies to facilitate the reconstruction of any Customer Data that may be lost or damaged by Supplier. Supplier will promptly notify Customer of any loss, damage to, or unauthorized access of Customer Data. Supplier will use commercially reasonable efforts to reconstruct any Customer Data that has been lost or damaged by Supplier as a result of its negligence or willful misconduct. If Customer Data is lost or damaged for reasons other than as a result of Supplier's negligence or willful misconduct, Supplier, at the Customer's expense, will, at the request of the State, use commercially reasonable efforts to reconstruct any Customer Data lost or damaged.

**B.    Data Security**

1.    Supplier will use commercially reasonable efforts, consistent with industry standards, to provide security for the Hosted environment and Customer Data and to protect against both unauthorized access to the Hosting environment, and unauthorized communications between the Hosting environment and the Customer's browser. Supplier shall implement and maintain appropriate administrative, technical and organizational security measures to safeguard against unauthorized access, disclosure or theft of Personal Data and Non-Public

Data. Such security measures shall be in accordance with recognized industry practice and not less stringent than the measures the service provider applies to its own personal data and non-public data of similar kind.

2.      All Personal Data and Non-public Data shall be encrypted at rest and in transit with controlled access. Unless otherwise stipulated, the service provider is responsible for encryption of Personal Data.

3.      Supplier represents and warrants to the Customer that the Hosting equipment and environment will be routinely checked with a commercially available, industry standard software application with up-to-date virus definitions. Supplier will regularly update the virus definitions to ensure that the definitions are as up-to-date as is commercially reasonable. Supplier will promptly purge all viruses discovered during virus checks. If there is a reasonable basis to believe that a virus may have been transmitted to Customer by Supplier. Supplier will promptly notify Customer of such possibility in a writing that states the nature of the virus, the date on which transmission may have occurred, and the means Supplier has used to remediate the virus. Should the virus propagate to Customer's IT infrastructure, Supplier is responsible for costs incurred by Customer for Customer to remediate the virus.

4.      Supplier shall provide its services to Customer and its users solely from data centers in the U.S. Storage of Customer Data at rest shall be located solely in data centers in the U.S. Supplier shall not allow its personnel or contractors to store Customer Data on portable devices, including personal computers, except for devices that are used and kept only at its U.S. data centers. Supplier shall permit its personnel and contractors to access Customer Data remotely only as required to fulfill Supplier's obligations under the Contract.

5.      Supplier shall allow the Customer to audit conformance to the Contract terms. The Customer may perform this audit or contract with a third party at its discretion and at Customer's expense.

6.      Supplier shall perform an independent audit of its data centers at least annually at its expense and provide a redacted version of the audit report upon request. Supplier may remove its proprietary information from the redacted version. A Service Organization Control (SOC) 1 audit report or approved equivalent sets the minimum level of a third-party audit.

7.      Any remedies provided in this Appendix are not exclusive and are in addition to other rights and remedies available under the terms of the Contract, at law or in equity.

## C.    Security Assessment

1.      The State requires any entity or third-party Supplier Hosting Oklahoma Customer Data to submit to a State Certification and Accreditation Review process to assess initial security risk. Supplier submitted to the review and met the State's minimum security standards at time the Contract was executed. Failure to maintain the State's minimum security standards

602293634.6
602293634.7
602293634.8

during the term of the contract. including renewals. constitutes a material breach. Upon request, the Supplier shall provide updated data security information in connection with a potential renewal. If information provided in the security risk assessment changes, Supplier shall promptly notify the State and include in such notification the updated information; provided, however, Supplier shall make no change that results in lessened data protection or increased data security risk. Failure to provide the notice required by this section or maintain the level of security required in the Contract constitutes a material breach by Supplier and may result in a whole or partial termination of the Contract.

2. Any Hosting entity change must be approved in writing prior to such change. To the extent Supplier requests a different sub-contractor than the third-party Hosting Supplier already approved by the State, the different sub-contractor is subject to the State's approval. Supplier agrees not to migrate State's data or otherwise utilize the different third-party Hosting Supplier in connection with key business functions that are Supplier's obligations under the contract until the State approves the third-party Hosting Supplier's State Certification and Accreditation Review, which approval shall not be unreasonably withheld or delayed. In the event the third-party Hosting Supplier does not meet the State's requirements under the State Certification and Accreditation Review, Supplier acknowledges and agrees it will not utilize the third-party Supplier in connection with key business functions that are Supplier's obligations under the contract, until such third party meets such requirements.

**D.** **Security Incident or Data Breach Notification:** Supplier shall inform Customer of any Security Incident or Data Breach.

1. Supplier may need to communicate with outside parties regarding a Security Incident, which may include contacting law enforcement, fielding media inquiries and seeking external expertise as mutually agreed upon, defined by law or contained in the Contract. If a Security Incident involves Customer Data, Supplier will coordinate with Customer prior to any such communication.

2. Supplier shall report a Security Incident to the Customer identified contact set forth herein within five (5) days of discovery of the Security Incident or within a shorter notice period required by applicable law or regulation (i.e. HIPAA requires notice to be provided within 24 hours).

3. Supplier shall:

   a. Maintain processes and procedures to identify, respond to and analyze Security Incidents;

   b. Make summary information regarding such procedures available to Customer at Customer's request;

   c. Mitigate, to the extent practicable, harmful effects of Security Incidents that are known to Supplier; and

    **d.**    Document all Security Incidents and their outcomes.

**4.**    If Supplier has reasonable belief or actual knowledge of a Data Breach, Supplier shall (1) promptly notify the appropriate Customer identified contact set forth herein within 24 hours or sooner, unless shorter time is required by applicable law, and (2) take commercially reasonable measures to address the Data Breach in a timely manner.

**E.**    **Breach Responsibilities:** This section only applies when a Data Breach occurs with respect to Personal Data or Non-Public Data within the possession or control of Supplier.

    **1.**    Supplier shall (1) cooperate with Customer as reasonably requested by Customer to investigate and resolve the Data Breach, (2) promptly implement necessary remedial measures, if necessary, and (3) document responsive actions taken related to the Data Breach, including any post-incident review of events and actions taken to make changes in business practices in providing the services, if necessary.

    **2.**    Unless otherwise stipulated, if a Data Breach is a direct result of Supplier's breach of its obligation to encrypt Personal Data and Non-Public Data or otherwise prevent its release, Supplier shall bear the costs associated with (1) the investigation and resolution of the Data Breach; (2) notifications to individuals, regulators or others required by state law; (3) credit monitoring services required by state or federal law; (4) a website or toll-free numbers and call center for affected individuals required by state law – all not to exceed the agency per record per person cost calculated for data breaches in the United States on the most recent Cost of Data breach Study: Global Analysis published by the Ponemon Institute at the time of the data breach; and (5) complete all corrective actions as reasonably determined by Supplier based on root cause.

    **3.**    If a Data Breach is a direct result of Supplier's breach of its obligations to encrypt Personal Data and Non-Public Data or otherwise prevent its release, Supplier shall indemnify and hold harmless the Customer against all penalties assessed to Indemnified Parties by governmental authorities in connection with the Data Breach.

**F.**    **Notices**

In addition to notice requirements under the terms of the Contract and those set forth above, a request, an approval or a notice in connection with this Appendix provided by Supplier shall be provided to:

Chief Information Security Officer

3115 N. Lincoln Blvd

Oklahoma City, OK 73105

and

servicedesk@omes.ok.gov.

**G.** **Supplier Representations and Warranties**

Supplier represents and warrants the following:

1. The product and services provided in connection with hosting services do not infringe a third party's patent or copyright or other intellectual property rights.

2. Supplier will protect Customer's Non-Public Data and Personal Data from unauthorized dissemination and use with the same degree of care that each such party uses to protect its own confidential information and, in any event, will use no less than a reasonable degree of care in protecting such confidential information.

3. The execution, delivery and performance of the Contract and any ancillary documents and the consummation of the transactions contemplated by the Contract or any ancillary documents by Supplier will not violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, any written contract or other instrument between Supplier and any third parties retained or utilized by Supplier to provide goods or services for the benefit of the Customer.

4. Supplier shall not knowingly upload, store, post, e-mail or otherwise transmit, distribute, publish or disseminate to or though the Hosting environment any material that contains software viruses, malware or other surreptitious code designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment or circumvent any "copy-protected" devices, or any other harmful or disruptive program.

**H.** **Indemnity**

Supplier agrees to defend, indemnify and hold the State, its officers, directors, employees, and agents harmless from all liabilities, claims, damages, losses, costs, expenses, demands, suits and actions (including without limitation reasonable attorneys' fees and costs required to establish the right to indemnification), excluding damages that are the sole fault of Customer, arising from or in connection with Supplier's breach of its express representations and warranties in these Information Technology Terms and the Contract. If a third party claims that any portion of the products or services provided by Supplier under the terms of another Contract Document or these Information Technology Terms infringes that party's patent or copyright, Supplier shall defend, indemnify and hold harmless the State and Customer against the claim at Supplier's expense and pay all related costs, damages, and attorney's fees incurred by or assessed to, the State and/or Customer. The State and/or Customer shall promptly notify Supplier of any third party claims and to the extent authorized by the Attorney General of the State, allow Supplier to control the defense and any related settlement negotiations. If the Attorney General of the State does not authorize sole control of the defense and settlement negotiations to Supplier, Supplier shall be granted authorization to equally participate in any proceeding related to this section but Supplier shall remain responsible to indemnify Customer and the State for all associated costs, damages and fees incurred by or assessed to the State and/or Customer. Should the software become, or in Supplier's

opinion, be likely to become the subject of a claim or an injunction preventing its use as contemplated in connection with Hosting services. Supplier may, at its option (i) procure for the State the right to continue using the software or (ii) replace or modify the software with a like or similar product so that it becomes non-infringing.

I.    **Termination, Expiration and Suspension of Service**

    1.    During any period of service suspension, Supplier shall not take any action to intentionally disclose, alter or erase any Customer Data.

    2.    In the event of a termination or expiration of the Contract, the parties further agree:

Supplier shall implement an orderly return of Customer Data in a format specified by the Customer and, as determined by the Customer:

        a.    return the Customer Data to Customer at no additional cost, at a time agreed to by the parties and the subsequent secure disposal of State Data;

        b.    transitioned to a different Supplier at a mutually agreed cost and in accordance with a mutually agreed data transition plan and the subsequent secure disposal of State Data or

        c.    a combination of the two immediately preceding options.

    3.    Supplier shall not take any action to intentionally erase any Customer Data for a period of:

        a.    10 days after the effective date of termination, if the termination is in accordance with the contract period;

        b.    30 days after the effective date of termination, if the termination is for convenience; or

        c.    60 days after the effective date of termination, if the termination is for cause.

After such period, Supplier shall, unless legally prohibited or otherwise stipulated, apply de-identification and pseudonymization encryption protocols (utilizing at least 256-bit encryption) to all Customer Data in its systems or otherwise in its possession or under its control.

    4.    The State shall be entitled to any post termination or expiration assistance generally made available with respect to the services.

    5.    De-identification and pseudonymization by Supplier of Customer Data shall be performed in a secure manner. Certificates of de-identification and pseudonymization, and, if requested, the decryption key, shall be provided to Customer within thirty (30) calendar day of its request for de-identification and pseudonymization.

### Appendix 2 to State of Oklahoma Information Technology Terms INTRODUCTION

The use and maintenance of all items of software or equipment offered for purchase herein must be in compliance with the most current version of the U.S. Department of Justice, Federal Bureau of Investigation ("FBI"), Criminal Justice Information Services (CJIS) Division's CJIS Security Policy ("CJIS Security Policy" or "Security Policy" herein).

The Entity or Affiliate acquiring the data or system is hereby ultimately responsible for compliance with the CJIS Security Policy and will be subject to an audit by the State of Oklahoma CJIS Systems Officer ("CSO") and the FBI CJIS Division's Audit Staff.

## CJIS SECURITY POLICY REQUIREMENTS GENERALLY

The CJIS Security Policy outlines a number of administrative, procedural, and technical controls agencies must have in place to protect Criminal Justice Information ("CJI"). Our experience is that agencies will generally have many of the administrative and procedural controls in place but will need to implement additional technical safeguards in order to be in complete compliance with the mandate. A Criminal Justice Agency ("CJA") and certain other governmental agencies procuring technology equipment and services that could be used in hosting or connecting or transmitting or receiving CJI data may need to use the check list herein to make sure that the software, equipment, location, security, and persons having the ability to access CJI will meet the CJIS requirements per the then current CJIS Security Policy. A completed Appendix II to said Security Policy will need to be signed by Vendor or a 3rd party if it has access to CJI, such as incident to the maintenance or support of the purchased hardware or software within which resides CJI. Per Appendix "A" to said Security Policy, **"access to CJI is the physical or logical (electronic) ability, right or privilege to view, modify or make use of CJI."**

## DIRECTIVE CONCERNING ACCESS TO CRIMINAL JUSTICE INFORMATION AND TO HARDWARE OR SOFTWARE WHICH INTERACTS WITH CJI and CERTIFICATION

The FBI CJIS Division provides state-of-the-art identification and information services to the local, state, tribal, federal, and international criminal justice communities for criminal justice purposes, as well as the noncriminal justice communities for noncriminal justice purposes.

**This Directive primarily concerns access to CJI and access to hardware and software in the use, retention, transmission, reception, and hosting of CJI for criminal justice purposes and not for noncriminal justice purposes.** In that regard, this Directive is not only applicable to such data, but also to the hardware and software interacting with such data, their location(s), and persons having the ability to access such data. The CJIS data applicable to the Security Policy is the data described as such in said Policy **plus all data transmitted over the Oklahoma Law Enforcement Telecommunications System ("OLETS") which is operated by DPS.**

In order to have access to CJI or to the aforesaid hardware or software, the vendor must be familiar with the FBI CJIS Security Policy, including but not limited to the following portions of said Security Policy:

    1.    the Definitions and Acronyms in §3 & Appendices "A" & "B";

2.    the general policies in §4;
3.    the Policies in §5;
4.    the appropriate forms in Appendices "D", "E", "F" & "H"; and
5.    the Supplemental Guidance in Appendices "J" & "K".

This FBI Security Policy is located and may be downloaded at:

By executing the Contract to which this Directive is attached, the vendor hereby CERTIFIES that the foregoing directive has and will be followed, including but not limited to full compliance with the FBI CJIS Security Policy, as amended and as applicable.

| Policy Requirement Checklist | | Compliance checklist |
|---|---|---|
| Policy Area 1 | Information Exchange Agreements | |
| Policy Area 2 | Security Awareness Training | |
| Policy Area 3 | Incident Response | |
| Policy Area 4 | Auditing and Accountability | |
| Policy Area 5 | Access Control | |
| Policy Area 6 | Identification and Authentication | |
| Policy Area 7 | Configuration Management | |
| Policy Area 8 | Media Protection | |
| Policy Area 9 | Physical Protection | |
| Policy Area 10 | Systems and Communications Protection and Information Integrity | |
| Policy Area 11 | Formal Audits | |
| Policy Area 12 | Personnel Security | |

47602293634.6
602293634.7
602293634.8

# ATTACHMENT C

**Scope of Work**

I.  Definitions. For purposes of this Scope of Work, definitions shall be as follows:

1.  Grants: Stay in School Scholarship and Bridge the Gap Scholarship Grants, collectively.
2.  Applicant(s): Parent or legal guardian applying for Grants eligibility on behalf of their K-12 student(s).
3.  Account Holder(s): Parent or legal guardian approved for participation in the Grants on behalf of their K-12 student(s)
4.  Provider(s): Approved private school provider.
5.  School(s): School applying to be a Provider but not yet approved.
6.  Stakeholders: Collective term used to refer to Applicants, Account Holders, Providers, Schools, and other members of the public with an interest in the Grants.
7.  Application System: online platform for Applicants and Providers to submit requested information to determine eligibility for the Grants
8.  Submitted Application: Once the Applicant commits to the process and clicks the submit button in the Application System.
9.  Fiscal Management and Payment System: online platform for Account Holders to receive grants and use grants to make payments as determine by Grants guidelines
10. Platform: Umbrella term referring to all components including Application System, Fiscal Management and Payment System, online support and training, and online reporting services.

II.  The Supplier shall create and supply a parent and student friendly online platform for use by Stakeholders. The Platform shall be designed for ease of use by Applicants and include: (1) an Applicant application portal for the Grants and a Provider application portal (collectively, the "Application System"); and (2) a Fiscal Management and Payment System ("Fiscal Management and Payment System"); support and training; and reporting services. Users will include Applicants, Providers, Schools, and any other Stakeholders.

III.  Timelines:

1.  The Platform shall be completed by August 10, 2020 (go-live).
2.  The Application System shall be closed once all Grants have been awarded, or December 30, 2020, whichever is earliest.

IV.  Application System: The Supplier shall create and provide an interactive Application System that meets the following specifications.

1.  General Requirements: The Application System shall provide the ability to do the following:
    1.  Input and upload data from applicants Internal Revenue Service tax forms.
    2.  Input data from government assistance programs such as TANF and SNAP.
    3.  Input personal information for multiple students in household on the same application.
    4.  Provide verification review of income based on data input by the Applicant, and identify the potential need for further review and processing.
    5.  Compare Applicant reported income to income thresholds defined by the program and determine eligibility for both Grants.
    6.  Require and allow the upload of forms into the Application System.
    7.  Allow electronic verification and acknowledgment by the Applicant of required assurances and rules of the program.

48602293634.6
602293634.7
602293634.8

8. Allow Applicant to start and stop an application mid-stream and save information to be able to resume later.
9. Allow Applicant to choose a pre-qualified school and upload an acceptance letter, or provide a verification report to a designated individual at a Provider to verify the Applicant has been accepted or attends the School.
10. Applicants may apply to both Stay in School Scholarship and Bridge the Gap Scholarship grants on the same application and applicable income guidelines will be applied to each respective grant.
11. Multiple students in a family may receive Stay in School Scholarship grants.
12. Once all Stay in School Scholarship grants are awarded, the Application Portal will remain open only for consideration of Bridget the Gap Scholarship grants.

2. **Applicant Application Portal:** The Application System shall provide the ability to do the following:
   1. Provide stages of approval based on existing system and reporting capabilities. This may include: Provider Assignment Review Pending, Provider Assignment Verified, Income Review Pending, Income Verified, and Provider Acceptance.
   2. Allow a System Administrator to view application status, including what applications are in process, income over guideline, incomplete, or approved.
   3. Allow a System Administrator or a Provider to upload or input documents on behalf of Applicants.
   4. Generate an acceptance or denial letter to Applicants.
   5. Allow Applicants to apply each year for renewal.
   6. Bundle siblings into the same Applicants user account.
   7. Allow additional income verification documents to be uploaded to the applicant account
   8. Provide workflow for Applicants to confirm Provider after acceptance
   9. Notification to Applicants that a Provider needs to be selected
   10. Provider selection
   11. Potential upload of acceptance letter

V. **Fiscal Management and Payment System:** The Supplier shall create, maintain, and operate a Fiscal Management and Payment System in the Platform for use by Stakeholders. The Fiscal Management and Payment System requested shall provide the following:
   1. Ability to create notional virtual wallet accounts for Account Holders to easily receive funds and pay for expenses.
   2. Ability to establish an account for each Account Holder, and be able to bundle families while keeping each student account separate.
   3. Ability for Account Holders to pay tuition to Providers.
   4. Ability for Account Holders to purchase educational resources other than tuition such as technology, supplies books, etc. with approved ecommerce vendors integrated into the Fiscal Management and Payment System.
   5. Ability to utilize subaccounts within the account to earmark funds specifically for either tuition or for educational resources.
   6. Ability for Account Holders to check balances, authorize payment, and upload invoices and statements.
   7. Allow Schools to register for participation to become Providers and receive ACH payments.

VI. **Customer Service:** The Supplier shall provide customer service for all Stakeholders. Which shall include:
   1. Ability to reach an Application System customer service representative from 8:00 a.m. – 5:00 p.m. (Central Time), Monday – Friday, via email, chat, and phone, and a Fiscal Management

49602293634.6
602293634.7
602293634.8

and Payment System customer service representative from 8:00 a.m. – 8:00 p.m. (Eastern Time), Monday – Friday and 10:00 a.m. 4:00 p.m. (Eastern Time) Saturday via email, chat and phone

VII.    Reporting: The Supplier shall make the following reports available via the platform. Reports shall include:
1.  Status of Provider applications.
2.  Status of Applicant applications.
3.  Listing of current user accounts.
4.  Detail summaries of purchases and amounts.
5.  Aggregate account balances.
6.  Year-end close-out of accounts and balances.

VIII.   Training: The Supplier shall create and deliver training for all identified stakeholders.

IX.    Hardware/Operating System Specification: The Supplier shall take commercially reasonable measures in its control to make the Platform is compatible with current version and the two (2) previous versions ("N-2") of widely-used device platforms and software. The table below represents a current example of commonly used systems and versions:

| Platform | Operating System |
|----------|------------------|
| Windows | Version 7,8,10 |
| Apple | Mac OS10+ |
| Chromebook | Chrome OS 59+ |
| IOS | IOS 11+ |

X.    Web Browser Specifications: The system should be compatible with market-available web browsers including, but not limited to:

1.  Google Chrome,
2.  Microsoft Edge, Microsoft Internet Explorer 11 (partial support),
3.  Firefox, and
4.  Safari.

**Payment**

The fee for the scope of work quoted above is as follows:

Implementation Fee: $650,000.00

ClassWallet to Invoice OEQA upon execution of the contract $17,350,000.00 to distribute in grants pursuant to this Contract.

ClassWallet to Invoice OEQA $325,000.00 on August 10, 2020 Go-Live

ClassWallet to Invoice OEQA $325,000.00 on August 30, 2020 Go-Live De-brief Meeting



**OFFICE OF THE**
**ATTORNEY GENERAL**

February 6, 2024

**By Email**
Trevor Pemberton, General Counsel
Office of the Governor of the State of Oklahoma
2300 North Lincoln Boulevard, Suite 212
Oklahoma City, Oklahoma 73105
Trevor.Pemberton@gov.ok.gov

**Re: Your January 30, 2024, Letter to Attorney General Gentner Drummond**

Dear Mr. Pemberton:

I write to seek a shared understanding about the ethical requirements for government lawyers and the role of the Attorney General, given your citation to several inapposite Rules of Professional Conduct in the above-captioned letter. As an initial matter, I must reiterate that Attorney General Drummond does not represent the Governor as a general matter or in connection with any lawsuit against ClassWallet.

More broadly: government lawyers are, in a word, different. We are different from private counsel, and different from typical counsel for organizations. The Oklahoma Rules of Professional Conduct recognize the distinct role we play—and they recognize that they must bow to contrary Constitutional authority and yield to statutory mandates. Relevant acknowledgements include:

- "Under various legal provisions, including constitutional, statutory[,] and common law, the responsibilities of government lawyers may include authority concerning legal matters that ordinarily reposes in the client in private client-lawyer relationships. For example, a lawyer for a government agency may have authority on behalf of the government to decide upon settlement or whether to appeal from an adverse judgment. Such authority in various respects is generally vested in the attorney general and the state's attorney in state government, and their federal counterparts . . . ."[1] OKLA. RULES

---

[1] The Scope of the Rules of Professional Conduct controls over contrary guidance in the Rules themselves. For example, the Scope provides that government lawyers "may be authorized to represent several government agencies in intragovernmental legal controversies in circumstances where a private lawyer could not represent multiple private clients. These Rules do not abrogate any such authority." Scope, n.18. By explicitly granting that authority, the Scope permits representation that "involve[s] the assertion of a claim by one client against another client represented by the lawyer in the same litigation." *Accord Conn. Comm'n on Special Rev. v. Conn. Freedom of Info. Comm'n*, 387 A.2d 533, 537 (Conn. 1978); *State ex rel. Allain v. Miss. Pub. Serv. Comm'n*, 418 So.2d 779, 782 (Miss. 1982); NAT'L. ASS'N OF ATT'YS GEN., THE ANTICORRUPTION MANUAL: A GUIDE FOR STATE PROSECUTORS 277 (Amie N. Ely & Marissa G. Walker eds. 2021).

OF PROF'L. CONDUCT ("RPC") scope, n. 18.

- "Defining precisely the identity of the client and prescribing the resulting obligations of such lawyers may be more difficult in the government context and is a matter beyond the scope of these Rules." RPC r. 1.13, n. 9.
- "[F]or purposes of determining the lawyer's authority and responsibility, principles of substantive law external to these Rules determine whether a client-lawyer relationship exists." RPC scope, n. 17.

As follows from above, your letter incorrectly minimizes the Attorney General's constitutional and statutory role. As the state's chief law officer, 74 O.S. § 18, the Attorney General is constitutionally vested with "[e]xecutive authority of the state," OKLA. CONST. art. VI, § 1(A). In litigation, the Attorney General has the power to determine what is "advisable and in the best interest of the state," 74 O.S. § 18b(A)(3), including whether to settle, compromise, or dispose of an action, *id.* § 18b(12). Courts across the country have consistently held that these types of responsibilities mean that Attorneys General are "not constrained by the parameters of the traditional attorney-client relationship." *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1266 (Mass. 1977).[2]

Moreover, there is no blanket prohibition on the Attorney General "making public statements in any way adverse" to agencies or offices that this Office represented in the past, as alleged in your letter. Silencing dissent quells transparency and is anathema to good government. While ethical rules relating to client confidences may be implicated in some cases, they do not provide grounds for the Governor to seek to muzzle the Attorney General by claiming the mantle of "client" here. Once again, the Attorney General is not the Governor's attorney as a general proposition or in this matter. If, however, the Governor provided confidential information regarding the ClassWallet matter that you believe that this office has an ongoing duty to keep secret, *see* Rule 1.9. n.3, I welcome a conversation about those communications.

As should be clear, the constitutional and statutory duties of the Attorney General require a nuanced reading of the Rules of Professional Conduct. We take our ethical mandates extremely seriously and grapple daily with the varied and important legal obligations conferred upon our office. However, your wooden application of certain rules overlooks clear contrary authority—within the rules themselves, in Oklahoma's constitution and statutes, and in caselaw throughout the country—that acknowledges the need for flexibility to ensure that the People of Oklahoma are fully served by their Attorney General.

Sincerely,

*[signature]*

AMIE ELY
FIRST ASSISTANT ATTORNEY GENERAL
OF OKLAHOMA

---

[2] *See supra n. 1; see also, e.g., Superintendent of Ins. v. Att'y Gen.*, 558 A.2d 1197, 1202 (Me. 1989); NAT'L ASS'N OF ATT'YS GEN., STATE ATT'YS GEN. POWERS & RESPONSIBILITIES 91–111 (Emily Myers ed., 4th ed. 2018).



EXHIBIT
**H**

### GENTNER DRUMMOND
### ATTORNEY GENERAL

February 9, 2024

**_Via Email_**
Cheryl Plaxico, Esq.
Plaxico Law Firm, PLLC
cplaxico@plaxico.law

Dear Ms. Plaxico:

With the recent lawsuit filed on behalf of the State of Oklahoma against Kleo, Inc. (hereinafter referred to as "Class Wallet"), it has come to my attention that you are serving as counsel for the Office of Management and Enterprise Services ("OMES"). As you are aware, Oklahoma law requires state agencies to undergo a statutory approval process through my office to obtain private representation.[1] To date, however, OMES has failed to submit the requisite 20i Application Form.

While I understand that the responsibility to submit the 20i Application is that of the agency or entity seeking private counsel, the statutory mandate to seek 20i list approval is entirely the obligation of the attorney(s) representative. Your familiarity with this requirement is undisputable as you are currently on the 20i list. However, your co-counsel in the above referenced case is not. I am deeply concerned that you permitted an unauthorized attorney to act on behalf of an Oklahoma state agency.

Additionally, I am aware that, as recently as last year, you represented state entities for which appropriate 20i applications were submitted.[2] With this experience and knowledge, it is difficult to comprehend how the mandates of Oklahoma law were so recklessly disregarded. I am disappointed that you chose to accept state representation where the proper procedures were clearly ignored.

As a result of you and your client's decisions to bypass statutory requirements, my office is evaluating the implications of your impermissible representation. At the appropriate time, you will be notified of the actions my office deems necessary to take. In the interim, should you wish to provide additional information, you may send a written response to Deputy Attorney General Kindanne Jones at Kindanne.Jones@oag.ok.gov.

Respectfully,

GENTNER DRUMMOND
_Attorney General_

---

[1] 74 O.S. § 20i
[2] See https://www.oag.ok.gov/sites/g/files/gmc766/f/documents/2024/2023_calendar_year_20i_report.pdf

313 N.E. 21ST STREET • OKLAHOMA CITY, OK 73105 • (405) 521-3921 • FAX: (405) 521-6246

 recycled paper

EXHIBIT
I


* 1 0 5 7 7 0 7 4 8 9 *

# IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA *ex rel.* OFFICE )
OF MANAGEMENT AND ENTERPRISE )
SERVICES, )
                              )
            *Plaintiff,*             )
                              )
v.                               )
                              )    Case No. CJ-2024-619
KLEO, INC. d/b/a CLASSWALLET,    )
                              )
            *Defendant.*          )

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

FEB 1 2 2024

RICK WARREN
COURT CLERK
30

## ENTRY OF APPEARANCE OF OKLAHOMA ATTORNEY GENERAL

I am the duly elected and sworn Attorney General for the State of Oklahoma.

The State of Oklahoma *ex rel.* Office of Management and Enterprise Services is the named

plaintiff in the operative Petition filed in the above-entitled cause. The Petition makes clear that the

suit arises out of a contract between the State and a private entity.

As Oklahoma Attorney General, I have the authority to take and assume control of the

prosecution of the State's interests in this case. The Oklahoma Constitution provides that: "The

Executive authority of the state shall be vested in a Governor... Attorney General... and other

officers provided by law and this Constitution... and shall perform such duties as may be designated

in this Constitution or prescribed by law." OKLA. CONST. art. VI, § 1. As it relates to the State's

involvement in litigation, Oklahoma law currently provides that "the Attorney General as the chief

law officer of the state" has the power and duty:

> To initiate or appear in any action in which the interests of the state or the
> people of the state are at issue, or to appear at the request of the Governor, the
> Legislature, or either branch thereof, and prosecute and defend in any court or
> before any commission, board or officers any cause or proceeding, civil or criminal, in
> which the state may be a party or interested; and when so appearing in any such cause
> or proceeding, **the Attorney General may, if the Attorney General deems it
> advisable and to the best interest of the state, take and assume control of the
> prosecution or defense of the state's interest therein.**

1

Okla. Stat. Ann. tit. 74, § 18b(A)(3) (emphases added).[1]

Therefore, my Office clearly has the power to assume and control the State's litigation. *State ex rel. Derryberry v. Kerr-McGee Corp.*, 1973 OK 132, ¶ 20, 516 P.2d 813, 818 ("In the absence of explicit legislative or constitutional expression to the contrary, [the Attorney General] possesses complete dominion over every litigation in which he properly appears in the interest of the State, whether or not there is a relator or some other nominal party."). Consistent with this power, I hereby take and assume control of the prosecution of the State's interest in this litigation.

I do not take this action lightly. After reviewing the claims brought in this lawsuit, as well as those in the original lawsuit on this matter, I see no other option because the claims are wholly without merit. Two separate audits compel this conclusion: One from the United States Department of Education's Office of Inspector General[2] and another from the Oklahoma State Auditor.[3] While the Governor's Office may be eager to shift blame for the misuse of over half a million dollars of federal funds, those audits confirm that his administration rejected ClassWallet's internal controls and did not perform review expenditures. When ClassWallet asked the person managing the program on behalf of the State, Ryan Walters, whether ClassWallet should direct questions regarding allowable items for

---

[1] It should be noted that this statute was amended in 1995 to add the language permitting my Office to appear "in any action in which the interests of the state or the people of the state are at issue," i.e., my Office can now appear in litigation on my own initiative. CORPORATION COMMISSION—OIL AND GAS—REVENUE AND TAXATION—APPORTIONMENT OF EXCISE TAX MONIES, 1995 Okla. Sess. Law Serv. Ch. 328 (S.B. 233) (WEST); *see also State, ex rel., Pruitt v. Steidley*, 2015 OK CR 6, ¶ 15, 349 P.3d 554, 558 (recognizing that the authority of the attorney general in Okla. Stat. Ann. tit. 74, § 18b was expanded in 1995). Consequently, the limited case law interpreting my Office's power prior to 1995 has been rendered obsolete.

[2] U.S. DEP'T OF EDUC. OFFICE OF INSPECTOR GEN., *Oklahoma's Admin. of the Governor's Emergency Educ. Relief Fund Grant*, (July 18, 2022), https://oig.ed.gov/sites/default/files/reports/2024-02/Oklahoma%25E2%2580%2599s-Administration-Governor%25E2%2580%2599s-Emergency-Education-Relief-Fund-Grant.pdf.

[3] OKLA. STATE AUDITOR & INSPECTOR, *State of Oklahoma: Single Audit Report* (June 27, 2023), https://www.sai.ok.gov/Search%20Reports/database/2021SingleAudit.pdf.

purchase to the State, Walters responded that there was blanket approval with vendors on the platform. Okla. Audit at 58.

The filing of such a meritless suit leaves the State open to paying hundreds of thousands in Defendant's attorneys' fees pursuant to 12 O.S. § 936. As the guardian of the State's interests, I will not sit idly by while taxpayer funds are threatened by frivolous suits. Accordingly, I deem it advisable and in the best interests of the State of Oklahoma to take and assume control of the prosecution of the State's interests in the above-entitled cause.

Further, the attorney purporting to represent the State, Cheryl Plaxico, is hereby terminated. The process for a state agency to obtain legal counsel is laid out in 74 O.S. § 20i. If an agency wishes to be represented by a private attorney, it "shall select an attorney ... from a list of attorneys and firms maintained by the Attorney General." *Id.* § 20i(B). Before entering into a contract with a private attorney, the agency must provide a copy of the proposed contract to the Attorney General. *Id.* § 20i(I). Following this, the Attorney General determines whether to approve the contract. *See Id.* § 20i(J). This process was not followed. Thus, Cheryl Plaxico never represented the State in this matter, and her purported representation of the State in this matter is hereby terminated.

Accordingly, I enter my appearance as counsel in this case for the State of Oklahoma *ex rel.* Office of Management and Enterprise Services solely for the purpose of protecting the interests of the State of Oklahoma.

Feb. 12, 2024.

GENTNER F. DRUMMOND, OBA #16645
*Attorney General*
GARRY M. GASKINS, II OBA #20212
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (fax)
Gentner.Drummond@oag.ok.gov

3

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Entry of Appearance was mailed this 12th day of February 2024, by depositing it in the U.S. Mail, postage prepaid, or by electronic mail to:

Cheryl Plaxico
Plaxico Law Firm, PLLC
923 N. Robinson Ave., 5th Floor
Oklahoma City, OK 73102

Gentner F. Drummond

4





**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

IN DISTRICT COURT
OKLAHOMA COUNTY

FEB 1 2 2024

**RICK WARREN**
**COURT CLERK**
30 _____

STATE OF OKLAHOMA *ex rel.* OFFICE )
OF MANAGEMENT AND ENTERPRISE )
SERVICES, )
)
    *Plaintiff,* )
)
v. )
)
KLEO, INC. d/b/a CLASSWALLET, )
)
    *Defendant.* )

Case No. CJ-2024-619

## DISMISSAL WITH PREJUDICE

The State of Oklahoma dismisses, with prejudice, its petition filed on January 30, 2024 because the claims are wholly without merit. No claim for costs or attorneys' fees can be made against the State because the summons and petition have not yet been served on the Defendant.

Feb. 12, 2024.

_____
GENTNER F. DRUMMOND, OBA #16645
    *Attorney General*
GARRY M. GASKINS, II OBA #20212
    *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (fax)
Gentner.Drummond@oag.ok.gov

1

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Dismissal with Prejudice was mailed this 12th

day of February 2024, by depositing it in the U.S. Mail, postage prepaid, or by electronic mail to:

Cheryl Plaxico
Plaxico Law Firm, PLLC
923 N. Robinson Ave., 5th Floor
Oklahoma City, OK 73102

_____
Gentner F. Drummond

2





## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

AUG - 9 2024

RICK WARREN
COURT CLERK

106

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

AUG 12 2024

RICK WARREN
COURT CLERK

155

| | |
|---|---|
| STATE OF OKLAHOMA *ex rel* OFFICE OF MANAGEMENT AND ENTERPRISE SERVICES, | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) Case No. CJ-2024-619 |
| KLEO, INC. d/b/a CLASSWALLET, | ) ) |
| *Defendant.* | ) ) |

### Journal Entry

On June 24, 2024, the above-entitled action came before this Court on the Attorney General's Opposed Motion to Stay Proceedings and Plaintiff's Motion to Deem Invalid and Set Aside the Dismissal with Prejudice and Entry of Appearance of Oklahoma Attorney General.

The Court, having considered the Parties' briefs, having heard the argument of counsel, and being well and fully advised, FINDS that good cause exists to stay the proceedings pending the Oklahoma Supreme Court's resolution of the certified question in *Cherokee Nation v. United States Department of the Interior*, No. CQ-122108 (Okla. 2024).

The Court further finds that the stay and the dispute over the validity of the Dismissal with Prejudice and Entry of Appearance of Oklahoma Attorney General—an issue not yet addressed by this Court—constitutes good cause for service of process not being made on Defendant within the time laid out in 12 O.S. § 2004(I).

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that the Attorney General's Opposed Motion to Stay Proceedings is GRANTED, Plaintiff's Motion to Deem Invalid and Set Aside the Dismissal with Prejudice and Entry of Appearance of Oklahoma Attorney General is STAYED, subject to the Court's discretion to lift the stay, *sua sponte*, or on motion of counsel.

It is further ORDERED that the time period for service of process set forth in 12 O.S. § 2004(I) is extended during the period of this Court's stay and until further order of this Court.

It is further ORDERED that the Attorney General, in collaboration with other counsel of record in this matter, shall update this Court every sixty (60) days as to the status of *Cherokee Nation v. United States Department of the Interior*, No. CQ-122108 (Okla. 2024).

HONORABLE SHEILA D. STINSON
OKLAHOMA COUNTY DISTRICT JUDGE
8/12/24

2

Approved as to form:

Cheryl Plaxico, OBA No. 4499
Austin Moseley, OBA No. 35690
PLAXICO LAW FIRM PLLC
923 N. Robinson Ave., 5th Floor
Oklahoma City, Oklahoma 73102
Telephone: (405) 400-9609
cplaxico@plaxico.law
amoseley@plaxico.law

and

Trevor S. Pemberton, OBA No. 22271
*General Counsel*
OFFICE OF GOVERNOR J. KEVIN STITT
2300 N. Lincoln Blvd., Ste. 212
Oklahoma City, OK 73105
(405) 521-2342
Trevor.Pemberton@gov.ok.gov
*Attorneys for Plaintiff*

GARRY M. GASKINS, II OBA #20212
*Solicitor General*
WILL FLANAGAN, OBA #35110
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov
William.Flanagan@oag.ok.gov

3



ORIGINAL

EXHIBIT

L

2025 OK 4

* 1 0 6 0 8 5 2 5 5 6 *

# IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

| | |
|---|---|
| THE CHEROKEE NATION,<br>a federally recognized Indian Tribe,<br>17675 S. Muskogee Ave.<br>Tahlequah, OK 74464, | )<br>)<br>)<br>)<br>) |
| THE CHICKASAW NATION,<br>a federally recognized Indian Tribe,<br>520 E. Arlington St.<br>Ada, OK 74820, | )<br>)<br>)<br>)<br>) |
| THE CHOCTAW NATION<br>a federally recognized Indian Tribe,<br>1802 Chukka Hina Dr.<br>Durant, OK 74701, and | )<br>)<br>)<br>)<br>) |
| THE CITIZEN POTAWATOMI NATION,<br>a federally recognized Indian Tribe,<br>1601 S. Gordon Cooper Dr.<br>Shawnee, OK 74801, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) |
| UNITED STATES DEPARTMENT OF THE<br>INTERIOR, DAVID BERNHARDT, in his<br>official capacity as the Secretary of the Interior,<br>TARA KATUK MAC LEAN SWEENEY, in her<br>official capacity as the Assistant Secretary of the<br>Interior – Indian Affairs, United States<br>Department of the Interior,<br>1849 C Street N.W.<br>Washington, DC 20240, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**
SUPREME COURT
STATE OF OKLAHOMA

**JAN 22 2025**

JOHN D. HADDEN
CLERK

Rec'd (date) 1-22-25
Posted
Mailed
Distrib
Publish    yes    no

No. 122,108

J. KEVIN STITT, in his official capacity as the )
Governor of the State of Oklahoma, )
2300 N. Lincoln Blvd. #212 )
Oklahoma City, OK 73105, )
 )
WILLIAM NELSON, SR., in his official )
capacity as the Chairman of the Business )
Committee of the Comanche Nation, )
584 NW Bingo Rd. )
Lawton, OK 73507, )
 )
JOHN R. SHOTTON, in his official capacity as )
the Chairman of the Tribal Council of the Otoe- )
Missouria Tribe of Indians )
8151 Hwy 177 )
Red Rock, OK 74651, )
 )
JOE BUNCH, in his official capacity as the )
Chief of the United Keetoowah Band of )
Cherokee Indians in Oklahoma )
18263 Keetoowah Cir. )
Tahlequah, OK 74464, and )
 )
BRIAN GIVENS, in his official capacity as the )
Mekko of the Kialegee Tribal Town )
100 Kialegee Dr. )
Wetumka, OK 74883, )
 )
     Defendants, )
 )
and )
 )
GENTNER DRUMMOND, in his official )
capacity as the Attorney General of the State of )
Oklahoma, )
 )
     Real Party in Interest. )

2

## CERTIFIED QUESTION FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

¶ 0    The United States District Court for the District of Columbia certified a question of state law to the Court pursuant to the revised Uniform Certification of Questions of Law Act, 20 O.S. 2011 §§ 1601-1611.

## CERTIFIED QUESTION ANSWERED

Colin Cloud Hampson and Frank Sharp Holleman, IV, Sonosky, Chambers, Sachse, En-Dreson & Perry, LLP, Bonita, California, for Plaintiffs Cherokee Nation, Chickasaw Nation, Choctaw Nation, and Citizen Potawatomi Nation

Chad C. Harsha, Cherokee Nation-Attorney General Office, Tahlequah, Oklahoma, for Plaintiff Cherokee Nation

Meredith Presley Turpin, Chickasaw Nation, Office of Executive Counsel, Ada, Oklahoma, for Plaintiff Chickasaw Nation

Stephen Greetham, Greetham Law, PLLC, Oklahoma City, Oklahoma, for Plaintiff Chickasaw Nation

Brian Danker, Durant, Oklahoma, for Plaintiff Choctaw Nation

Kristofor R. Swanson and Matthew M. Marinelli, U.S. Department of Justice, DOJ-ENRD, Natural Resources Section, Washington, DC, for Defendant United States Department of Interior

Phillip G. Whaley, Daniel G. Webber, Jr., Matthew C. Kane, and Patrick R. Pearce, Jr., Ryan Whaley, Oklahoma City, Oklahoma, for Defendant Governor J. Kevin Stitt

Jeffrey B. Wall and Judson O. Littleton, Sullivan & Cromwell LLP, Washington, DC, for Defendant Governor J. Kevin Stitt

Gentner Drummond, Garry M. Gaskins, II, Kyle Peppler, and William Flanagan, Office of the Attorney General, State of Oklahoma, for Defendant State of Oklahoma

**DARBY, J.**

3

¶ 1    The United States District Court for the District of Columbia certified the following question of state law to this Court under the Revised Uniform Certification of Questions of Law Act, 20 O.S. §§ 1601-1611.

> May the Attorney General of Oklahoma, under Title 74, Section 18 of the Oklahoma Statutes, "take and assume control" of the "defense of the state's interests," Okla. Stat. tit 74 § 18b(A)(3), in the instant case before this Court – in which the Governor of Oklahoma is named as a defendant in his official capacity for his role in entering into certain tribal-gaming contracts on behalf of the State of Oklahoma – over the objection of the Governor, who is vested with "Supreme executive power" under Article VI, Section 2 of the Oklahoma Constitution, and when the Governor has already exercised his authority under Title 74, Section 6 of the Oklahoma Statutes to "employ counsel to protect the rights or interests of the state," Okla. Stat. tit 74 § 6?

¶ 2    The certified question is answered in the negative.

## I.    CERTIFIED FACTS AND PROCEDURAL HISTORY

¶ 3    The underlying facts of this case are set out in the federal court's certification order. In answering a certified question, this Court will not presume facts outside those offered by the certification order. *See Siloam Springs Hotel, LLC v. Century Surety Co.*, 2017 OK 14, ¶ 2, 392 P.3d 262, 263; *Howard v. Zimmer, Inc.*, 2013 OK 17, n.5, 299 P.3d 463, 465 n.5; *In re Harris*, 2002 OK 35, ¶ 4 n.5, 49 P.3d 710, 713 n.5; *Jones v. Univ. of Cent. Okla.*, 1995 OK 138, ¶ 5, 910 P.2d 987, 989. While this Court will neither add to nor delete from such facts, we may consider uncontested facts supported by the record. *Siloam Springs*, 2017 OK 14, ¶ 2, 392 P.3d at

4

263; *Howard*, 2013 OK 17 n.5, 299 P.3d at 456 n.5; *In re Harris*, 2002 OK 35, ¶ 4, 49 P.3d at 713.

¶ 4     The underlying case is about the validity of certain tribal-gaming compacts for casino operations in Oklahoma entered into under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §2701 *et seq.* In August 2020, four Native American tribes (Plaintiff tribes) brought the underlying action in federal court seeking to invalidate the compacts at issue which were entered into by Governor J. Kevin Stitt and four other Native American tribes. The Plaintiff tribes each operate casinos in Oklahoma. The compacts at issue were submitted to the U.S. Secretary of the Department of the Interior for approval and were approved by operation of law. In their federal lawsuit, the Plaintiff tribes seek review and reversal of this approval. They maintain that the new compacts were not lawfully entered into by the Governor and violated Oklahoma law, and that by executing these compacts the Governor has played a role in violating their rights under the IGRA.[1]

¶ 5     The Governor has been represented by private retained counsel since the lawsuit began, pursuant to Section 6 of Title 74, which authorizes the Governor "to employ counsel to protect the rights or interests of the state." The Governor filed his first answer in January 2021, and filed an answer to the operative complaint in

---

[1] The Plaintiff tribes also sued the U.S. Department of the Interior and related federal officials there, as well as the leaders of the tribes who entered into the compacts with Governor Stitt. The certified question before this Court does not involve those sets of defendants.

October 2021, in his official capacity as Governor of the State of Oklahoma and for the State of Oklahoma as the real party in interest.

¶ 6    In July 2023, two and one-half years after the Governor filed his first answer, the Attorney General of Oklahoma filed a five-page Notice of Appearance in the federal case, asserting that pursuant to Section 18b(A)(3) of Title 74,[2] he is authorized to "take and assume control" of the "defense of the state's interests." Notice of Appearance of Oklahoma Attorney General; Rec. at 1441. The Attorney General argued that the compacts at issue were invalid, and that the Oklahoma Supreme Court has "clearly and unambiguously" ruled that the Governor had no authority to unilaterally execute them. *Id.* at 1443 (citing *Treat v. Stitt*, 2020 OK 64, 473 P.3d 43 and *Treat v. Stitt*, 2021 OK 3, 481 P.3d 240).[3]    Accordingly, the Attorney General maintained that the Governor has abrogated his duty under the Oklahoma Constitution, Article VI, Section 8, to "cause the laws of the State to be faithfully executed." On the same day, the Oklahoma Solicitor General also filed a Notice of Appearance in the federal case "as attorney for J. Kevin Stitt, in his official capacity as the Governor of the State of Oklahoma, solely for the purpose of protecting the interests of the State of Oklahoma." Notice of Appearance; Rec. at 1451-52). There, the Solicitor General specified "[t]o be clear, my client in this

---

[2] *See* pertinent text of Section 18b *infra* at ¶ 17.

[3] *See* discussion of *Treat I* and *Treat II*, *infra*, at ¶ 11.

6

case is the real party in interest, the State of Oklahoma, not the Governor." Notice of Appearance; Rec. at 1451 n.1.[4]

¶ 7    The Governor filed a motion to strike the Attorney General's and Solicitor General's appearances and argued that the Attorney General does not have statutory authority to replace counsel already hired by the Governor.  The Governor pointed out that Oklahoma law authorizes him to "employ counsel to protect the rights or interests of the state in any action or proceeding, civil or criminal, which has been, or is about to be commenced." 74 O.S. 2011, § 6.  He further asserted that, because the Governor holds "Supreme Executive power" pursuant to the Oklahoma Constitution, Article VI, Section 2, the Attorney General does not have authority to seize the litigation from the Governor.  After analyzing the issue, the U.S. District Court for the District of Columbia certified the above-stated question of law to this Court.

## II.    PROCEDURE AND REQUIREMENTS FOR ANSWERING CERTIFIED QUESTIONS

¶ 8    This Court is authorized to answer unresolved questions of law if certified in accordance with the Revised Uniform Certification of Questions of Law Act, 20 O.S. 2021, §§ 1601-1611. *See Siloam Springs, supra,* 2017 OK 14, ¶ 14, 392 P.3d

---

[4] In his appearance, the Solicitor General adopted and incorporated by reference the Attorney General's Notice of Appearance and did not raise any independent arguments beyond those asserted by the Attorney General.  In the pleadings filed by the Attorney General, the names of both the Solicitor General and the Attorney General appear in the signature block.  For purposes of this opinion, our analysis applies to both the Attorney General's and the Solicitor General's appearances in the underlying federal case.

at 265-66; *Gov't Employees Ins. Co. v. Quine*, 2011 OK 88, ¶ 13, 264 P.3d 1245, 1248. In determining whether a certified federal question of law should be answered by this Court, we consider the factors stated in 20 O.S. 2021, § 1602 – 1) whether the answer is dispositive of an issue in pending litigation in the certifying court, and 2) whether there is established and controlling law on the subject matter. *Siloam Springs*, 2017 OK 14, ¶ 14, 392 P.3d at 266; *Quine*, 2011 OK 88, ¶ 13, 264 P.3d at 1248.

¶ 9    Both requirements in Section 1602 are satisfied here. First, answering the certified question would clearly be determinative of a pending issue in the underlying case – whether the federal court should strike the appearance of the Attorney General. Second, the certified question presents an issue of first impression for which there is no controlling Oklahoma precedent.

## III.  ADDITIONAL BACKGROUND

### A. The Litigation History of the Gaming Compacts at Issue - *Treat I, Treat II,* and IGRA

¶ 10    Oklahoma's State-Tribal Gaming Act (the Act) provides the terms and conditions under which the State's federally recognized tribes can engage in Class III gaming on tribal land through compacts. 3A O.S. Supp. 2018 §§ 261-282. The Act is "game-specific" and prohibits certain house-banked card, dice, and table games, as well as event wagering. 3A O.S. Supp. 2018, § 262(H). The Act also

8

provides a Model Compact which includes fixed terms required for use in tribal gaming agreements. 3A O.S. Supp. 2018, § 280.1; 3A O.S. Supp. 2012, § 281. Procedurally, the Governor is authorized to enter into tribal gaming compacts via two methods – 1) by using an agreement conforming with the Model Compact, or 2) if the tribal gaming compact contains provisions different from those in the Model Compact, by obtaining approval for the agreement from the Joint Committee on State-Tribal Relations (Joint Committee), as provided in Section 1221 of Title 74.[5]

¶ 11    Under this legal framework, this Court previously declared that two of the tribal gaming compacts at issue – those entered into between the Governor and the Comanche and Otoe-Missouria Tribes – were invalid under Oklahoma law because the gaming compacts authorized certain forms of Class III gaming prohibited by state law. *Treat v. Stitt*, 2020 OK 64, ¶¶ 6-8, 473 P.3d 43, 45 [hereinafter *Treat I*]. While *Treat I* was pending before this Court, the Governor entered into two more gaming compacts with the United Keetoowah Band of Cherokee Indians (UKB) and the Kialegee Tribal Town (KTT). This Court subsequently ruled that those two

---

[5] 74 O.S. Supp. 2012, § 1221, paragraph (C), states in pertinent part:

> 1. The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest. The Governor may elect to name a designee who shall have authority to negotiate and enter into cooperative agreements on behalf of the state with federally recognized Indian tribes as provided for in this section. Except as otherwise provided by this subsection, such agreements shall become effective upon approval by the Joint Committee on State-Tribal Relations.

9

compacts were also invalid under Oklahoma law because they contained terms different from the Model Compact authorized by statute and were not approved by the Joint Committee. *Treat v. Stitt*, 2021 OK 3, ¶ 11-12, 481 P.3d 240, 243-44 [hereinafter *Treat II*].

¶ 12    While the *Treat I* and *Treat II* cases dealt with the compacts under Oklahoma law, the underlying case in the D.C. District Court involves the federal procedures governing the tribal gaming compacts. After a state and an Indian tribe have entered into a gaming compact, the next part of the process involves the federal IGRA, under which the compact is submitted to the Secretary of the Interior for approval. 25 U.S.C. §§ 2710(d)(3)(B), 2710(d)(8).[6]    If the Secretary does not approve or

---

[6] The pertinent language in paragraph (d)(3) of 25 U.S.C. § 2710 is as follows:

  (A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

  (B) Any State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register.

Paragraph (d)(8) of 25 U.S.C. § 2710 states:

  (A) The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe.

  (B) The Secretary may disapprove a compact described in subparagraph (A) only if such compact violates–
      (i) any provision of this chapter,
      (ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or
      (iii) the trust obligations of the United States to Indians.

disapprove the compact within forty-five (45) days, the compact is considered to have been approved by the Secretary, but only to the extent it complies with the provisions of the IGRA. 25 U.S.C. § 2710(d)(8)(C). In the present case, all four compacts were submitted to the Secretary, and the Secretary took no action on any of them within the required forty-five (45) days.[7] After the "no action" approval, the Secretary published the compacts in the Federal Register – the Comanche and Otoe-Missouria compacts on June 29, 2020, and the UKB and KTT compacts on September 8, 2020 – at which time the compacts "took effect" as a matter of federal law. 25 U.S.C. §2710(d)(3)(B).[8]

¶ 13    The Plaintiff tribes challenge the status of the compacts under the federal law, asserting that their various defects under Oklahoma law preclude the Secretary's "no action" approval. The Plaintiff tribes seek declaratory relief setting aside the Secretary's approval of all four compacts. *See* First Amended and Supplemented Complaint; Rec. at 509, *et seq.*

---

(C) If the Secretary does not approve or disapprove a compact described in subparagraph (A) before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter.

(D) The Secretary shall publish in the Federal Register notice of any Tribal-State compact that is approved, or considered to have been approved, under this paragraph.

[7] The Plaintiff tribes and the Attorney General submitted comments to the Secretary setting forth various objections to the compacts and explaining why they should not be approved. The Secretary did not respond to those objections, and instead took no action within the forty-five-day period.

[8] We issued *Treat I* on July 21, 2020 (reh'g denied Sept. 14, 2020), applicable to the Comanche Nation and Otoe-Missouria compacts. We issued *Treat II* on Jan. 26, 2021, applicable to the UKB and KTT compacts.

11

¶ 14    Governor Stitt selected and retained his own counsel who has represented the Governor in defending the federal case since January 2021.    In his defense, Governor Stitt has maintained that the approval of the compacts remains valid under the federal IGRA, and that any provisions which were subsequently determined to violate state law can be severed.    The Governor asserts that a compact which has already taken effect under federal law cannot be rendered invalid as a result of later disputes under state law.    *See* Memorandum of Law in Support of Defendant Governor J. Kevin Stitt's Rule 12(C) Motion, ECF # 154 and 154-1 at 18-21, Rec. at 1376-79.    As these issues unfold in the underlying case, the Attorney General now seeks to appear on behalf of the Governor and the State.

**B. The Governor and the Attorney General Both Possess Statutory Authority Regarding Representation of the State's Interests in Litigation**

¶ 15    Section 18c of Title 74 sets up Oklahoma's overall approach regarding the employment of attorneys by state officers, boards, and commissions.    Under this statute, state entities are generally prohibited from employing or appointing attorneys, and instead the duties of legal representation are vested in the Attorney General.    The statute, however, also provides several exceptions to this general pronouncement, and it specifically authorizes the Governor "to employ special counsel to protect the rights or interest of the state."    74 O.S. Supp. 2019, § 18c(A)(4)(a).    The pertinent parts of Section 18c are as follows:

12

A. 1. Except as otherwise provided by this subsection, no state officer, board or commission shall have authority to employ or appoint attorneys to advise or represent said officer, board or commission in any matter.

. . . .

4. All the legal duties of such officer, board or commission shall devolve upon and are hereby vested in the Attorney General; provided that:

a. *the Governor shall have authority to employ special counsel to protect the rights or interest of the state as provided in Section 6 of this title,* . . .

74 O.S. Supp. 2019, § 18c (emphasis added).

¶ 16   Section 6 of Title 74, which is referenced in Section 18c(4)(a), specifies that the Governor has the power to retain independent legal counsel in cases involving interests of the State, and to direct the activities of his employed counsel.  Section 6 states as follows:

> *The Governor shall have power to employ counsel to protect the rights or interests of the state in any action or proceeding, civil or criminal, which has been, or is about to be commenced,* and the counsel so employed by him may, *under the direction of the Governor*, plead in any cause, matter, or proceeding in which the state is interested or a party, may prosecute offenses against the law of the state, and may institute and conduct proceedings before grand juries; provided, that nothing herein contained shall limit the power of courts of record to appoint an attorney to prosecute criminal actions in such courts when the district attorney is disqualified or unable to act.

74 O.S. 2011, § 6 (emphasis added).

13

¶ 17    The statutory scheme regarding the Attorney General's authority is further laid out in Title 74, Section 18b, which designates the Attorney General as the chief law officer for the State of Oklahoma and enumerates the many duties of that office. With regard to the Attorney General's representation of the State in legal proceedings, the pertinent portions of Section 18b are as follows:

> §A. The duties of the Attorney General as the *chief law officer* of the state shall be:
>
> 1. To appear for the state and prosecute and defend all actions and proceedings, civil or criminal, in the Supreme Court and Court of Criminal Appeals in which the state is interested as a party;
>
> 2. To appear for the state and prosecute and defend all actions and proceedings in any of the federal courts in which the state is interested as a party;
>
> 3. *To initiate or appear in any action* in which the interests of the state or the people of the state are at issue, *or to appear at the request of the Governor,* the Legislature, or either branch thereof, and prosecute and defend in any court or before any commission, board or officers any cause or proceeding, civil or criminal, in which the state may be a party or interested; *and when so appearing in any such cause or proceeding,* the Attorney General may, if the Attorney General deems it advisable and to the best interest of the state, *take and assume control of the prosecution or defense of the state's interest therein;*

74 O.S. Supp. 2022, § 18b (emphasis added).

¶ 18    Relying largely upon Section 18b, the Attorney General asserts that he has broad authority to assume control of the State's defense in any litigation involving the State's interests. The Governor, however, points to the specific sections which

provide him with the clear "authority to employ counsel to protect the rights or interest of the state" and to direct his chosen counsel how to proceed in that litigation. 74 O.S. Supp. 2019, § 18c(A)(4)(a); 74 O.S. 2021, § 6. After considering the arguments of both sides, the federal court determined that the State's statutory scheme alone provides no established and controlling law which resolves this dispute. Memorandum Opinion and Order; Rec. at 1521.

### C. The Constitution Vests the Governor with Supreme Executive Power

¶ 19    Article VI, Section 1 of the Oklahoma Constitution enumerates the executive branch offices of the State. It provides:

> The Executive authority of the state shall be vested in a *Governor*, Lieutenant Governor, Secretary of State, State Auditor and Inspector, *Attorney General*, State Treasurer, Superintendent of Public Instruction, Commissioner of Labor, Commissioner of Insurance and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books and papers at the seat of government, and shall *perform such duties as may be designated in this Constitution or prescribed by law.*

Okla. Const. art. VI, § 1(A) (emphasis added).

¶ 20    The Constitution makes no further reference to the duties or powers of the Attorney General. With regard to the Governor, however, the Constitution states that "[t]he *Supreme Executive power* shall be vested in a *Chief Magistrate*, who shall be styled 'The Governor of the State of Oklahoma.'" Okla. Const. art. VI, § 2 (emphasis added). Section 8 of Article VI further provides that "[t]he Governor

15

shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States, and he shall be a conservator of the peace throughout the State." Okla. Const. art. VI, § 8.

¶ 21    The Governor maintains that the Attorney General's attempt to take and assume control of the underlying case is incompatible with the Oklahoma Constitution. He points out that the Oklahoma Constitution does not enshrine any express powers of the Attorney General, and argues that the Attorney General's authority is constitutionally inferior to the Governor's. The Governor asserts that the Attorney General does not have superior powers in litigation involving the interests of the State, as such powers would interfere with the Governor's exercise of his "Supreme Executive power" as "Chief Magistrate" and his constitutional prerogative cannot be unwound or preempted by another executive officer.

¶ 22    In analyzing the Governor's argument, the federal court stated:

> Governor Stitt's argument has some commonsense appeal, given the Oklahoma Constitution's use of the word "Supreme" to describe his executive power. On the other hand, that same document permits the state legislature to prescribe by law the duties of the Attorney General, which it has done by allowing him to "take and assume control" of the defense of the state's interests in litigation. And taken to its logical conclusion, Governor Stitt's position would mean that there is no sphere in which the Attorney General – an independently elected constitutional officer – may act to prosecute or defend the interests of the state against the wishes of the Governor. Whatever "Supreme

16

Executive power" means under the Oklahoma Constitution, the Court is skeptical that it sweeps that broadly. In any event, the parties have brought to the Court's attention no case in which any Oklahoma court has addressed whether, under the Oklahoma Constitution, the Attorney General has a sphere of responsibility in which he may act independently from the Governor, and if so, the contours of that sphere.

Memorandum Opinion and Order; Rec. at 1521.

## IV.   ANALYSIS

### A. The Attorney General Cannot Seize Control of the Federal Case Over the Objection of the Governor

¶ 23   At the outset, we acknowledge the gravity of the question presented for resolution by this Court and its obvious impact upon the highest offices in the executive branch of our state government. We endeavor here to answer this certified question in a manner specific to the present case, without broad pronouncements. We desire to provide an answer which will guide these two officials to perform their duties in a manner that minimizes unnecessary disruption and best supports the ongoing function of our government. With this in mind, we hold that the Governor may continue to use his chosen counsel to represent the State's interests in the present case.

¶ 24   While the Oklahoma Constitution does not explicitly describe the Governor's authority over the other executive branch offices, we believe that a hierarchy is clearly contemplated by the above-quoted language in Article VI, Section 2. Black's Law Dictionary defines "magistrate" as the "highest-ranking official in a

government, such as the king in a monarchy, the president in a republic, or the governor in a state. — Also termed *chief magistrate*; *first magistrate*." Black's Law Dictionary (12th ed. 2024) (emphasis in original). The common definition of "supreme" is "highest in rank or authority (the supreme commander), *especially*: in a position of unquestioned authority, dominance, or influence." Merriam-Webster, https://www.merriam-webster.com/dictionary/ supreme (last visited July 31, 2024) (emphasis in original). This Court has held that the use of the word "supreme" to modify the term "executive power" indicates that the people intended to vest the Governor with the full range of executive powers which were recognized when the Oklahoma Constitution was adopted. *Vandelay Ent., LLC v. Fallin*, 2014 OK 109, ¶ 12, 343 P.3d 1273, 1276.

¶ 25  Long ago, the Kansas Supreme Court provided the following analysis regarding the "supreme executive power" of the Governor:

> We do not find that the meaning of the phrase, "the supreme executive power" as contained in our Constitution and the Constitutions of many other states of this Union, has ever been precisely defined, although the matter is referred to in some decisions. Perhaps the term itself, taken in connection with the context, is sufficiently explicit. An executive department is created, consisting of a Governor and the other officers named, and he is designated as the one having the supreme executive power; that is, the highest in authority in that department.

*State ex rel. Stubbs v. Dawson*, 86 Kan. 180, 119 P. 360, 363 (1911) (holding Attorney General, if so directed by the Governor, was required to investigate and

18

prosecute a proceeding under state prohibitory liquor law). Oklahoma's Constitution indicates a similar structure, where the executive department is headed by the Governor, who possesses Supreme Executive power, and serves as the highest authority in that department.

¶ 26  Relevant to our analysis here, the Alabama Supreme Court recently faced a similar issue in *Riley v. Cornerstone Community Outreach, Inc.*, 57 So. 3d 704 (Ala. 2010). In *Riley*, the Alabama governor had established a task force on illegal gambling and appointed special prosecutors to enforce the state gambling laws. The underlying controversy involved the state's seizure and forfeiture action against certain electronic bingo gambling devices which had been confiscated. The Alabama attorney general eventually sought to assume direction and control of the ongoing action, discharge the governor's appointed special counsel, and dismiss the case. The *Riley* court rejected the attorney general's attempt to assume control, and held that the special prosecutors authorized by the governor "have the right to represent the State in this case and to see it through to completion." *Riley* at 741.

¶ 27  Alabama's constitution contains pertinent language very similar to Oklahoma's – providing that the "supreme executive power" of the state "shall be vested in a chief magistrate," who holds the power to take care that the laws are faithfully executed. Ala. Const. art. V, §§ 113, 120. After a detailed analysis

19

regarding the positions and responsibilities of the governor and the attorney general, the *Riley* court stated:

> Our decision today is consistent with the fundamental but simple notion that "there is a constitutional hierarchy within the executive branch and one office—the Governor—is at its top." The "supreme executive power" is more than a "mere verbal adornment" of the office of Governor.

*Id.* at 740 (quoting a brief filed by the Alabama attorney general in a different case).

¶ 28   In his concurring opinion in *Riley*, Alabama's Chief Justice provided a succinct summary:

> To me, the analysis can be condensed to a simple concept: Governor Riley is the governor. He is the leader of the executive branch. For our democratic form of government in our State to work as intended, *someone must have the final say. The Alabama Constitution makes it clear that that person, for the executive branch, is the governor.*

*Riley* at 741 (Cobb, C.J., concurring in part and concurring in the result) (emphasis added).   The same is true of the Oklahoma Constitution and the hierarchy which it creates, placing the Governor at the top of the executive branch.

¶ 29   This Court long ago determined that the Governor's authority to bring suit in the name of the State was based upon constitutional grounds, rather than statute:

> Thus it will be seen that the right of the Governor to bring suit in the name of the state, in all matters *publici juris*, is placed upon the high ground of his duty, under the Constitution of the state, to cause the laws to be faithfully executed, and not upon any statutory ground.

*State v. Huston*, 1908 OK 157, 97 P. 982, 985.

¶ 30   The seemingly broad statutory power granted to the Attorney General to direct and control litigation does not operate to override the Governor's constitutional role as Chief Magistrate or his authority to bring suit.  Although both the Governor and the Attorney General possess similar authority, the Governor is ultimately the leader of the executive branch.   Under the hierarchy contemplated in the Oklahoma Constitution, the Governor has the right to represent the State's interests in the present case.

¶ 31   In addition to the constitutional considerations, we turn to the basic rules of statutory construction to reconcile the relevant statutes.   This Court has long emphasized the importance of construing a statute consistent with the legislative intent, in a manner that considers the general scope and meaning of the entire act. We have stated:

> The general rules that apply in construing a statute are that the legislative intent must govern, and to arrive at the legislative intent, the entire act must be considered; a construction should be given the act which is reasonable and sensible, and should not be construed so that it would lead to an inconsistency between different parts as they bear upon each other.

*Lancaster v. State*, 1967 OK 84, ¶ 6, 426 P.2d 714, 716 (citations omitted).  Where a statute's meaning is uncertain, we will give it a reasonable construction which will avoid absurd consequences if this can be done without violating legislative intent.  *Wylie v. Chesser*, 2007 OK 81, ¶ 19, 173 P.3d 64, 71. *See also Udall v.*

21

*Udall,* 1980 OK 99, ¶ 11, 613 P.2d 742, 745 ("[i]n ascertaining legislative intent, the language of the entire Act should be construed with a reasonable and sensible construction"); *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n,* 1988 OK 117, ¶ 7, 764 P.2d 172, 179 ("[s]tatutory construction that would lead to an absurdity must be avoided and a rational construction should be given to a statute if the language fairly permits."). Any doubt as to the purpose or intent of a statute may be resolved by resorting to other statutes relating to the same subject matter. *Naylor v. Petusky,* 1992 OK 88, ¶ 4, 834 P.2d 439, 441. This Court will not limit consideration to one word or phrase but will consider the various provisions of the relevant legislative scheme to ascertain and give effect to the legislative intent and the public policy underlying the intent. *YDF, Inc. v. Schlumar, Inc.*, 2006 OK 32, ¶ 6, 136 P.3d 656, 658; *American Airlines, Inc. v. Oklahoma Tax Comm'n,* 2014 OK 95, §33, 341 P.3d, 56, 65.

¶ 32   In his quest to enter an appearance in the federal case, the Attorney General argues that, under Title 74, Section 18b, he has complete dominion over litigation involving the State, and although the Governor is authorized to employ counsel, the Attorney General has the power to take and assume control in any case involving the State's interests. We do not, however, read the Attorney General's statutory authority to extend so broadly. Although the Attorney General is given extensive authority to represent the State, he does not possess "complete dominion" over all

22

litigation involving the State or state offices. Oklahoma's statutory scheme clearly contemplates that many state entities, including the office of the Governor, will retain their own counsel and direct the strategy in such representation.[9] To properly ascertain legislative intent here, we must consider these statutory provisions in their entirety and to be reasonable and consistent as a whole.

¶ 33    While the final portion of Section 18b(A)(3) gives the Attorney General the power to "take and assume control" of litigation in which he appears, we see no indication in these provisions which would subordinate the Governor's express power to select his own counsel to that of the Attorney General. To the contrary, the Governor's authority to select and retain his own counsel is specifically expressed by two unambiguous statutes. 74 O.S. Supp. 2019, § 18c(A)(4)(a) and 74 O.S. 2011, § 6. Although there appears to be a conflict between these statutes and Section 18b, it is not an irreconcilable one. Our prior holdings require that "when there is a conflict between two statutes, one specific . . . and one general, the

---

[9] Several state entities are specifically exempted from the prohibition in section 18c against hiring counsel other than the Attorney General, including but not limited to the Corporation Commission, the Council on Law Enforcement Education and Training, the Oklahoma Tax Commission, the Commissioners of the Land Office, the State Board of Corrections, the Oklahoma Health Care Authority, the Department of Public Safety, the Oklahoma State Bureau of Narcotics, the Alcoholic Beverage Laws Enforcement Commission, and the Office of Management and Enterprise Services. 74 O.S. 2021 § 18c(A)(2). Like the Governor, many state offices also have separate statutory authority to hire their own counsel and to have those lawyers represent their offices in litigation. *See, e.g.*, 36 O.S. 2021 § 305(A) (Oklahoma Insurance Department); 37A O.S. 2021 § 1-108(B) (Alcoholic Beverage Laws Enforcement (ABLE) Commission); 40 O.S. 2021 § 5-202 (Oklahoma Employment Security Commission (OESC) civil enforcement actions); 43A O.S. 2021 § 2-206 (Oklahoma Department of Mental Health and Substance Abuse Services); 47 O.S. 2021 § 2-121 (Oklahoma Department of Public Safety (DPS)); 57 O.S. 2021 § 508.1 (Oklahoma Department of Corrections); 74 O.S. 2021 § 61.4 (Office of Management and Enterprise Services (OMES)); 74 O.S. 2021 § 150.21 (Oklahoma State Bureau of Investigation (OSBI)); 74 O.S. 2021 § 908(5) (Oklahoma Public Employees Retirement System (OPERS)); 74 O.S. 2021 § 2210 (Oklahoma Tourism and Recreation Department).

statute enacted for the purpose of dealing with the subject matter controls over the general statute." *Stitt v. Treat*, 2024 OK 21, ¶ 30, 546 P.3d 882, 893 (citing *Mutual Injury Trust Fund v. Coburn*, 2016 OK 120, ¶ 23, 386 P.3d 628, 636). Moreover, we will construe legislation "in such manner as to reconcile the different provisions, render them consistent and harmonious, and give intelligent effect to each." *South Tulsa Citizens Coalition, L.L.C. v. Arkansas River Bridge Auth.*, 2008 OK 4, ¶ 15, 176 P.3d 1217, 1221 (footnote omitted). While the pertinent statutes could have been drafted with terms that more precisely answer the specific question now before us, a common-sense reading of the various provisions leads us to conclude that the Legislature intended to empower both the Governor and the Attorney General to represent the State's interests in litigation.

¶ 34   To be clear, the broad authority of the Attorney General to represent the State is not nullified by the statutes which permit the Governor to select his own counsel. Rather, the Governor's specific authority runs concurrently with the general authority of the Attorney General. A statutory interpretation to the contrary would create an absurd and inconsistent result, ignoring those provisions which allow the Governor to select his own counsel, and denying the Governor the ability to act where he is clearly authorized to do so. In addition to the authority expressly given by statute, a state officer generally has such powers "as are necessary for the due and efficient exercise of the powers expressly granted, or such as may be fairly

24

implied from the statute granting the express powers." *Marley v. Cannon*, 1980 OK
147, ¶ 10, 618 P.2d 401, 405 (citations omitted). The Governor may opt for the
State's interests to be represented by counsel other than the Attorney General – this
is necessarily implied from his express authority to retain his own counsel in the
first place.

¶ 35  In their briefs, both parties discuss *State ex rel. Derryberry v. Kerr-McGee
Corporation*, 1973 OK 132, 516 P.2d 813. In *Derryberry*, a newly-elected Attorney
General challenged the authority of his predecessor to settle a case. This Court
stated that the "Attorney General's powers are as broad as the common law *unless
restricted or modified by statute*, and that his authority to dismiss, settle or
compromise the litigation in question, in the absence of fraud or collusion, is
undisputed." *Derryberry*, 1973 OK 132, ¶ 27, 516 P.2d at 819 (emphasis added).
In analyzing the issue, we made the following pronouncement, which both parties
emphasize in their respective arguments:

> The Attorney General, by statute, 74 O.S. 1971 § 18 is the Chief Law
> Officer of the State. *In the absence of explicit legislative or
> constitutional expression to the contrary*, he possesses *complete
> dominion over every litigation in which he properly appears* in the
> interest of the State, whether or not there is a relator or some other
> nominal party.

*Derryberry*, 1973 OK 132, ¶ 20, 516 P.2d at 818 (emphasis added). The Attorney
General invokes this quoted language in support of the proposition that he possesses

complete dominion over the underlying federal case and may make exclusive litigation decisions there on behalf of the State.

¶ 36   We disagree with the Attorney General's interpretation of *Derryberry*.  The above-quoted language recognizes that the Attorney General's dominion over a case can be overridden by "*explicit legislative or constitutional expression to the contrary.*"  *Derryberry,* 1973 OK 132, ¶ 20, 516 P.2d at 818 (emphasis added).  In the present case, such legislative and constitutional expressions to the contrary clearly exist.  As we outlined in detail above, the Governor has both specific legislative authority to select his own counsel as well as superior constitutional power as Chief Magistrate.    In the presence of the unambiguous legal pronouncements establishing the Governor's powers, the Attorney General may not assume control over the objection of the Governor – especially in a lawsuit involving the Governor's own actions, in which the Governor is named as a defendant, and where the Governor's selected counsel has been handling the representation since 2021.

¶ 37   We hold that the Attorney General's statutory authority to take and assume control of the State's defense is subordinate to the Governor's constitutionally-granted Supreme Executive power, and statutorily-granted authority which gives him the right to represent the State and choose his counsel in defense of the action. *See* Okla. Const. art. VI, § 2; 74 O.S. §§ 6, 18c(A)(4)(a). Should the Attorney

26

General enter an appearance on his own initiative, as authorized by Section 18b(A)(3), on his own behalf or on behalf of another State entity, he still may not take and assume control of the Governor's case where the Governor has employed his own counsel.

## B. Requests from the Speaker of the House and Senate Pro Tempore

¶ 38   The Attorney General asserts that both the House of Representatives and the Senate have requested that he assume control of the Governor's defense in the underlying case.  He points to two letters sent to him – one from the Speaker of the House and the other from the President Pro Tempore of the Senate – in support of his appearance in the federal case.[10]  In the first letter, dated July 18, 2023, President Pro Tempore of the Oklahoma State Senate, Greg Treat, objected to the Governor's defense of the gaming compacts at issue and asked the Attorney General to "consider this my formal request under § 18b(A)(3) on behalf of the Oklahoma State Senate to assume control of the defense of the state's interest" in the federal case.  Rec. at 1448.  In the second letter, dated July 21, 2023, Speaker of the Oklahoma House of Representatives, Charles McCall, indicated that he was responding to the Attorney General's request that the Legislature support his decision to intervene in the underlying case, and stated that "while we believed you

---

[10] The Attorney General attached these letters to his appearance filed with the federal court. Notice of Appearance, Exhibits 1 and 2; Rec. at 1447 - 1450.

27

could intervene in federal litigation without legislative approval, you have taken the position that you cannot and therefore need our approval." Rec. at 1450. Rep. McCall stated that the "House calls on you to act in the way you as Attorney General believe to be in the best interest of Oklahoma and if that means intervening then we call on you to act in accord with the letter you sent us and proceed on behalf of the state under 74 O.S. §18b(A)(3)." Rec. at 1450. Neither letter references a vote of either chamber or otherwise indicates a legislative resolution directing the Attorney General to appear in the case.

¶ 39   In response, the Governor furnished correspondence from another legislator, who challenged the support letters and pointed out the Legislature has approved no resolution regarding this case. Representative Tom Gann, in a letter to the Attorney General dated July 26, 2023, stated that Speaker McCall's letter was "not a reflection of the collective stance of the House of Representatives" and "certainly does not meet the legal requirements to represent 'The Legislature' as outlined in Title 74 18b(A)(C) [sic]."[11]

¶ 40   The Attorney General maintains that, by virtue of the support letters from the Speaker and the President Pro Tem, he has authority to appear and assume control of the case pursuant to *Derryberry*. We disagree.

---

[11] The Governor attached this letter to his motion to strike the Attorney General's appearance filed with the federal court. Defendant Governor Stitt's Motion to Strike or Otherwise Refuse to Recognize Notices of Appearance, Exhibit 1; Rec. at 1459.

¶ 41    The Attorney General has furnished no persuasive authority that these letters from individual legislators constitute a proper request from either chamber of the Legislature.[12]  We need not, however, answer that question here.  Whether or not these letters are adequate requests, we find no support in Title 74, Section 18b or elsewhere that the Legislature may direct the Attorney General to assume control and override the Governor's actions in the present case.  We decline to adopt an interpretation which raises such obvious separation-of-powers concerns.  The Governor has already exercised his constitutional and statutory authority, opting to retain counsel to represent the interests of the State in this case, where the Governor is a named defendant.  We conclude that the Legislature's ability to invoke Attorney General involvement does not extend so far as to supersede the Governor's express powers in this proceeding.

---

[12] The Attorney General references two internal legislative rules in support of the proposition that the Speaker of the House and the Senate President Pro Tempore both have authority to engage legal counsel on behalf of their respective bodies (Brief in Chief, n.3) – Oklahoma House Rule 1.6(a), which states in part that "[t]he Speaker may engage legal counsel on behalf of the House…" (Okla. House Rules, § 1.6 (59th Legis.), available at https://dgbf0g52sf9l0.cloudfront.net/House_Rules_59th_Oklahoma_Legislature_2023_2024_49464075f1.pdf); and Senate Rule 2.4(A), which states that "[t]he President Pro Tempore shall be the chief executive officer of the Senate and shall prescribe all policies not otherwise provided by law or by the rules." (Okla. Senate Rules, § 2.4 (59th Legis.), available at https://oksenate.gov/senate-rules#l-rule-2-4).  Neither of these rules squarely addresses the situation before us in the present case.  We need not decide here whether either rule authorizes these individuals, without a legislative resolution and vote, to direct the Attorney General to intervene and assume control in any case, especially one which does not directly involve either chamber of the Legislature.

### C. The Governor's Position in the Federal Lawsuit is Not Inconsistent with State Law

¶ 42    The Attorney General argues that he has the power to take over representation of the State in the underlying federal case, over the objection of the Governor, because the gaming compacts are not valid under Oklahoma law and therefore the Governor's efforts to defend them in federal court are inconsistent with state law. The underlying case, however, involves more than just state law, and presents issues specific to the federal IGRA and its procedural nuances.

¶ 43    Granted, whether or not the compacts received approval under the federal IGRA process, their invalidity under Oklahoma law has been decided by this Court in *Treat I* and *Treat II*. It is Oklahoma law that determines whether a tribal gaming compact is consistent with the IGRA. *Treat v. Stitt*, 2020 OK 64, ¶ 6, 473 P.3d 43, 45, as corrected (July 22, 2020) (*Treat 1*) (citing *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557 (10th Cir. 1997). Nonetheless, the very specific issue before the federal court goes one step further than that – it concerns the timing of the federal process and whether the Secretary of the Interior's approval of the compacts under the IGRA is affected by the subsequent state court holdings. The *Treat* cases did not answer that question, as they dealt only with state law. *Treat I* at ¶ 3, 473 P.3d at 44 (issue before the Court is limited to whether the Governor had the authority to bind the State with respect to the new tribal gaming compacts under state law); *Treat v. Stitt*, 2021 OK 3, ¶ 3, 481 P.3d 240, 241 (*Treat II*) (state law prohibited the

Governor from executing contracts with terms different from those in the Model Gaming Compact).

¶ 44    The IGRA is a federal statute, the interpretation of which presents a federal question suitable for determination by a federal court. *See Pueblo of Santa Ana, supra*, 104 F.3d at 1557 (10th Cir. 1997). It is within the purview of the federal court to articulate the impact, if any, which our *Treat I* and *Treat II* holdings have upon the approval of the compacts under the federal IGRA.

¶ 45    Governor Stitt, a named defendant in the federal case, does not contest this Court's findings in the *Treat I* and *Treat II* cases. Instead, his argument in the underlying case is that, as a matter of federal law, the after-the-fact state court decisions do not operate to unwind the federal approval process under the IGRA, and that any provisions which were subsequently determined to violate state law can be severed. *See* Memorandum of Law in Support of Defendant Governor J. Kevin Stitt's Rule 12(C) Motion, ECF # 154 and 154-1 at 18-21; Rec. at 1376-79. This Court need not attempt to predict how the federal court will rule on the merits, nor will we address questions regarding the interplay between the state and federal gaming laws which are not properly before us. That controversy should be allowed to play out in the D.C. District Court. We find no requirement in Oklahoma law that the Governor should abandon his arguments or his defense of the compacts in this regard.

31

**D. The Governor Has a Right to Counsel Who Will Represent His Interests**

¶ 46   The Attorney General seeks to enter his appearance in the federal case as counsel "for J. Kevin Stitt, in his official capacity as the Governor of the State of Oklahoma." Notice of Appearance of Oklahoma Attorney General; Rec. at 1444. Because the Governor is named as a defendant in his official capacity, the Attorney General argues that the State of Oklahoma, and not the Governor, is the real party in interest. Thus, the Attorney General claims that he is simply seeking to represent the State of Oklahoma's interests by taking and assuming control of the Governor's defense.

¶ 47   An individual's "official capacity" usually refers to a person's status as a legally recognized representative of an entity. *Pellegrino v. State ex rel. Cameron Univ. ex rel. Bd. of Regents of State*, 2003 OK 2, ¶ 5, 63 P.3d 535, 537 (citing *Braswell v. U.S.*, 487 U.S. 99, 107–108, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988)). Suit against a government officer in his or her official capacity is actually a suit against the entity that the officer represents and is an attempt to impose liability upon the governmental entity. *Speight v. Presley*, 2008 OK 99, ¶ 20, 203 P.3d 173, 179. *Pellegrino*, 2003 OK 2, ¶ 5, 63 P.3d 535, 537 (citing *McMillian v. Monroe County*, 520 U.S. 781, 785, n. 2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)).   In the federal-law context, the distinction is relevant for state sovereign immunity and

32

Eleventh Amendment considerations, where a suit seeking damages against a state official is generally no different than a suit against the state itself.[13]

¶ 48    To answer the question certified to this Court, we need not delve into the complexities of sovereign immunity of the State or its officials. The Plaintiff tribes named the Governor as a party defendant in the federal case, and neither party here has raised an argument challenging that. Although the State of Oklahoma is ultimately the real party in interest, we disagree that the Attorney General may seize control of the defense based upon that fact alone. The Governor, in his official capacity, is answerable on behalf of the State in the underlying matter, and we conclude that he possesses statutory and constitutional authority to represent the interests of the State of Oklahoma in that proceeding.

¶ 49    From this conclusion, it flows logically that the Governor's participation as a named defendant in the underlying case includes the choice of counsel who will represent the Governor's position. We have held that the "right to be represented by counsel ordinarily should include the right to make a choice, if timely exercised, of attorneys whose views are consonant with one's own or who at least will present

---

[13] We are aware of no Eleventh Amendment arguments raised by the Governor or the Attorney General in the present case. This is not surprising, as exceptions to the Eleventh Amendment are implicated to the extent that the Plaintiff tribes seek declaratory relief rather than monetary damages against the State. *See, e.g., Fowler v. Stitt*, 104 F.4th 770, 781–83 (10th Cir. 2024) (citations omitted) (holding that the Eleventh Amendment did not prohibit claims for injunctive and declaratory relief against Governor Stitt and other officials in their official capacities). We do note that, in contrast to the instant case, in *Fowler*, the Attorney General represented the Governor and other state defendants in the federal case.

33

the client's interests." *State ex rel. Howard v. Oklahoma Corp. Comm'n*, 1980 OK 96, ¶ 23, 614 P.2d 45, 50.

¶ 50  In *Howard*, the Corporation Commission argued it had the right to be represented by its own in-house counsel, and that the Attorney General, whose views were at variance with those of the Corporation Commission, should be excluded from appearing for it. This Court agreed – we reasoned that where an entity is subject to being brought into court, it has the right to defend pursuant to Article II, Sections 6 and 7 of the Oklahoma Constitution. Section 6 provides that "[t]he courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice." Okla. Const. art. II, § 6. Section 7 states "[n]o person shall be deprived of life, liberty, or property, without due process of law." Okla. Const. art. II, § 7.

¶ 51  We reasoned that, if an entity has the constitutional right to defend, then "surely it is entitled to the benefit of counsel." *Howard,* 1980 OK 96, ¶ 21, 614 P.2d at 49. Where the Corporation Commission may be brought into court, then the Oklahoma Constitution "under any concept of affording it any semblance of even-handed justice, must require that it be represented if it so desires, by counsel

34

who can and will ably and conscientiously express its views to the tribunal."
*Howard*, 1980 OK 96, ¶ 25, 614 P.2d at 50.

¶ 52   Having been brought into the underlying federal case as a named defendant,
the Governor may defend the claims – here, his retained counsel has represented
the State's interests as directed by the Governor since the case began in 2021.  As
in *Howard*, we conclude that the Governor, in defending the claims asserted against
the State, is entitled to be represented by an attorney whose views are consonant
with his own, or who at least will represent those views on his behalf in the federal
case.

## E. The Sphere of the Attorney General's Responsibility

¶ 53   Our holding today answers the certified question, which asks only if the
Attorney General may "take and assume control" of the "defense of the state's
interest" in the instant case.  We note that in the Memorandum Opinion and Order,
the federal court expresses it is skeptical that the Governor's executive power
sweeps so broadly as to prohibit the Attorney General from appearing for the State
against the Governor's wishes.  Memorandum Opinion and Order; Rec. at 1521.
The federal court then states that the parties have not referenced any Oklahoma case
which addresses whether the Attorney General has a sphere of responsibility in
which he may act independently from the Governor, and if so, the contours of that
sphere.  *Id.*

35

¶ 54    We clarify that our conclusion today does not nullify the Attorney General's authority to appear *ex officio* in the present case.    The following statement in *Howard* provides pertinent guidance:

> [I]nasmuch as the views of the Commission's attorneys are at variance with those of the Attorney General, and the Attorney General is authorized to represent the views of that segment of the people of the State who may agree with his views, we deem it appropriate for that official to appear in this case ex officio.

*Howard*, 1980 OK 96, ¶ 26, 614 P.2d at 50-51.

¶ 55    We agree with the federal court's skepticism about extending the Governor's power to unilaterally prevent the Attorney General from appearing in the case.  By virtue of his office, the Attorney General may act independently from the Governor, and represent such segment of the State's interest not represented by the Governor. We will not attempt to predict the manner in which the Attorney General's involvement will correspond or conflict with the Governor's defense, or potentially impact the progress of the case.  As with all complex litigation involving multiple parties with competing interests, judicial economy is balanced with other considerations of fairness and fundamental rights.  We defer to the federal court to determine that portion of the State's interests, if any, which warrants additional involvement by the Attorney General versus those views which are adequately represented by the other parties in the case.

36

## V.     CONCLUSION

¶ 56   The Governor possesses statutory and constitutional authority to represent the interests of the State of Oklahoma in the underlying case, and his participation includes the choice of counsel who will represent the Governor's position. The Attorney General is authorized to appear as discussed herein, but he may not take and assume control of the defense of the State's interests in the present case, over the objection of the Governor, where the Governor has lawfully retained his own counsel.

## CERTIFIED QUESTION ANSWERED

Rowe, C.J., Kuehn, V.C.J., Winchester, Edmondson, Combs **(by separate writing)**, Gurich, Darby, Kane, JJ., concur



EXHIBIT

**M**

THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA *ex rel.* OFFICE )
OF MANAGEMENT AND ENTERPRISE )
SERVICES, )
                 )
        *Plaintiff,* )
                 )
v.                 )
                 )    Case No. CJ-2024-619
KLEO, INC. d/b/a CLASSWALLET, )
                 )
        *Defendant.* )

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAR 1 0 2025

RICK WARREN
COURT CLERK
128_____

## ATTORNEY GENERAL'S MODIFIED ENTRY OF APPEARANCE

Attorney General Gentner Drummond hereby enters his modified entry of appearance in this

case *ex officio* on behalf of the State of Oklahoma. The Oklahoma Supreme Court recently made clear

that the Governor lacks the "power to unilaterally prevent the Attorney General from appearing in [a]

case. By virtue of his office, the Attorney General may act independently from the Governor, and

represent such segment of the State's interest not represented by the Governor." *Cherokee Nation v.*

*United States Dep't of the Interior,* 2025 OK 4, ¶ 55. As such, considering two independent audits have

already confirmed that the Governor and his administration are to blame for the misuse of public

funds in this case, the Attorney General intends to continue protecting the State's interests from such

misuse of public funds. To the extent the Governor follows through with service of the summons and

petition after the prior lawsuit went unserved, the Attorney General looks forward to deposing the

Governor and others in his administration over their misuse of taxpayer dollars.

1

GENTNER F. DRUMMOND, OBA #16645
*Attorney General*
GARRY M. GASKINS, II OBA #20212
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (fax)
Gentner.Drummond@oag.ok.gov

2

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Entry of Appearance was mailed this 10th of March, 2025, by depositing it in the U.S. Mail, postage prepaid, or by electronic mail to:

| | |
|---|---|
| Cheryl Plaxico<br>Plaxico Law Firm, PLLC<br>923 N. Robinson Ave., 5th Floor<br>Oklahoma City, OK 73102 | Benjamin Lepek<br>*General Counsel*<br>OFFICE OF GOVERNOR J. KEVIN STITT<br>2300 N. Lincoln Blvd., Ste. 212<br>Oklahoma City, OK 73105 |
| Remington D. Dean<br>*Deputy General Counsel*<br>Office of Governor J. Kevin Stitt<br>2300 N. Lincoln Blvd., Ste. 212<br>Oklahoma City, OK 73105 | |

Gentner F. Drummond





J. Kevin Stitt
Office of the Governor
State of Oklahoma

September 3, 2025

Hon. Gentner Drummond
Oklahoma Attorney General
OFFICE OF THE OKLAHOMA ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, OK 73105

Attorney General Drummond,

I'm writing to raise a serious ethical concern about actions you and Solicitor General Garry Gaskins have taken in several ongoing cases. I'm asking that both of you take immediate steps to correct what I believe are clear and repeated violations of the Oklahoma Rules of Professional Conduct in active litigation.

Over the past year, you and Mr. Gaskins have repeatedly used your official positions to actively work against the interests of other state officials and entities in litigation. At first, I was willing to chalk this up to miscommunication or policy disagreements. But it's become clear this is part of a larger pattern. In multiple cases, you've entered appearances on behalf of named state officials or agencies without telling them—and then taken legal positions directly opposed to their own. You've then continued your involvement after causing significant disruption and harm.

I've experienced this firsthand in *Cherokee Nation v. U.S. Dep't of Interior*, D.D.C. No. 20-cv-02167-TJK, where I was sued in my official capacity as Governor. I had long been represented by outside counsel in that case. Yet without notifying me, you and Mr. Gaskins filed court papers claiming to represent me, without any authority to do so. Even worse, you used those filings to attack my legal defenses and accuse me of violating my constitutional duties, all in documents filed ***under my name***. I had to ask the court to strike your appearance, and rather than stepping back, you doubled down and continued to argue against my position while still claiming to speak for me. That conduct forced an entirely avoidable proceeding before the Oklahoma Supreme Court—at significant cost to taxpayers—which ***unanimously*** rejected your position. *See Cherokee Nation v. U.S. Dep't of Interior*, 2025 OK 4, ¶ 48–52, 564 P.3d 58. The Court made clear that as the Governor and as a named defendant, I have the right to defend myself and select counsel of my choosing. Despite that ruling, you and Mr. Gaskins have continued inserting yourself into that case and interfering with my legal defense.

This pattern of unethical behavior did not stop with me. The same tactics were used against then-Commissioner Allie Friesen of the Department of Mental Health and Substance Abuse Services in *Briggs v. Friesen*, N.D. Okla. No. 23-cv-81-GKF. After she raised concerns about a proposed class action settlement, you ignored her objections, finalized the deal anyway, and submitted it to the court using her name—despite her repeated refusal to go along with it. When she tried to fire you and work with new counsel I appointed, you refused to step aside. Once again, you claimed that only "the State" was your client, not the official named in the lawsuit. And once again, the court rejected that argument—only after you'd already undermined the Department's legal position by *confessing liability in open court* and generating more needless legal costs.

This happened a third time in *Office of Management and Enterprise Services v. Kleo, Inc.*, Okla. Cnty. No. CJ-2024-619 *formerly filed as O'Connor v. Kleo, Inc.*, Okla. Cnty. No. CJ-2022-3757 ("ClassWallet case"), where OMES sought to pursue a claim after being wronged by a vendor. Without the agency's consent, you dismissed the case. Then, after OMES refiled it through new counsel, you and Mr. Gaskins jumped back in—again without authorization—and dismissed it again, this time *with prejudice*. You also publicly criticized the agency's position in court and in public statements, and then tried to remove OMES's independent lawyers, based on the argument that the Attorney General controls all litigation for the State. That argument, again, has been rejected by the Oklahoma Supreme Court, and yet you persist in seeking to stay in that case for the purpose of frustrating OMES' efforts to hold the vendor accountable to the taxpayers.

The pattern is consistent and troubling: you and Mr. Gaskins enter appearances in cases without authorization from your purported client, assert legal positions that contradict and undermine your supposed clients' interests, and then aggressively and publicly attack the very state officials and entities you claim to represent. These actions have had real consequences. Your conduct has weakened the state's legal position in these cases, caused unnecessary delays, wasted taxpayer dollars and public resources, and created legal uncertainty and drama for state agencies and officials trying to do their jobs.

This isn't a political dispute. It's a matter of legal ethics. No attorney, regardless of position, should claim to represent a client without that client's knowledge and consent, let alone work against the client in court. In fact, your high position in government with the law enforcement powers attendant to your office requires an even more scrupulous adherence to your ethical obligations as an attorney—*being Attorney General does not grant you license to run roughshod over legal ethics rules*. And once a court has rejected such an approach, no attorney should seek to remain in a case and obstruct his former client's legal positions. But that is exactly what you have done, over and over again.

2

In my view, these actions violate several provisions of the Oklahoma Rules of Professional Conduct, especially those requiring attorneys to follow the client's direction, avoid conflicts, withdraw when representation is no longer appropriate, and not engage in conduct that prejudices the administration of justice. And because these actions are ongoing, so are the violations.

Accordingly, consider this letter my formal demand that you, Mr. Gaskins, and any other attorneys from your office immediately cease the unethical pattern of conduct described in this letter. Specifically, you are demanded to:

1. Withdraw from any representation or attorney appearances in the cases mentioned above;
2. Cease all further involvement—direct or indirect—in those matters;
3. Provide written confirmation that you will not take further action in those cases;
4. Refrain from similar unethical conduct in other pending or future litigation involving state officials; and
5. Undergo legal ethics training relating to conflicts of interest and attorneys' duties to their clients, and make such training available to all attorneys in your office.

Thank you for your attention to this important matter.

Sincerely,

J. Kevin Stitt
Governor of the State of Oklahoma

CC: Garry M. Gaskins, II; Benjamin M. Lepak

3



**GENTNER DRUMMOND**
**ATTORNEY GENERAL**

September 9, 2025

*Via E-mail*

The Honorable J. Kevin Stitt
Governor of the State of Oklahoma
Kevin.Stitt@gov.ok.gov

Re:    **Your Improper Attempt to Interfere with Attorney General's Constitutional Duty to Represent the State of Oklahoma's Interests in Litigation.**

Dear Governor Stitt:

I am in receipt of your letter dated September 3, 2025, in which you attempt to improperly pressure an independent constitutional officer for declining to acquiesce to your failed leadership and policies. It is striking that someone lacking both legal training and a law license would presume to lecture the State's chief law officer on legal ethics. Perhaps that explains why your letter cites no specific ethical rule that you contend I have violated.

But before turning to the relevant precedent, it is necessary to address your misstatements of fact. Let me be clear: I have never represented you or other state officials without consent. In each of the three cases you cite, I made clear that my representation was limited to protecting the interests of the State, as reflected in my filings in those matters:

---

[^4]: To be clear, my client in this case is the real party in interest, the State of Oklahoma, not the Governor.

4

Accordingly, I enter my appearance as counsel in this case for the State of Oklahoma *ex rel.* Office of Management and Enterprise Services solely for the purpose of protecting the interests of the State of Oklahoma

Feb. 12, 2024.

GENTNER F. DRUMMOND, OBA #16645
*Attorney General*

First, the Attorney General's client is the State. Commissioner Friesen and Executive Director Moran were sued in this matter in their capacities as "Commissioner of the Oklahoma Department of Mental Health and Substance Abuse Services" and "Executive Director of the Oklahoma Forensic Center," which effectively makes this a suit against the State. *Will*, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . [a]s such, it is no different from a suit against the State itself."). As the Attorney

4

General represents the State, the rules of ethics and substantive state law treat him differently than a private sector attorney representing a private sector client.

As to the law, the sole authority you cite is *Cherokee Nation v. United States Dep't of the Interior*, 2025 OK 4. But in that case, the Oklahoma Supreme Court—who regulates the practice of law in this State—rejected any assertion that my conduct in representing the State's interests was somehow unethical. Specifically, in the briefing filed on your behalf with the Oklahoma Supreme Court, your attorneys contended that my participation in the underlying case violated Oklahoma Rule of Professional Conduct 1.2, asserting that I was not advancing your personal interests rather than the interests I determined were in the best interests of the State. They likewise claimed I had an unspecified conflict because I was independently representing the State of Oklahoma's interests, rather than your personal political agenda.

Nevertheless, the Oklahoma Supreme Court unanimously rejected those arguments and held that the Attorney General is "an independently elected constitutional officer." *Cherokee Nation*, 2025 OK 4, ¶ 22. "By virtue of his office, the Attorney General may act independently from the Governor and represent such segment of the State's interest not represented by the Governor." *Id.* at ¶ 55. More importantly, the Oklahoma Supreme Court declared that the **Governor cannot "unilaterally prevent the Attorney General from appearing in the case."** *Id.*

Although you have demonstrated a willingness to disregard binding precedent in the underlying *Cherokee Nation* case, my duty as a licensed attorney and independent constitutional officer—having sworn an oath to uphold the Oklahoma Constitution—is to adhere to the directives of the Oklahoma Supreme Court. The Court has expressly held that you cannot

2

"unilaterally prevent the Attorney General from appearing in the case." Consistent with that directive, I will continue to represent the interests of the State of Oklahoma in all matters for which I am authorized, regardless of whether doing so conflicts with your misguided leadership or failed policy choices.

Respectfully,

GENTNER DRUMMOND
*Attorney General*

3